UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

****************************************************

UNITED STATES OF AMERICA,                          *

                       Plaintiff,          *

            -v-   11-CR-264           *

JULIUS DeSIMONE, et al.,                           *

                   Defendants.         *

****************************************************

    Transcript of Summation regarding the above-referenced matter, held before the Honorable David N. Hurd, United States District Court Judge, at the Alexander Pirnie Federal Courthouse, 10 Broad Street, Utica, New York, on October 12, 2012.


APPEARANCES:       U.S. Department of Justice
                   601 D Street NW, Suite 8000
                   Washington, DC  20004
                        By:  Todd W. Gleason, Esq.

                   ANGELO MUSITANO, ESQ.
                   Attorney for Cross Nicastro
                   324 Pine Avenue
                   Niagara Falls, New York  14301

                   PAUL B. BRICKFIELD, ESQ.
                   Attorney for Dominick Mazza
                   70 Grand Avenue, Suite 102
                   River Edge, New Jersey  07661

                   ROBERT ZELLER, ESQ.
                   Attorney for Mazza & Sons, Inc.
                   25 East Salem Street
                   Hackensack, New Jersey  07601

U.S. v DeSIMONE - 11-CR-264

1          MR. GLEASON:  Thank you, your Honor.
2     Counsel, Your Honor.  Members of the jury, three great
3     forces rule the world:  stupidity, fear and greed.  And
4     that's a quote by Albert Einstein.  It was in a very
5     different context to be sure, but nowhere is it more
6     4applicable than this case.
7          Greed.  The beginning of this trial my
8     co-counsel, Mr. Donner, told you that this was a case
9     about pollution for profit and, indeed, that's what the
10    evidence has shown.  The evidence has shown specifically
11    that the defendants in this case and other conspirators
12    stood to make a great deal of money, both saving money by
13    bringing materials upstate and dumping them and by people
14    in upstate getting the fees for the dumping itself and
15    you can see this cost savings and those cost gains were
16    significant, particularly when you consider the tonnage
17    that was being dumped.
18         Likewise, the defendants stood to gain a
19    great deal here.  Defendant Nicastro, in particular, for
20    development of -- that he hoped to get from the property
21    once the property was filled in.  Last, with respect to
22    the Mazza defendant, specifically, found a cheap way to
23    get rid of contaminated materials that were continually
24    being rejected at Delaware Recycling Products, Inc.,
25    DRPI.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1            This was a consequence of that greed, an

2    open landfill, unpermitted in Upstate New York.

3    Thousands and thousands of pounds of pulverized

4    construction and demolition debris, much of which was

5    contaminated with asbestos.  The pictures speak a

6    thousand words here, folks.

7            Stupidity.  The way this crime was

8    committed was ridiculous and it's the greed, the

9    unbridled brazenness the defendant exhibited here which

10   is what got them caught.  There's no doubt about that,

11   folks.  They ran a landfill with no scales, no fence, no

12   liner, and none of the other features that a normal

13   landfill would have to protect human health and the

14   environment.

15            The defendants here cut corners, broke

16   regulations, violated statutes, all intended to protect

17   the community and they were so brazen about it, that

18   that's what got them caught.

19            The pictures of the landfill speak a

20   thousand words here, folks.  Especially when you compare

21   it to a normal landfill.  Even Mr. Mazza's solid waste

22   management facility, you saw that there were fences,

23   scales, site controls at that landfill.  None of that is

24   present here.

25            Likewise, it was the unbridled greed that

1    led them to get so desperate for more business that they

2    started soliciting other companies.  To that end, after

3    months of dumping they decided, okay, now we'll do a

4    permit but we'll do it via laser printer.  We won't

5    actually apply for a permit, we'll just make one

6    ourselves.  But they never even got that right, folks.

7    One of the copies says new backstakes, just to show you

8    how illegal this whole enterprise actually was.

9                    And fear.  Fear.  Once the defendants and

10   co-conspirator to this crime knew they were being

11   investigated, they started falsifying disposal reports,

12   lying to law enforcement, concealing documents, all in an

13   effort to cover their tracks, and that was all out of

14   fear, folks.

15                   Now, as Mr. Donner told you, my job now is

16   to go through each of the crimes charged against each of

17   the defendants, talk to you about the elements of those

18   crimes and how our proof satisfies those elements.  We

19   have the burden of proof here, ladies and gentlemen.

20   It's a burden that we readily accept and a burden which,

21   we submit, we more than exceeded here.

22                   Before I get to talking about the evidence

23   specifically, I do need to talk to you about the

24   conspiracy law generally and orient you as to these

25   different charges.  Now, at the end, Your Honor here will

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

U.S. v DeSIMONE - 11-CR-264

1  provide the jury instructions.  If there's anything I say

2  that conflicts with what he says with respect to law,

3  follow what Your Honor says.  Okay?  But I do need to

4  orient you here a little bit so you have a sense of where

5  we're going.

6              A conspiracy is not an elaborate,

7  complicated concept here, folks, and there's been some

8  confusion that's been infused with this trial.  So what a

9  conspiracy is, fundamentally, an agreement.  A conspiracy

10 is simply an agreement between one or more

11 co-conspirators and it's an agreement to commit a crime.

12 In this case the conspiracy we have charged has what's

13 called multiple prongs, multiple objects to violate -- a

14 conspiracy to violate specific laws.

15             The judge will provide instructions to you

16 at the end with respect to what the knowledge intent is

17 to each of those prongs.  Pay particular attention when

18 he talks about the prongs intended for the Clean Water

19 Act prong of the conspiracy relating to the wetlands.

20 It's a general intent standard.  He will explain what

21 that means but suffice it to say that ignorance of the

22 law is no defense.  That's something we can all

23 understand.  It needs to be an agreement to commit a

24 crime and one or more co-conspirator needs to commit an

25 overt act in furtherance of the conspiracy.  One or more

1    overt acts.  We have alleged dozens in the indictment.

2              The overt act doesn't need to be unlawful

3    in its own right, folks.  So a good analogy here is a

4    bank robbery conspiracy.  Three guys meet, they talk

5    about let's go rob a bank.  There's your agreement.  Then

6    they decide let's go out to Walmart and buy ski masks.

7    Buying the ski masks in its own right at Walmart, not

8    illegal, but it's an overt act in furtherance of that

9    conspiracy.  That's all that's required.  Okay?  It's all

10   that's required and the overt act doesn't need to be

11   committed by either of the gentlemen in this room, it can

12   be committed by any co-conspirator -- charged, uncharged,

13   indicted, unindicted, dead or alive.  There's a person in

14   the conspiracy that committed an overt act.  That's

15   enough.  You're in for a penny, you're in for a pound.

