UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK

**************************************************

UNITED STATES OF AMERICA,                          *

                              Plaintiff,           *

                    -v-    11-CR-264               *

JULIUS DeSIMONE, et al.,                           *

                              Defendants.          *

**************************************************


     Transcript of Rebuttal Summation regarding the

above-referenced matter, held before the Honorable David N.

Hurd, United States District Court Judge, at the Alexander

Pirnie Federal Courthouse, 10 Broad Street, Utica, New York,

on October 12, 2012.


APPEARANCES:    U.S. Department of Justice
                601 D Street NW, Suite 8000
                Washington, DC  20004
                     By:  Todd W. Gleason, Esq.

                ANGELO MUSITANO, ESQ.
                Attorney for Cross Nicastro
                324 Pine Avenue
                Niagara Falls, New York  14301

                PAUL B. BRICKFIELD, ESQ.
                Attorney for Dominick Mazza
                70 Grand Avenue, Suite 102
                River Edge, New Jersey  07661

                ROBERT ZELLER, ESQ.
                Attorney for Mazza & Sons, Inc.
                25 East Salem Street
                Hackensack, New Jersey  07601

U.S. v DeSimone, et al. - 11-CR-264

1          THE COURT:  Testimony rebuttal summation,
2     if any.
3          MR. GLEASON:  Please.  Well, folks, as I
4     warned you this morning, you heard the facts of the case
5     from the United States and you heard excuses from the
6     defendants.  Folks, over the last couple hours there have
7     been a lot of excuses and there's been a fair amount of
8     mud slinging at the prosecution and the investigation
9     team.
10         Well, folks, let me go through and submit
11    to you, ignore that.  Ignore all of it.  Concentrate on
12    the evidence.  The facts.  The testimony.  You'll get to
13    the right place.  There are a few arguments that were
14    made by various defense attorneys that I do feel I need
15    to address specifically, and I'm going to do my best to
16    go through that quickly.  I know you heard a lot of
17    people talking to you today.  You heard a lot of people
18    bloviating for quite awhile so I will just make this fast
19    if I can.
20         With respect to defendant Nicastro, well,
21    first thing I'm struck by is the length to which
22    defendant Nicastro is going to run away from his own
23    grand jury testimony.  It is his own sworn statements,
24    and they're sprinkled throughout here, they're addressed
25    in numerous places.  First, Nicastro's attorney said, did

1    anyone say that Cross Nicastro met with others?  Sure.

2    Cross Nicastro did in his grand jury testimony.  He

3    wasn't in every meeting.  Quote-unquote.  He didn't need

4    to be, folks.  He doesn't need to be at every single

5    meeting but he's admitted he was at multiple meetings.

6    Meetings where they discussed the extent of the filling,

7    the money that was going to be exchanged, how they were

8    going to go about doing that, the fact that they were

9    going to use a bulldozer.  All those things.

10              There's another question posed by counsel.

11   Why wasn't defendant Nicastro invited to a specific

12   meeting with Pat Stamato.  Again, he doesn't need to be

13   at every meeting to establish a conspiracy.  I'll submit

14   to you that the reason he wasn't at this particular

15   meeting was because, as Patrick testified, the minute Pat

16   Stamato saw him on site, he said to Cross Nicastro, "What

17   you are dumping there is illegal."  Mr. Nicastro got

18   upset and stormed off the site.  That's why he didn't go

19   to the meeting.

20              Now, defendant Nicastro's attorney also

21   talked to you extensively about the filling agreement.

22   Well, the essence of the agreement between the parties

23   here, folks -- again, I need to stress this to you.  It

24   was an agreement to illegally fill this site for the

25   exchange of money, to make and save money, and the

U.S. v DeSimone, et al. - 11-CR-264

1  filling agreement itself specified that and I've noticed

2  through the course of my career that when an attorney

3  knows that their clients are incriminated by a particular

4  document, they tend to try to adopt it as their own in

5  closing argument and that's exactly what Mr. Musitano did

6  here with Government Exhibit 18, which is the filling

7  agreement.  He stated, for instance, the filling

8  agreement didn't say they were dumping for five years,

9  even though it was a five-year term.  Folks, read the

10  contract.  The whole contract was about dumping on the

11  site.  It didn't deal with anything else.  What was the

12  five-year period relevant to if not the dumping?