16             So I'd like to talk now about the evidence

17   specifically.  Now, we don't need to prove motive in this

18   case.  That's not an element of the conspiracy crime but

19   it's nonetheless instructive here so I am going to go

20   through it.

21             So let's start with defendant Cross

22   Nicastro.  His own grand jury testimony will be sprinkled

23   throughout my presentation.  His own words here are very

24   telling.  First, he said it's tough to farm a site due to

25   the soggy areas.  He wanted to get out of the farming

1    community.  He wanted to do something else.  His own
2    grand jury testimony spells that out.  Question.  You had
3    said it was somewhat difficult to farm that particular
4    property.  Isn't that right?  His answer, yes.  You said
5    it's soggy, that was in your -- during certain times of
6    the year; is that correct?  Yes.  Soggy areas, folks, and
7    the another way to say that is wetlands or jurisdictional
8    waters.  I wanted to make it more usable for development
9    and his own cousin, Chris Nicastro, said that he wanted
10   the site developed and filled to build a restaurant or
11   some other commercial enterprise.  That's what he wanted
12   to do with the property.  He was done farming.  Wasn't
13   making enough money.  It was too difficult.  He wanted to
14   do something else.
15               Motive for Mazza defendants.  Well, it's
16   financial, folks.  That's the first reason.  You heard
17   Patrick Stamato testify, an individual with a lot of
18   years in the solid waste business, said it usually costs
19   about a hundred dollars a ton in downstate and New
20   Jersey.  The deal Mr. Mazza struck, Mr. Decker to dump
21   with this property was $52 a ton.  It's cutting his cost
22   in half, folks.  Even if the materials were
23   uncontaminated.  But then that leads us to the other
24   motive.  He had a history of rejections at Delaware
25   Recycling Products, leading right up to the opening of

1    the Frankfort site.

2              Fulton Williams testified to that effect

3    and if you look at government's -- Government Exhibit

4    34-D, which I urge you to do in the jury room, given how

5    hard it's to read on screen, I would certainly urge you

6    to look at the pattern.  I'll talk about that.  I'll talk

7    about that more in a moment but that was one of the

8    motives.  He was having trouble getting rid of the

9    materials.  Even admitted that on the stand.  He was

10   having trouble getting rid of these materials.

11             Counsel for Mr. Mazza said at one point

12   during the trial, during cross-examination, the site was

13   open for abuse.  Exactly.  This site was open for abuse.

14   Dominick Mazza was having trouble getting rid of

15   materials in the summer of 2006.  The opportunity came

16   along, he saw a site open for abuse, he could get rid of

17   it cheap, you could get rid of it easy and that's what he

18   did.

19             Other conspirators to this crime are

20   listed on the screen.  I'm not going to go through all

21   those motives, but those are other conspirators, folks,

22   and those are their motives.  So let's get to the first

23   element here.  What exactly was the agreement?  You heard

24   a lot of cross-examination to the effect of, well, maybe

25   he didn't agree with that or this aspect of the

U.S. v DeSIMONE - 11-CR-264

1  conspiracy.  Maybe he didn't enter into an agreement with

2  respect to this or that.  Fundamentally, folks, the

3  overall agreement was to make and save money by illegally

4  dumping at the Frankfort site.  That's uniform to

5  everybody, including the two individuals in this room,

6  including the unindicted co-conspirators, even including

7  the other individuals listed on the previous screen.

8  Every one of them wanted to make or save money by

9  illegally dumping at the Frankfort site.  It's just that

10 simple.  They may have achieved those objectives through

11 different means, they may have gone about it differently

12 but that was the overall objective.

13            So, with respect to the conspiracy, let's

14 talk about who agreed with who.  There's been a lot of

15 testimony about, well, maybe he didn't agree with this

16 person, that person, maybe he didn't know this person or

17 that person.  Let's start with Cross Nicastro and, again,

18 his own grand jury testimony, his own mouth talks about

19 the fact that before the dumping got started several

20 individuals came up to visit the property and he

21 quibbled, no.  No, that's not true.  Nicholas Marangi

22 never visited that property.  Yes, he did.  But he said

23 several.  Don Torriero visited that property as well.

24 Yes.  Butch Luther visited that property.  Yes.  So that

25 would be several individuals visited the property then.

1    Correct?  Okay.

2              When Mr. Marangi visited the property you

3    discussed where the filling was to occur.  Didn't you?

4    The extent of the filling on the property.  Yes.  But

5    regardless, at some point in the spring of 2006 you and

6    an individual by the name of George Luther did discuss

7    filling that property; is that right?  His answer, right.

8    At some point you met with Mr. Luther and two gentlemen

9    by the name of Mr. Nicholas Marangi and Mr. Julius

10   DeSimone, correct?  Correct.  And you discussed filling

11   that property.  Yes.  Regardless, Mr. Marangi was the

12   person who was going to provide the filling material to

13   fill that property.  Yes.  Mr. Luther was going to run

14   the excavation and filling operations onsite; is that

15   right?  Yes.  In other words, George Luther was going to

16   run the bulldozer onsite to move the filling material

17   around.  Correct?  Yes.  And Mr. DeSimone would run the

18   finances and operations onsite; is that right?  Think

19   George Luther ran the finances.

20             How can he say to you, members of the

21   jury, that he wasn't involved in the agreement that led

22   to this filling?  How can they say that to you?  Listen

23   to his own testimony.  He was involved in the extent --

24   deciding the extent of the filling, how it was going to

25   be filled, the financial agreements.  He was in this up

1   to his neck and then they took it a step further and they

2   executed a general agreement for the filling of that

3   property.  That property which, as you can see here,

4   members of the jury, they discussed the extent of the

5   filling, it's set forth in the orange outline here.

6   That's the extent of the filling.

7          Julius DeSimone, George Luther, all these

8   people -- Special Agent Derx, Investigator Clarke all

9   talked about the extent of the filling.  That's what the

10  orange line is.  That's the area that they wanted filled.

11  So they executed an agreement to that effect.  Two

12  sections are of particular note here.  Three dollars a

13  ton for the dumping.  Nicholas Marangi was going to pay

14  them $3 a ton to dump there.