13          Likewise, there was a lot of questions

14  about the analyticals.  Everybody keeps claiming that

15  there were these analyticals that were bouncing around

16  saying the site was clean.  The burden is obviously on

17  the United States and we readily accept that burden, but

18  the defense is free to put in whatever documents they

19  choose.  Where are the analyticals?  These famous

20  analyticals that everybody kept saying the materials were

21  clean?  They are not here.

22          Mr. Nicastro claims that he never knew

23  there was asbestos.  It's not what he's charged with

24  here, folks.  We have never submitted to you that

25  defendant Nicastro knew that Mazza was going to be

1    bringing up contaminated materials.  What he's charged

2    with here is a Clean Water Act conspiracy.

3              Now, when the judge gives you the jury

4    instructions, there's going to be a section on the

5    conspiracy and the knowledge intent.  There's a -- right

6    after he reads the knowledge intent, we anticipate there

7    will be a supplemental instruction dealing with knowledge

8    as it pertains to the Clean Water Act and Superfund

9    counts.  Read it carefully, folks.  Listen carefully.

10   Talks about ignorance of the law not being an excuse.

11             Doesn't matter if the clean -- if the fill

12   being dumped there is clean or not, folks.  Doesn't

13   matter if it was perfectly clean and if it looked great.

14   Fact of the matter is, both Josh Frost and the

15   defendants' own expert testified you still need an Army

16   Corps of Engineers permit to fill the site if you were

17   going to get into the wetlands.  That's the fact of the

18   matter, and that brings me to the next matter.

19             The wetlands.  There was an astonishing

20   comment made by both counsel with respect to their own

21   expert.  I'm not sure why and I believe the quote went

22   something like, there were no wetlands on the site

23   according to Mr. McMullen.  Apparently we weren't

24   listening to the same testimony.  Mr. McMullen testified

25   that the wetland boundary, documented by Joshua Frost,

U.S. v DeSimone, et al. - 11-CR-264

1    were accurate.  That's what he said.  And certainly,

2    likewise, defendant Nicastro's counselor said, did anyone

3    say Cross Nicastro agreed to fill wetlands?  No, he

4    agreed to fill the soggy areas on his property that

5    contained the wetlands.  You can call them whatever you

6    want.  They are wetlands.

7              Likewise, you heard counsel for the Mazza

8    defendant say we slimed the jury.  That's the direct

9    quote.  We slimed the jury.  We threw dirt in the jury

10   box because we said Josh Frost wasn't around, able to dig

11   around in the fill pile -- pad deposited by the

12   defendants.  Josh Frost testified he didn't want to

13   expose his people to the health risks associated with the

14   asbestos pile.  That's a fair comment.  He didn't

15   delineate this.  Nobody did a field delineation on the

16   actual fill pad.  They had to rely an aerial photography.

17   It doesn't matter.

18              The fact of the matter was, it was a

19   five-year exclusive contract.  They had nowhere else to

20   go.  Eastern boundary was already filled, all they could

21   do is go west.  Going west puts you into the wetland.  It

22   was a conspiracy to violate the Clean Water Act, not a

23   substantive Clean Water Act count.

24              Mr. Nicastro's attorney said, quote, it's

25   preposterous to think somebody would build a restaurant

U.S. v DeSimone, et al. - 11-CR-264

1   there.  Could we please have Government's Exhibit 5-U.

2   Submit to you, members of the jury, it's preposterous to

3   think that somebody's still farming in materials that

4   look like that.  That's absolutely ridiculous.  If he

5   wasn't, what was he using the site for?  Certainly wasn't

6   agricultural anymore.  Another excuse.  You can take that

7   down.

8                    Someone told defendant Nicastro there was

9   a permit.  George Luther said there was a permit.  Other

10  people told him there was a permit.  Well, folks, let me

11  tell you.  When I was in high school the excuses that got

12  my through was, I don't know, I don't care, somebody told

13  me I could do that.  That got me through high school

14  unscathed.  Well, that's the same excuse the defendant

15  Nicastro is using right now.  Somebody told me it was

16  okay.  Somebody told me it was fine.  Folks, it's his

17  property.  You're not going to go figure out if you have

18  a permit to fill your own property, you're going to rely

19  on words of somebody else?  It's just not a good excuse.