15          Section 5.  This is important, folks.

16  It's a five-year exclusive contract.  They were going to

17  dump there for five years and I believe there's an

18  extension in the contract for another three but let's

19  stick with five years for now.  That's what they did in

20  just two or three months.  And look who signed the

21  agreement.  Cross Nicastro, Butch Luther, Nicholas

22  Marangi.

23          We don't need to prove -- reduce a

24  conspiracy to a writing here, folks.  But here that's

25  what they did.  Now, the other point that I think needs

1    to be made here early on about what exactly the agreement

2    was, what it was they were agreeing to do here, if you

3    find it doesn't need to be -- you don't need to find

4    absolutely every single prong of the conspiracy or that

5    every aspect listed on the screen is illegal.  You need

6    to find one of them.  If the Frankfort site was projected

7    to fill wetland or waters, if it was within a hundred

8    feet of those waters, if it was within 50 feet of South

9    Side Road, if it was accepting unrecognizable pulverized

10   materials and contaminated materials or generating fees

11   or other consideration, making money off of dumping, it

12   was an illegal landfill and that agreement was a reduced

13   writing, reducing the agreement.

14                  If so -- moving on.  So the -- the -- it's

15   pretty clear from that that Cross Nicastro had an

16   agreement with all the individuals listed on that screen,

17   Nicholas Marangi, Don Torriero, Eagle Recycling, which is

18   Nick Marangi's and Don Torriero's company, George Luther,

19   Tannery Road, L.L.C., which is a company that George

20   Luther established.  Jon Deck.  I've got an asterisk

21   there, folks.

22                  Several of the defendants have argued

23   throughout this trial they didn't know or meet certain

24   individuals.  We don't need to prove that they all knew

25   each other.  Jon Deck was arranging for the transport of

1    the materials to this site.  Nicholas -- pardon me.

2    Cross Nicastro and Dominick Mazza didn't need to know him

3    necessarily to prove there was a conspiracy, and let me

4    give you an example.

5                    A drug conspiracy.  The people cutting the

6    cocaine and shipping it from Colombia to Florida don't

7    know the street-level dealers in Washington, D.C., or

8    Philadelphia but it's a drug distribution conspiracy

9    nonetheless.  They were all aware of the crime, they are

10   all aware of the illegality of it.

11                   Cross Nicastro's property was this -- was

12   the object of all the shipments that Jon Deck arranged.

13   And now let's talk about the -- who it was that the Mazza

14   defendants entered into an agreement with and let's start

15   with the very document upon which Dominick Mazza

16   allegedly relied in sending up these 21 loads of

17   contaminated material up to the Frankfort site.  Let's

18   start there.

19                   Look at all the names that are listed on

20   his copy of that permit.  Jon Deck, Don Torriero,

21   Nicholas Marangi, Tannery Road, L.L.C., and then Cross

22   Nicastro's address.  He was certainly aware of all of

23   these players.  They were all listed on the very document

24   he says that he read.  It's right there, folks.

25                   And this is a point where I'm going to

1    pause and talk to you a little bit about Dominick Mazza's

2    testimony yesterday.  He took the stand and he told you

3    he read this over quickly, and based on this and a quick

4    conversation with Jon Deck, he sent the shipments from

5    his facilities up to Frankfort, New York.

6              You need to ask yourself whether that was

7    credible testimony.  He's been with the solid waste

8    business which is heavily regulated, fairly rough

9    business for 20 or 30 years.  Decades I think is what he

10   said.  A guy he's never dealt with before shows up,

11   doesn't know Jon Deck from Adam, shows up, hands him this

12   piece of paper and says, go ahead, let's start shipping

13   stuff up.  He doesn't inquire with any of the other

14   people on this page, he gives it a quick speed-read.  He

15   starts shipping stuff up.

16             Is that really credible, members of the

17   jury?  He's got a whole family of people depending on

18   him, on this business, generating money which was one of

19   his priorities, and he just says, I'm going to send up

20   solid waste to someplace I've never seen based on one

21   five-minute conversation with Jon Deck.  Is that really

22   credible explanation?  Or is it more likely that he was

23   having trouble getting materials disposed of, he was

24   getting things rejected in Delaware, he saw an

25   opportunity and he took full advantage of it.  Is that

1  more likely, folks?

2          Nonetheless, you can see he was aware of

3  all these other players.  He certainly talked to Jon Deck

4  about the shipments.  Nicholas Marangi.  All these other

5  people were listed there and he was sending the materials

6  to Cross Nicastro's property.

7          Likewise, folks, follow the money here.

8  If you don't believe the contracts I've just shown you,

9  if you don't believe the permit letter, the fraud letter,

10 follow the money here and, again, let's start with Cross

11 Nicastro's own grand jury testimony.  It says that

12 Mr. DeSimone and Mr. Luther all got paid a fee for the

13 dumping that occurred at the farm for the site; is that

14 right?  His answer, yes.  There's a contract for the

15 filling of that site, isn't that right?  Yes, there is.

16 I won't go through all this.  I'm not going to read all

17 that to you but, regardless, he talks about the fact

18 there is an even money split here.

19          Money was gone.  One dollar Butch Luther,

20 one to DeSimone, one to Nicastro, there's a monetary

21 relationship, there's a flow of money happening here.

22 Likewise, look at the other money trails that are

23 involved in this case.  You've got Eagle, which is

24 Nicholas Marangi's company sending money to Jon Deck.

25 You've got Tannery Road, which is Butch Luther's company

U.S. v DeSIMONE - 11-CR-264

1    sending money to Cross Nicastro, and we have got

2    government exhibits that speaks to all this.  Look at all

3    these money trails, folks.  You've got Mazza paying Deck

4    and then Deck turning around and paying Tannery Road.

5    The money trails say a lot here, folks.

6                Now, I'm going to stop here and talk about

7    the members of this conspiracy.  As I alluded to already,

8    it's not just the two men and their companies here that

9    are conspirators.  Julius DeSimone and Butch Luther were

10   conspirators, that's why we put them on the stand.

11   Candidly, I think you saw what they testified to.  Julius

12   DeSimone, in particular.  It's a man who's pled guilty

13   to, among other things, making false statements.

14                Folks, you shouldn't believe a word that

15   man says -- not a word -- unless, of course, it's

16   corroborated by other evidence in this case and it is.  A

17   lot of what he said is corroborated by other evidence.

18   It's rare to find people who are in the throes of the

19   conspiracy without clean hands.  It's just not going to

20   happen.  We wanted to show you folks who was involved in

21   this conspiracy.  That's why we put them on the stand.