20                   He never got a copy of the fraud letter.

21  That's another excuse that defendant Nicastro's broken.

22  He didn't need it.  All he cared about was billing the

23  property and that's the portion of the conspiracy with

24  which he's charged.  He didn't need to be involved in

25  every aspect of the conspiracy and the dumping started

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

U.S. v DeSimone, et al. - 11-CR-264

1    well before there was even a semblance of a permit on the

2    property.  As a matter of fact, before there was a

3    permit, there were 310 loads dumped on that property,

4    totaling 13,000,690 pounds of waste before there was ever

5    even the notion of getting a permit.

6              Defendant Nicastro said he didn't make

7    much money.  Well, he didn't make much money because he

8    got caught early on in this criminal conspiracy.

9    Regardless, he contracted to make a lot of money.

10             You're also seeing another common theme

11   here.  Blaming other co-conspirators.  George Luther

12   dumped there.  So did Cross Nicastro.  According to his

13   grand jury testimony, he dumped at the site for more than

14   20 years.

15             Counsel said that George Luther has a

16   cooperation agreement.  That's actually not accurate at

17   all.  He has what's called a proffer agreement.  It's a

18   letter of immunity for one day and one day only.  He has

19   no other promises and it wasn't for his testimony here in

20   front of you.  He hasn't had any promises from the United

21   States for years.

22             They're claiming Butch Luther's attorney,

23   Longeretta -- we keep hearing that name.  Longeretta is

24   either completely inept or was complicit in this crime

25   and all the evidence appears to point to the latter.

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1   There's been unindicted co-conspirators.  Through the

2   course of this trial it sure looked like we have got

3   another unindicted co-conspirator.

4            There is a question posed.  Why would an

5   attorney prepare a contract for his brother-in-law that's

6   criminal?  Well, first -- this is very important,

7   folks -- they didn't execute that filling agreement until

8   the dumping was already underway.  They had already been

9   dumping on the site for -- by the time they executed that

10  contract.  Longeretta prepared that contract to give this

11  site the appearance of legitimacy and to maximize the

12  amount of money his -- his brother-in-law was going to

13  get.

14           Fair question that Mr. Musitano asked.

15  Why is Mr. Longaretta sending all these letters to DEP

16  after the fact?  Letters that are inconsistent with what

17  Luther testified to.  I submit to you that's because he

18  knows full well he's implicated in a Superfund site and

19  is trying to cover his own -- you know what he's trying

20  to cover.  Besides, this is hardly the first time, folks,

21  an attorney has been implicated in a crime.  Keep that in

22  mind.

23           Julius DeSimone.  Lot of attacks on Julius

24  DeSimone and don't believe a word Julius DeSimone says

25  unless it's corroborated by other evidence.  Mr. Musitano

1   mischaracterizes what the plea agreement actually said.

2   If the judge lets it go back into the jury room with you,

3   read it.  Read the plea agreement, what his objections

4   actually are and I'll leave it at that.

5                    Mr. Musitano says Mr. Nicastro has always

6   been -- been -- I think he used the word consistent.

7   He's never concealed anything.  I will agree he's

8   consistent.  He's been consistently guilty.  He wasn't

9   charged early on.  He wasn't charged early on because

10  there wasn't adequate evidence early on.  Things develop

11  over time in a criminal investigation.

12                   What changed was sampling of documents,

13  financial agreements, things like that that were gathered

14  over time.  That's why he got charged.  Mr. Musitano said

15  that Mr. Nicastro didn't conceal.  Well, he actually did

16  conceal because, as I mentioned, contract wasn't executed

17  until after the dumping started.  That was an attempt to

18  shroud this site with sort of a cover of legitimacy.

19                   Here's another fact for you; 98 loads were

20  dumped before that contract was even executed and it

21  totaled more -- it totalled close to 5 million pounds of

22  waste that were dumped before there was even an agreement

23  executed.  If he really thought this was a legal

24  landfill, why didn't he advertise it?  Why didn't he put

25  up a clean fill wanted sign?  Why didn't he do that?  He

1    didn't.

2              And, lastly, Mr. Nicastro denied knowledge

3    of illegality when he spoke to Mr. Derx.  I'm sure we can

4    all imagine Special Agent Derx's surprise when he heard

5    the target of the criminal investigation was claiming

6    that he didn't do it.  It's probably the first time in

7    his 15-year career that's ever happened.

8              Now, I will move to Mazza defendants and

9    I'm going to try to deal with this all at once, that way

10   speed things along.  First thing I'm going to ask you,

11   how many different people need to be lying for the Mazza

12   defendants theory to be correct?  Investigator Clarke

13   needs to be lying.  Agent Derx needs to be lying.  Fulton

14   Williams needs to be lying.  Officer Schoonover needs to

15   be lying.  Brandi McPeak needs to be lying.  New Jersey

16   Department of Environmental Protection Agency needs to be

17   lying.  Ron Feehan needs to be lying, according to them.