22                So let's talk about the conspiracy prongs

23   of the conspiracy.  The first one, Clean Water Act, to

24   fill waters of the United States.  As I mentioned, we had

25   multiple individuals talk about the extent of the filling

1   and that's the orange lines on that diagram.  Likewise,

2   you have Army Corps wetland, Joshua Frost, who went out

3   to the site, did research, and in his expert opinion

4   found three wetlands in the fill area.  Along with

5   multiple streams going right into the Mohawk River.

6   Federal waters, in his estimation.

7              And then you had the Mazza defendants put

8   up another expert who corroborated those findings.  Is

9   there any conclusion that he came to yesterday that

10  refuted what Josh Frost said?  The answer is no.  Now,

11  both those people said we don't -- both those -- Josh

12  Frost said he doesn't know whether the actually existing

13  fill pad -- whether that actually got into wetland or

14  not.  He couldn't -- he couldn't dig around the bottom of

15  the pile.  Likewise, the defendants' expert didn't dig

16  around at the bottom of the pile to find hydro soils but,

17  again, the conspiracy doesn't need to succeed, rather, it

18  needs to be an agreement to do an act the law forbids and

19  in this case, folks, the act is clear.  Even the

20  defendants' own expert, when I asked him the question if

21  they got into wetland, if they continue to fill west and

22  they got into that wetland, would that be a crime, he

23  said yes, it absolutely is.

24              That's all we need to show and, again,

25  this is a blow-up for your edification.  And the other

1    thing that's important to note here is, I've said,

2    there's a five-year contract.  That's what they filled in

3    three months.  Four hundred truckloads in three months by

4    the conspirators, 21 of which came from Mazda & Sons, 403

5    months.  How many truckloads are going to go up there in

6    60 months and the conspiracy was accelerating.

7            Asbestos wasn't going to go straight up.

8    We weren't going to have a fill pad that was the height

9    of a skyscraper, folks.  They had nowhere to go.  Cross

10   Nicastro's boundary ends at the eastern end of his

11   property.  Only places to go were west and north.  They

12   were going to get into those wetlands.  There's no doubt

13   about that.  And there's the particular section again of

14   the agreement that talks about being a five-year

15   exclusive.

16           And, again, let's go back to the defendant

17   Nicastro's own grand jury testimony.  I'll draw your

18   attention to the bottom.  Question 14, when Mr. Marangi

19   visited the property, you discussed where the fill was to

20   occur, didn't you?  The extent of the filling on the

21   property.  His answer was yes.  Defendant Cross Nicastro

22   knew exactly where the fill was going to go over the next

23   five years, that's what he wanted, that was the whole

24   point, was to get this property and these soggy areas

25   filled so he could build something.

1          Again, the other thing we need to show, it
2     was done without a permit or they didn't have an
3     intention to have a permit.  Well, look at the purported
4     permit they put in front of you.  The dumping began in
5     June 2006, the date on that agreement June or July, I
6     should say, the date on the agreement was September.
7     They have been dumping for months before that even
8     occurred to them, well, maybe we should get at least
9     something that looks like a permit and, again, go to the
10    grand jury testimony, folks.  You've been filling this
11    for 20 years.  His answer, probably.  Anything from New
12    York state?  No.  Anything from the federal government?
13    No.  EPA?  No.  Army Corps?  No.  There was no permit for
14    the filling.  There wasn't going to be a permit for the
15    filling.
16          Folks, the only reason they didn't get any
17    of these wetlands is because this is one of those
18    fortunate circumstances where law enforcement caught them
19    before they caused the damage.  Before they -- well,
20    before they caused damage to those wetlands depicted on
21    that diagram.  They certainly caused quite a bit of
22    damage with what they did.
23          The next part, the part 360 Regulations,
24    which are state regulations.  Specific, can't be, one, a
25    hundred feet of a wetland or water, water can't be within

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

U.S. v DeSIMONE - 11-CR-264

1   50 feet of a public right of way.  Folks, what does the

2   picture show you?  It's right on South Side Road.  You

3   can see the floodplain to the west, right beyond the hay

4   bales where it starts.  You've got the Mohawk River right

5   there.

6            Likewise, there have to be engineering

7   studies, groundwater controls, liners, all those types of

8   things and, again, defendant Nicastro admits none of that

9   was present on the site, not a one of them.  No liner, no

10  groundwater monitoring, no sampling.

11           So let's go to the knowledge aspect here.

12  Were the defendants' actually aware of the part 360

13  Regulations?  Go back to Mazza defendants' copy of their

14  letter.  The letter on which they allegedly relied for

15  what they claim was legal dumping or what they thought

16  was legal dumping.  But the letter they got goes right --

17  right there it says what they were doing was illegal in

18  its own right because, again, it wasn't a real good crime

19  they committed.  It wasn't a real smart plan they had, it

20  was the best they could do.  So, for instance, the copy

21  of the letter he was providing specifically says it has

22  to be recognizable, uncontaminated materials to include

23  concrete, concrete products and the like.  It also says

24  it can't be hazardous waste.

25           Well, folks, look at the pictures again.

1     There's household waste, there's lightbulbs, there's

2     shingles, there's transite siding.  None of which falls

3     within that exemption.  You've also got -- in this

4     picture you've got the lightbulbs and you've got

5     hazardous materials in there and I'll get to that in more

6     detail in a minute but I want to pause here and say,

7     yesterday Dominick Mazza again takes the stand and said,

8     those types of materials couldn't have come from my

9     facility, I had that great star screen system.

10              Well, he's also admitted he had a grinder

11    on site.  But he nonetheless stuck right with his story.

12    That material couldn't have come from my site.  My site

13    was only generating something that looked like sand.  Why

14    is it, then, that New Jersey Department of Environmental

15    Protection Inspector Brandi McPeak came in and testified

16    that's exactly what she saw at the Mazza facility, that

17    they were generating.  Why is that, folks?  She didn't

18    have a dog in this fight.  Rather, the only person that

19    said this material was clean, wonderful, that the star

20    screen system generated this material was Dominick Mazza.

21              Dominick Mazza stands the most to lose in

22    this case.  Again, the samples came up high for asbestos,

23    folks.  Again, his own letter, if you don't -- if you

24    don't buy that, folks, fine.  The letter specifically

25    says you can't be exchanging money for dumping.  That's

1    pretty much uncontested.  They were exchanging money for

2    the dumping and, likewise, don't forget with respect to

3    Mr. Nicastro.  Mr. Nicastro admitted to special agents

4    that when the first loads started coming in, he saw that

5    wasn't clean fill and, folks, he was there every day.  He

6    saw this stuff coming in every day.  I'll get to this in

7    much more detail.