18   A lot of people that need to be lying.

19             They discussed asbestos at some length.

20   They discussed in terms of the CERCLA charge, the

21   Superfund count.  They say at one point there's no direct

22   evidence that Dominick put asbestos in the trucks.  Well,

23   that contradicts the testimony of Investigator Clarke,

24   Mr. Schoonover, Mr. Loffredo, Mr. Williams.

25   Mr. Williams, who had a direct conversation with

U.S. v DeSimone, et al. - 11-CR-264

1    Mr. Mazza, testified they were consistently seeing

2    hundreds of pounds in Mazza and Son's shipments.  They

3    likely said like DeSimone and -- and one point said Mazza

4    material looked excellent.  Well, that's in direct

5    contradiction to what Brandi McPeak said.  She said the

6    material was routinely generated through the horizontal

7    grinders and it was pulverized C and D materials.

8    Likewise, Derx and NEIC talks about the condition of the

9    materials.

10             Next, like to move on to their arguments

11   regarding the conspiracy.  They ask the question, What

12   evidence is there in this trial that there was an

13   agreement?  Well, again, look at Defendants' Exhibit 3-A.

14   Look at the money trails here, folks.  They all point to

15   an agreement between Deck, Torriero, Marangi, Mazza.

16   Defense Exhibit 3-A, Dominick Mazza thought this was so

17   legitimate, look at the address line.  The address line

18   is to his site in Florida.  He's a speed reader, he

19   glances over it quickly.  Look at the address line.  He

20   thought he was sending material to a site in Upstate

21   New York where the address line is actually to Florida.

22   How carefully did he need to read the document to realize

23   it was a site in Florida, allegedly on that particular

24   fraud permit?

25             Likewise, read the language of the fraud

1    letter.  It specifically prohibited what Mr. Mazza

2    shipped.  Likewise, Mr. Brickfield made a comment.  He

3    drew an analysis.  The bank robber analysis.  If a guy

4    walks into your office and he's wearing a ski mask and

5    he's got a machine gun and you stand up and you walk out

6    with him and you go to the bank, you joined the

7    conspiracy.  Well, folks, I submit to you that's exactly

8    what happened here.

9              Dominick Mazza was having trouble getting

10   rid of material at his -- at his Mazza and Son facility.

11   John Deck walked in, doesn't need to be a spoken

12   agreement, they both knew what was going on.  Mazza

13   shipped -- shipped the materials based on that.  He

14   walked out with a ski mask on.

15             Likewise, acts of concealment.  This was

16   really still legitimate, if he really thought this was on

17   the up and up, why are there so many acts of concealment?

18   Mr. Brickfield got up here and waved around a Monmouth

19   County filing.  You didn't see him waving around the New

20   Jersey DEP filing where the October report omits Tannery

21   Road.  You don't see him up here trying to explain away

22   the two tickets that I showed you in the closing this

23   morning and to Mr. Mazza yesterday.  The scale ticket

24   that lists Tannery Road and in the corresponding

25   environmental form that says it's Pennsylvania.  Didn't

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    explain that.

2              Mr. Brickfield said it doesn't make any

3    sense that you would conspire with people you don't even

4    know.  But apparently Mr. Mazza will contract with and

5    just ship materials to somebody he doesn't even know,

6    somebody he doesn't research?  Likewise, we're now

7    hearing a lot of argument now that -- where's John Deck.

8    I'm going to -- let me -- I'm going to limit my next

9    comment to the Mazza defendants.

10             Ladies and gentlemen, in this case, as the

11   judge has told you, United States has this sole burden of

12   proof, which burden we gladly accept.  We have done that

13   consistently.  But just because the United States has a

14   burden doesn't mean the defendants do not have the

15   ability to call a witness if they wish, despite having no

16   burden to do so.  If they thought John Deck was going to

17   help their case that much, they could have called him to

18   testify themselves.

19             Likewise, out of all of Mazza & Sons

20   employees, only Dominick Mazza himself testified about

21   the type and size of the waste that was produced.  If it

22   was true that Mazza & Sons produced only waste

23   inconsistent with what they found dumped illegally at

24   Frankfort, New York, they could have easily called other

25   witnesses to say so.  Why didn't that happen?