8                    Another prong of the conspiracy is what we

9    call Superfund law.  It's -- the acronym is CERCLA and

10   it's -- it specifies that if you release one pound or

11   more of a hazardous substance within a 24-hour period,

12   not going to get into that in great detail, suffice to

13   say that's exhibit -- Government Exhibit 1 is more or

14   less dispositive on this point.

15                   There's also a prong of the conspiracy

16   known as client conspiracy but it's fraud, a conspiracy

17   to defraud the United States from enforcing its own laws

18   and here what you need to look to is the conspirators

19   provide copies of the fraud letter to investigators.

20   When the investigators started getting wind of this site,

21   some of the conspirators starting giving copies of this

22   letter saying the site is legal.  This site was legal.

23   Likewise, conspirators set up certain business entries to

24   conceal the fact that consideration was being paid, like

25   Tannery Road.

1          And last, but not least, this brings you

2     to a fairly big point.  The Frankfort site was omitted on

3     monthly solid waste disposal reports, submitted to New

4     Jersey Department of Environmental Protection by Dominick

5     Mazza and his company, thought the site was so legal.

6     Folks, if they thought it was perfectly on the up and up,

7     if they relied on Jon Deck, why isn't it on all the

8     documents that get reported to the environmental agency?

9     Why is that, folks?  The site is on the up and up, why

10    not just report it?  That's not what he did.

11          You look at the solid waste disposal

12    report for October 2006 that was submitted to New Jersey

13    DEP by the Mazza defendants.  You can look there, compare

14    it to what he was getting rejected in Delaware, he was

15    having asbestos rejections in Delaware.  Yet -- no.  No

16    asbestos problems.  Look at the right-hand column.

17    There's nothing there.  Folks, go through Government

18    Exhibit 45-E.  Go through the whole thing.  You won't see

19    45-E, the mention of Frankfort or Tannery Road in all

20    those pages.  Nowhere.  Yet, all those pages to report it

21    and he didn't.  However, this is the interesting point.

22    They call the witness yesterday from Monmouth County, not

23    environmental enforcement agency, a planning agency.

24    Planning agency that uses the same form, they asked for a

25    copy of the same form.  Why was that different, folks?

U.S. v DeSIMONE - 11-CR-264

1    Why?  Still didn't mention asbestos.  Didn't talk about

2    that.  But, Tannery Road somehow miraculously appears on

3    this document.

4              Folks, this is the revised document.  They

5    revised it.  That individual couldn't say definitely when

6    the Monmouth County report was filed.  Folks, it was

7    filed after Dominick Mazza knew he was under

8    investigation.  He's messing around with the paperwork.

9    There's no doubt about that, folks.  Likewise, this isn't

10   an isolated occurrence.  This isn't a mistake.  Take some

11   of the documents he's got internally.  Dominick Mazza was

12   on the stand yesterday, he talked about scale receipts,

13   something they generate for billing purposes.

14             Okay.  So let's look at one of those

15   loads, says -- Mazza talks about the facility I.D.,

16   tonnage, date, all that stuff and it lists Tannery Road,

17   L.L.C.  That's something he's going to use internally for

18   billing purposes.  Now, let's look at what's going to the

19   State of New Jersey for the same exact shipment.  Same

20   tonnages, same date, same facility, but now we have got

21   it going to Pennsylvania.  Why is that, folks?  Another

22   coincidence.  Likewise, there are other prongs of the

23   indictment that -- that involve other conspirators.  We

24   won't necessarily get into that because it's not really

25   something you need to consider given the defendants that

1    remain in this case.

2              Last, I mention to you overt acts.  You

3    need to have one overt act committed by any of the

4    co-conspirators.  Doesn't need to be one of the

5    conspirators in this room and we have listed dozens.

6    There are payments, there are transmissions of that fraud

7    letter, there are shipments, there's the dumping, there's

8    the acts of concealment after the fact.  All of those are

9    overt acts in furtherance of this conspiracy.

10             Again, the conspiracy didn't need to

11   succeed.  They didn't need to get into the wetlands for

12   us to make our burden on count one.  So that's the --

13   that is count one.  That's the facts and that's the

14   evidence that supports count one.  So I want you to see

15   the consequences of this conspiracy.  I'm sure you're

16   aware of it already but I think it's worth looking at.

17   You've got an illegal wetland fill in Upstate New York, a

18   fill pad that's approximately 30 feet thick of

19   contaminated construction and demolition debris wide open

20   to the public.  There was testimony that there were bike

21   tracks going back and forth across this property.  You've

22   got piles of contaminated material that had to be kept

23   and dealt with as a Superfund site.  You've got this type

24   of material scattered all throughout the site.  That's

25   the consequences, folks.

U.S. v DeSIMONE - 11-CR-264

1           So that moves me on to count two.  The

2    actual Superfund count, the substantive Superfund count.

3    Here's the elements we need to prove.  There needs to be

4    a release, a friable asbestos and a reportable quantity,

5    which in this case is one pound, and you have to know of

6    its release and fail to report it.  Those are the

7    elements, folks.  So let's go through them.  Regarding

8    the release, Owen Loffredo from Serveco testified that he

9    sent two trucks to pick up loads 1106 and 1109 at the

10   Mazza facility and he preloaded those loads.  So they

11   were loaded on the 10th and he dispatched them up to the

12   Frankfort site on the 11th.  So, no doubt about that.

13           It also bears mentioning these are the

14   manifests, okay?  1106 and 1109.  Folks, you heard that

15   over and over through this trial.  It's obviously an

16   important point.  Don't forget, Dominick Mazza during his

17   interview with federal agents, admitted to Special Agent

18   Derx that he arranged to have those two loads dumped at

19   Frankfort on the 11th.  He admitted that.  And you have

20   two law enforcement eyewitnesses, folks.  Two law

21   enforcement eyewitnesses.

22           You have Corey Schoonover and you have

23   Investigator David Clarke.  Two individuals that got

24   there during the early morning hours on October 11th and

25   saw three trucks, one of which was actively dumping that

1    belonged to Eagle Recycling.  There's no doubt about

2    that.  They also saw two other trucks onsite right near

3    piles three, four and five.  Those two trucks attempted

4    to leave.  They were sent right back into the facility

5    and they were directed to stand by the piles that they

6    just dumped.  Those individuals were photographed and the

7    documents were seized from them, the documents 1106 and

8    1109.