U.S. v DeSimone, et al. - 11-CR-264

1          Bring you the obstruction.  I think it was

2   Mr. Zeller said why didn't they bring in the whole

3   collection of these thousands of manifests?  Well, you

4   heard the investigator -- you heard the testimony of

5   Investigator Clarke who spent days going through these

6   manifests.  They still want us to bring thousands and

7   thousands of pages to you of irrelevant documents, stuff

8   that we readily admit is completely irrelevant.

9          They also said that while the government

10  had forms 1106 and 1109 -- listen carefully to Judge Hurd

11  when he explains what the requirements are for

12  obstruction.  Didn't need to be a successful obstruction.

13  Didn't even need to be a -- there didn't even need to be

14  a likelihood of success.  Just because it was a poor plan

15  to obstruct doesn't mean it wasn't an obstruction.

16          Likewise, the investigator took two

17  copies, DeSimone had another.  There's one more left.  At

18  least one more because the copy they have was a

19  photocopy, that says you -- that Mazza and Son

20  Corporation was making photocopies of those documents as

21  well.

22          They asked a question during their

23  closing.  Why do you hide something when you've spoken to

24  the feds?  That was a quote I believe from Mr. Zeller or

25  Mr. Brickfield.  Well, you hide something when you spoke

Lisa L. Tennyson, CSR, RMR, FCRR
UNITED STATES DISTRICT COURT - NDNY

1    to the feds because you need to substantiate the lies

2    that you told the feds.  Mr. Zeller commented New Jersey

3    DEP can come on the facility whenever they want and I'm

4    not sure what he means by that.  Apparently it's New

5    Jersey's DEP's fault they didn't go to Mazza & Sons to

6    check and start comparing the documents that were already

7    provided against what's in the Mazza files?  That's what

8    they're asking?  They can't just rely on what Mazza &

9    Sons is transmitting to them?

10                 Make a comment that the government didn't

11   tell you about South Plainfield.  Well, the forms that

12   correspond to South Plainfield are in a government

13   exhibit.  We did bring that to you.  We did make you

14   aware of it.  Those documents were also turned over to

15   the defendants in the course of reciprocal discovery.

16   This wasn't a surprise.

17                 As to the Superfund count, they pose a

18   question.  Can you say anything or can you say without

19   any hesitation that those two piles belong to Mazza &

20   Sons, Inc.?  I'm going to go through this one more

21   painful time.  You have two law enforcement eyewitnesses.

22   You've got the moments after the Mazza & Sons shipments

23   were dumped, directed the drivers to go stand by the

24   piles, took a picture, checked the back of the cabs to

25   see if they were empty, took the manifests 1106 and 1109,

1   and Mazza is still in here saying those aren't our piles.

2   That's incredible, folks.  That is absolutely incredible.

3   And, likewise, lest we forget, Dominick Mazza told

4   federal agents in October 2008 he admitted that he sent

5   two shipments up there that morning.

6            Make a comment that Mazza doesn't grind

7   his construction/demolition debris and that there's no

8   grinders.  Quite contrary.  There's a photograph of one

9   of those horizontal grinders.  You've got a New Jersey

10  DEP inspector talking about the fact that every time she

11  went there, they were using grinders to put through

12  things other than wood.

13            Sampling.  They make a quote, the

14  government wants you to infer that the whole load was

15  contaminated based on one sample.  We're not asking you

16  to do that at all, folks.  We don't need to prove the

17  whole load was contaminated or the whole load wasn't.  We

18  need to prove one pound was asbestos.  Just one out of

19  the 80,000-plus pounds that were in those two piles.

20  Sampling is more than sufficient complied with any NEIC

21  standards, it's perfectly out of here.

22            They made a comment that Derx got seven

23  samples wrong.  This isn't a quiz, folks.  This isn't a

24  test.  Special Agent Derx testified that when you go to a

25  site, you're trying to characterize the materials, you

1  take -- you want to know what you're dealing with.  He

2  didn't know what he was dealing with with a lot of those

3  samples, so he collected representative samples.  This

4  isn't a test.  This isn't a failure of Special Agent

5  Derx.  It was a -- it was actually a very thorough job to

6  make sure they were getting samples of representative

7  materials.

8           Likewise, their own witness, Jack Gall,

9  said that transite becomes friable when it's put through

10 grinders.  That's the evidence.  They pose a question.