9              Okay?  Now, I know that the defendants

10   made a lot -- they tried to make a lot of hay out of the

11   fact that Owen Loffredo, when he found out trucks have

12   been stopped, that he sent them back to the Mazza

13   facility and told them to dump it on their floor.  He

14   didn't actually see that, that's what he directed his

15   drivers to do.  He didn't see it.  The two people that

16   did see it were, again, Corey Schoonover and David

17   Clarke.  David Clarke testified that when those trucks

18   left the site, they were empty.

19             Those trucks dumped those loads, folks.

20   This is direct evidence.  There is no doubt about that.

21   And there's cross-examination that the defendants have

22   gone into over and over and over again.  Maybe it's not

23   our pile, we don't think it was our piles, we dispute the

24   fact it's our piles.  Folks, they are, in essence -- what

25   they in essence want you to believe is that -- I'll give

1    you a metaphore or an analogy.

2              Two officers are dispatched because they

3    hear -- because gunshots are heard in an apartment.  They

4    go to the complex, they storm in through the door, they

5    see a man with a machine gun standing, smoking machine

6    gun standing over a woman that's been shot to pieces.

7    These defendants would have you believe that's not

8    sufficient evidence.  That's not good enough because the

9    officers didn't actually see the assailant pump the lead

10   into this woman.  That's what they want you to believe

11   here.

12             It's nonsense, folks.  Don't fall for

13   that.  You've got two law enforcement officers, law

14   enforcement officers took the stand and say under oath

15   those two trucks dumped those three piles or those two

16   piles that tested positive and those are the piles

17   specifically.  I wanted to show you that.

18             Now, regarding friable asbestos -- this is

19   an important point.  Special Agent Justus Derx testified

20   that he saw friable asbestos scattered throughout the

21   piles dumped by Mazza and Son, Inc.  He sampled that

22   material, he took photographs of that material.  He said

23   it wasn't isolated, it was sampling, that was

24   representative of material that was scattered throughout

25   these -- these loads dumped by the Mazza defendants.

U.S. v DeSIMONE - 11-CR-264

1    Piles three, four and five correspond to samples 14, 15
2    and 16.
3              Likewise, he went into such detail that he
4    photographed the samples in the bag and after they were
5    in the bag, because he didn't want to expose himself,
6    after they were in the bag he was able to reduce those
7    samples to powders by hand pressure.  He testified to
8    that.  There's the other sample, and then those samples
9    were sent off for analysis and came up positive for
10   regulated amounts of asbestos, folks.  That's
11   uncontested, those findings.
12             Likewise, we need to show there was one
13   pound.  Well, the total weight in the trucks was about
14   88,000 pounds, folks.  Special Agent Derx testified that
15   the material that -- that he sampled was commingled
16   throughout those piles and he said it was consistent with
17   the residential structure and he thought it was those
18   same residential structure because he saw pink paint on
19   the transite.  How many houses have pink paint?  He
20   testified further that in his expert opinion, an expert,
21   might I add, probably the foremost national expert on
22   asbestos-related crimes, testified that there was
23   probably 450 pounds of pure asbestos in such a small
24   house.  We need to prove one pound.
25             Last element is that the National Response

1    Center wasn't notified.  This is an easy one.  National

2    Response Center checked for their records and they didn't

3    find a thing.  To this day, folks, nobody has reported

4    the release of hazardous substances on this site.  Not

5    defendant Nicastro, not defendant Mazza, not Mazza &

6    Sons, Inc.

7                 Likewise, the knowledge here.  Again,

8    you've got to go right back to Delaware Recycling

9    Products.  This is why this is important, folks.

10   Delaware Recycling Products has been rejecting things

11   throughout the whole summer, the same types of materials,

12   from Mazza and Sons, Inc., from August to September 2006.

13   There is the history of the rejections.  Dominick Mazza

14   testified that he was aware of the problems, he had a

15   conversation with Fulton Williams, one of the individuals

16   who worked at DRPI.  He was well aware that they were

17   having this problem.  He was well aware of the rejections

18   and these are the -- these are the actual rejection

19   notices that go along with the summary.

20                 Again, look at the dates, look at the

21   party.  It's all going back to Mazza & Sons and the

22   conversation was, in essence, you are costing me money.

23   Dominick Mazza wasn't happy about this.  Well -- and you

24   heard what Dominick Mazza's attitude is here -- he said

25   it on the stand yesterday.  His attitude about this is,

1    he makes more money the more trucks that are coming

2    through his facility, and his workers are turning the

3    trucks around quickly so they can keep generating revenue

4    and he said something to the effect of I tried to follow

5    the law where practicable, when it's possible, to the

6    extent I can.  But not if it's going to get in the way of

7    generating revenue; he made that poignantly clear.  He

8    didn't take the stand, I'm sorry this happened, I'm

9    totally aware of it.  If I had known something about it,

10   I would have done something about it.  That's not what he

11   testified to.  That's not what he did.

12            Likewise, he knew he was having a problem

13   in his facility.  He said that yesterday.  They have

14   barrels around with asbestos here, things like that.  So

15   that's a -- that's the Superfund count.

16            With respect to the false statement,

17   that's another charge against Dominick Mazza and his

18   company.  What we need to prove that he made a knowingly

19   false statement that was material to the matter within

20   federal jurisdiction, in this case, EPA.  That's what we

21   need to prove.  Dominick Mazza stated -- let's go through

22   this.  He came up to Syracuse in 2008 and he said, among

23   other things, initially, I didn't have any rejections

24   whatsoever.  He was asked that question.  Did you have

25   any rejections anywhere else?  No.  No.  Then he was

1    confronted with the paperwork, and might I -- and let me

2    back up for a moment.

3              During that interview he was warned at

4    length don't lie, don't guess, don't answer if you don't

5    know.  If you want to talk to your attorney, do so.  If

6    you violate those rules, it's a felony.  He was warned at

7    length.  He was represented by counsel but, nonetheless,

8    he lied.  He said no, I had no rejections.  Then he was

9    confronted with the paperwork, the law enforcement agents

10   said he got upset, he got irate.  He admitted that he got

11   irate.  He said I believe that Mr. Benedict got him

12   irate, got him all flustered.

13             Well, members of the jury, he also lied to

14   you because he said that he -- he told them about these

15   rejections before he saw the paperwork.  That's just

16   simply not true, folks.  He lied to you about that.  But,

17   nonetheless, let's think about what he says if he gets

18   upset, and his reaction is, I'm going to start lying.  He

19   didn't get upset and leave the room.  He didn't get

20   upset, say you people are acting like idiots.  He didn't

21   do that.  His reaction apparently is when he's under

22   pressure, he lied.  That's what he did.