11 What evidence was there that Dominick Mazza knowingly

12 shipped asbestos?  Well, again, folks, we have been over

13 this, Delaware Recycling rejections, they go to that.

14 Fulton William said there were other samples that tested

15 positive.  Dominick Mazza was well aware of it and they

16 are still trying to minimize it.  They said -- during

17 their summation they said, quote, despite their best

18 efforts, occasionally they get a few pieces.  Well, why

19 is it Fulton Williams that's telling you they are finding

20 hundreds of pounds of suspect material that he believes

21 was friable at the bottom of shipments?

22           False statements.  We will go to that.

23 You heard the story change again.  During the testimony

24 of Dominick Mazza yesterday he claimed no, no, no.  I

25 recanted and I told the investigator they were Delaware

U.S. v DeSimone, et al. - 11-CR-264

1    rejections in August before they showed me the documents

2    and now you heard Mr. Brickfield back up and say,

3    actually, they did show him the documents first.  That

4    story keeps changing, folks.  Continues to change.

5                    They also said Mr. Mazza is a, quote, very

6    busy man.  I'm not sure what that means, folks.  He's too

7    busy to tell the truth?  He's too busy to be accurate

8    when he's talking to federal agents?  He admitted at the

9    meeting with federal agents that he was aware of the

10   November Delaware rejections.  They didn't ask him about

11   the sample.  They didn't say, "Are you aware of sampling

12   coming back?"  They asked him specifically about if he

13   had any loads rejected after October 2006 and he said no.

14                   And you heard Mr. Brickfield say something

15   completely inconsistent with the evidence.  You heard him

16   say that Dominick said he didn't know, he wasn't sure.

17   That's not what he said.  He made a definitive no, I

18   didn't have any rejections after October 2006.

19                   Lastly, I'm going to leave you with --

20   during his testimony yesterday Dominick Mazza had no

21   explanation whatsoever for why it is documents going

22   under the environmental agency omitted the Frankfort

23   shipments.  He didn't talk about that at all.  He ran

24   away from that, folks.  He didn't want to talk about that

25   with you at all.  The Monmouth County forms show Tannery

1   Road but again, folks, as I told you this morning,

2   Monmouth County forms say revised.  They have no idea

3   when they were that was filed and it didn't go to an

4   environmental agency.  Why isn't it the same exact

5   documents, folks?  Why are they revising it?  And that

6   comes to the common theme depending on what form, what

7   recipient, what they're doing about, documents change and

8   substance of what's reported to changes.  That's the M.O.

9   here.

10          So here's the takeaways.  Please, please,

11  please disregard the excuses, the banter between the

12  attorneys, the arguments.  Focus on the evidence.  The

13  fundamental agreement, folks, is to illegally dump for

14  money and the landfill was illegal if it accepted clean

15  fill in wetlands, if it had contained contaminated

16  materials, if it was within 50 feet of South Side Road,

17  if it was within a hundred feet of waterways, and last

18  but not least, if there was any money being exchanged for

19  the dumping, that was an illegal landfill and there was

20  an agreement to make an illegal landfill.  If any one of

21  those are true, it was an illegal landfill; doesn't need

22  to be all of them.  Can be just one of those things.

23  That's what the evidence showed in this case and,

24  frankly, that's all that matters.

25          Defendants say this is important case.

1   They said it over and over.  It's very important to

2   Dominick Mazza and his family and they're right.  This is

3   an important case, but it is also important to this

4   community.  A community that now has to deal with a

5   Superfund site in its backyard.  The judge will instruct

6   you to consider the facts and the law.  He's right.

7   Consider only the facts and the law and, folks, you do

8   that here, there's only one conclusion to be reached and

9   that's guilt beyond a reasonable doubt as to all counts

10   and against all defendants.  Thank you, folks.

11                    * * * * * * * * * *

12

13

14              C E R T I F I C A T I O N

15

16   I, Lisa L. Tennyson, RMR, CSR, CRR, Official Court

17   Reporter in and for the United States District Court,

18   Northern District of New York, hereby certify that the

19   foregoing 20 pages taken by me to be a true excerpt to

20   the best of my ability.

21

22              _____ *Lisa L. Tennyson* _____

23              Lisa L. Tennyson, R.M.R., C.S.R., C.R.R.

24

25

                Lisa L. Tennyson, CSR, RMR, FCRR
                UNITED STATES DISTRICT COURT - NDNY