23             So we go through that episode, get caught

24   once, you can see and then he's asked again, we have gone

25   through this exercise once.  Do you have any stuff

1    rejected after October?  Again, no.  And he gets caught

2    again.  Documents get put in his face.  So those are the

3    documents and this time there are sample analyses that

4    corresponded to it.  Now he claims he wasn't aware of

5    these sample analyses but he certainly told you on the

6    stand he was aware of the rejections and aware that there

7    was an asbestos problem.

8              Folks, again, this -- he put it up here

9    just as a reference but Government Exhibit 34-D.  Look

10   through it.  An interesting pattern develops here.  We

11   have rejections going to Delaware Recyclable Products all

12   through August and then August 31 rejection stopped.  But

13   lo and behold, they pick up again on October 12th.  Why

14   is that date so relevant?  It's the day after the

15   Frankfort site got shut down.  He wasn't getting things

16   rejected in Delaware anymore because he had a new outlet

17   for the unacceptable waste he was generating.  And then

18   when that new outlet at the Frankfort site went away,

19   contaminated materials start going to Delaware.

20             Again, here's a point that a colleague of

21   mine in Chattanooga makes from time to time.  Dominick

22   Mazza quibbled with me when I said you were prepped about

23   this meeting by your attorney.  How much prepping do you

24   really need to tell the truth, folks?  How much coaching

25   do you need to tell the truth?  He was asked a simple

1    question.  Tell the truth to federal agents.  You don't

2    need a lot of prepping to do that.  So that brings us to

3    obstruction of justice and this one is Dominick Mazza's

4    company.  What we need to prove is that he provided an

5    altered document to a federal agency to influence an

6    investigation.  Here's what we don't need to prove, which

7    I anticipate the defendant will argue.  He actually

8    impeded the investigation or that it was a good plan to

9    impede or impair the investigation.  That it was likely

10   to succeed.  We don't need to prove that.  We absolutely

11   had documents 1106 and 1109.  We got them from Julius

12   DeSimone.

13              It's not really the point, folks.  The

14   point is, he secreted the documents in an effort to

15   shield himself from criminal liability.  Let's go to the

16   grand jury subpoena.  Likewise -- before I get to that,

17   before I get to that part of it, another point of

18   Dominick Mazza's testimony yesterday which was, frankly,

19   just incredible, was -- he runs a small family company,

20   only a few family members that work there and he's got

21   other people but he said it's got two shareholders, it's

22   a small company.

23              Who handles the documents?  Who actually

24   deals with these documents?  I don't know.  You don't

25   know?  Maybe the ladies in the scale house, maybe --

1    maybe they have it.  I'm not sure.  He's very evasive

2    about that.  He's still trying to distance himself from

3    these documents, folks.  He was issued a grand jury

4    subpoena.  Well -- let me back up for a second because

5    this count is against Mazza & Sons, Inc.  You have to

6    think about how do you establish knowledge on behalf of a

7    corporation?  It's a difficult question.  There's two

8    ways to do it.  An agent, like Dominick Mazza, can speak.

9    He can have the knowledge of the corporation.

10   Corporation is the sum total of its employee.

11             You can have, as the judge will instruct

12   you, collective corporate knowledge.  One individual can

13   know something, another individual can know that, but the

14   sum total of the employees' knowledge has to be applied

15   to the corporation.  That's important here.  Even if

16   Dominick Mazza is saying I didn't know where the

17   documents were, his company did.  So he's issued a grand

18   jury subpoena.

19             Folks, by that -- by way of background, a

20   grand jury subpoena is not a voluntary compliance

21   document.  It's not a request.  It's an enforceable order

22   to provide documents.  Here's what we asked for.  In

23   particular, look at the bottom circle there.  It's asking

24   for, among other things, all manifests, contacts,

25   shipping information or any other document involving or

U.S. v DeSIMONE - 11-CR-264

1   regarding any disposal at an open dump, sanitary landfill

2   or solid waste management facility in New York state.

3   That's what we asked for.  What we got was thousands of

4   waste origin manifests.  A lot of them not even going to

5   anyone in New York.  They papered us.  They buried us

6   with these things.  But the interesting thing to note

7   here is now he's saying, well, I'm not really sure we had

8   a whole lot of waste management in manifests.  The grand

9   jury response is chocked full of them.  They -- they were

10  maintaining these documents in the normal course of their

11  business.  This was routine procedure for them to do so

12  and it bears mentioning here, folks, some of those waste

13  origin manifests will be in the original exhibit binders.

14  They are original documents.  Those waste management

15  manifests -- you will notice, they are multiple copies.

16  So you have a white copy on top followed by three

17  carbons -- green, pink and yellow.  Green, pink and

18  yellow.

19          Agents on the site did confiscate two of

20  those copies.  Julius DeSimone had a third.  Dominick

21  Mazza was maintaining the fourth and he didn't produce

22  it.  It also bears mentioning that he did produce

23  manifest 1104; 1104 corresponded to the shipment that

24  tested negative for asbestos.  Another coincidence.  Look

25  at that.  Here's what we didn't get, folks.  Now, they

U.S. v DeSIMONE - 11-CR-264

1    may try to argue, well, there was other documents, that

2    you could have compared this document to that document

3    and then look over here at this document and go through

4    all these binders like they tried to do with Investigator

5    Clarke but Investigator Clarke testified the documents

6    they may try to put in front of you don't show the same

7    information, folks.  They secreted these documents for a

8    reason.

9              Those are the manifests that correspond

10   upon pile three and four, sample 14 and 15.  There is the

11   samples, again, in the bags, and they correspond to

12   positive hits for asbestos.  It's just that simple.

13   Moreover, you heard Ron Feehan, another New Jersey DEP

14   inspector, testify that he heard a Mazza & Sons, Inc.,

15   employee say something to the effect that Dominick Mazza

16   probably had the Frankfort files.

17             Now, he's got a file that he was keeping.

18   Why would he be keeping a file on his own, folks?  Why

19   not just keep it in the business with everything else?

20   Think about that.  But I would like to ask yourself this

21   question while you're thinking about that.  Have you

22   noticed how every mistake, every misunderstanding, every

23   typo, every omission, it's always to their benefit.  It's

24   always to Mazza & Son's benefit.  He doesn't accidentally

25   produce stuff that's inculpatory, that incriminates him.

U.S. v DeSIMONE - 11-CR-264

1   It's only the stuff he doesn't produce.  He doesn't

2   overproduce, he underproduces consistently.

3                  That's what he wants you to believe, that

4   all this is just a misunderstanding, a mistake, an error,

5   an omission.  That's a lot of coincidences, folks.

6   That's a lot of errors and omissions.  All of which are

7   going to that man's favor.

8                  Now, I've talked throughout the case about

9   -- addressed some of the anticipated defenses, folks,

10  throughout the presentation.  Some of them, frankly, that

11  have been raised through trial just defy categorization

12  so let me try to address some of them now.

13                 I believe on cross-examination of

14  Investigator Clarke counsel for Dominick Mazza said, Are

15  you aware that rejection only involved a couple pieces

16  of, like, a toilet seat.  Well, among other things,

17  that's directly contradicted by the testimony of Fulton

18  Williams who said that the rejections dealt with hundreds

19  of pounds of asbestos that was hidden in loads that were

20  coming into Delaware Recycling from Mazza & Sons, Inc.

21  Moreover, folks, since when do we have fireproof toilet

22  seats?  Why would a toilet seat be made out of asbestos

23  in the first place?  It's ridiculous, folks.

24                 There is also nearly half a day of

25  testimony about chains of custody.  Nearly half a day

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    went by on this and one of the points, I guess the only

2    point they really made is that the guy that carried the

3    -- didn't do the analysis was the guy that carried the

4    envelope from person A to person B didn't know how the

5    analyst actually reduced the sample to powder.  He argued

6    with him, did you use a hammer?  Did you -- that was the

7    extent of their cross-examination, folks.  It's very

8    simple.  Samples were taken in Delaware.  They went

9    through several people, they were analyzed, they came

10   back positive for asbestos.  That's all there is to it,

11   folks.  It's that simple.

12            And, again, Fulton Williams testified that

13   in his estimation, with all the training he had, it was

14   friable asbestos that they were seeing in these Mazza

15   loads.  This is -- this is a defense that's been made by

16   Cross Nicastro.  I haven't talked about him for a few

17   minutes because he's only charged in count one but he has

18   asserted a defense that he believed somebody else was

19   getting the permit for this filling or this dumping.

20   It's his property.  He needs the permit.  He needs to

21   make the application.  He needs to go to those agencies

22   and get that.  You can't rely on somebody else.  That's

23   the equivalent of me going and getting permits for

24   wetland filling or dumping on all your property and then

25   I can just trespass and dump all over your property.

U.S. v DeSIMONE - 11-CR-264

1   That's not how the system works, folks.

2                The site wasn't secured -- that's been an

3   argument made by Dominick Mazza -- between October and

4   November when the site was closed to when it was

5   sampling.  The site wasn't secured.  It's an open

6   landfill, folks.  It's not really a way to secure the

7   site.  They did block the ingress and egress.  They did

8   routine patrols.  Corey Schoonover, who did the patrols,

9   said the sites -- it didn't change.  Likewise, what's the

10  real insinuation here, that somebody drove into the site

11  with a bag of pulverized transite siding and didn't just

12  dump it on the ground in one spot but took the time to

13  sprinkle it through piles three and four.  It's not a

14  valid argument.  It's ridiculous.

15               Likewise, there is extensive

16  cross-examination by Special Agent Derx -- of Special

17  Agent Derx were, are a lot of times -- well, I won't

18  comment on that, but regardless, they made a couple

19  arguments.  One, that he didn't sample the whole pile.

20  That he didn't collect all the evidence.  He's supposed

21  to take 80,000 pounds out of these two piles and take

22  them back to his evidence locker at CID?  Is that what

23  they want him to do?  Likewise, they argue with him

24  because they didn't piece together all the pieces of

25  transite and rebuild the house.  I guess that's what they

1    were arguing.

2              Well, folks, he took a representative

3    sample of materials he was seeing littered throughout the

4    pile, that's what he did.  He followed NEIC procedures,

5    EPA procedures and his training and experience.  That's

6    what he did.

7              And, lastly, there's been some argument --

8    why were the Mazza defendants charged?  There were other

9    people that dumped to the site.  Well, they are ignoring

10   the fact that there's a conspiracy.  We named some of the

11   individuals who were involved in the conspiracy.  Some of

12   those individuals have died, some of them have been

13   unindicted, some have been indicted.  Some have -- some

14   are not in this room, there's no doubt about that, but

15   the judge will instruct you, you're not to be considering

16   who else was involved in rendering your decision and

17   verdict as to these other people except to the extent to

18   establish a conspiracy.

19             Likewise, folks, the decision of who to

20   charge rests with the United States.  Not the Mazza

21   defendants.  The judge will instruct you that's not

22   something you should be considering.  I'll tell you,

23   though, why the Mazza defendants were charged.  No other

24   defendant was caught dumping red-handed on the site other

25   than Eagle Recycling and Mazza & Sons, Inc.  Caught

1    dumping asbestos-contaminated materials.  No other

2    defendant hid documents, falsified reports and made false

3    statements to law enforcement.  That's why Dominick Mazza

4    and his company are on trial.  Don't lose sight of that.

5              Folks, what I am begging you to do,

6    please, please, please consider the evidence in this

7    case, not the excuses.  Consider the evidence that's in

8    front of you and the judge will instruct you extensively

9    on that.  Consider the arguments -- not the arguments,

10   not the insinuation.  Consider the evidence and it is

11   substantial in this case, ladies and gentlemen.  There is

12   a tremendous amount of evidence here, folks.

13             Now, the defendants are all going to give

14   closings as well and I will have a chance to talk to you

15   at the end and, again, I'm going to ask you while you're

16   considering all their arguments, ask yourself, are they

17   arguing evidence or are they arguing excuse?  Please do

18   that.  The evidence, in addition, leads to but one

19   conclusion here, folks.  Guilt beyond a reasonable doubt.

20   That's the verdict we are asking of you folks as against

21   all these defendants on all these charges.

22             The facts establish it, the law supports

23   it and justice demands it.  We thank you for the time you

24   put into this case and for your service.  Thank you.

25

                    Lisa L. Tennyson, CSR, RMR, FCRR
                  UNITED STATES DISTRICT COURT - NDNY

U.S. v DeSIMONE - 11-CR-264

1

2

3

**C E R T I F I C A T I O N**

4

5

6

7          I, Lisa L. Tennyson, RMR, CSR, CRR, Official

8   Court Reporter in and for the United States District

9   Court, Northern District of New York, hereby certify that

10  the foregoing 42 pages of testimony taken by me to be an

11  true excerpted computer-aided transcript to the best of

12  my ability.

13

14          _Lisa L. Tennyson_

15          Lisa L. Tennyson, R.M.R., C.S.R., C.R.R.

16

17

18

19

20

21

22

23

24

25

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY