UNITED STATES  DISTRICT COURT

NORTHERN DISTRICT OF NEW YORK
****************************************************
UNITED STATES OF AMERICA,


vs.                        11-CR-264


CROSS NICASTRO;
DOMINICK MAZZA;
MAZZA & SONS, INC.,

                        Defendants
****************************************************

          Transcript of the Trial Proceedings held on

October 11, 2012, before the HONORABLE DAVID N. HURD, at

the United States Federal Courthouse, 10 Broad Street,

Utica, New York, before Nancy L. Freddoso, Registered

Professional Reporter and Notary Public in and for the

State of New York.

                A P P E A R A N C E S

Government:        UNITED STATES ATTORNEY'S OFFICE
                   ROOM 900, HANLEY FEDERAL BLDG.
                   100 SOUTH CLINTON STREET
                   SYRACUSE, NEW YORK  13261-7198
             BY:   CRAIG A. BENEDICT, AUSA

                   TODD W. GLEASON, ESQUIRE
                   United States Department of Justice

                   GARY N. DONNER, ESQUIRE
                   United States Department of Justice


                NANCY L. FREDDOSO, R.P.R.
             Official United States Court Reporter
                  10 Broad Street, Room 316
                    Utica, New York 13501
                       (315) 793-8114

```
 1                    A P P E A R A N C E S

 2   For Defendant Cross Nicastro:

 3                         OFFICE OF ANGELO MUSITANO
                           ATTORNEY AT LAW
 4                         324 PINE AVENUE
                           NIAGARA FALLS, NEW YORK 14301
 5                    BY:  ANGELO MUSITANO, ESQUIRE

 6

 7

 8
     For Defendant Dominick Mazza:
 9
                           BRICKFIELD & DONAHUE
10                         ATTORNEYS AT LAW
                           70 GRAND AVENUE, SUITE 102
11                         RIVER EDGE, NEW JERSEY 07661
                      BY:  PAUL B. BRICKFIELD, ESQUIRE
12

13

14

15   For Defendant Mazza & Sons, Inc.:

16                         REM ZELLER LAW GROUP
                           ATTORNEYS AT LAW
17                         25 EAST SALEM STREET
                           HACKENSACK, NEW JERSEY 07601
18                    BY:  ROBERT ZELLER, ESQUIRE
                           MITCHELL FAGEN, ESQUIRE
19

20

21

22

23

24

25

26
```

1174

1    I N D E X   O F   P R O C E E D I N G S

2                                              PAGE

3    Defendant Nicastro Rests                 1178

4         WITNESS                             PAGE

5    LAWRENCE J. ZAAYENGA

6      Direct Examination By Mr. Brickfield:   1178

7      Cross-Examination By Mr. Donner:        1184

8      Redirect Examination By Mr. Brickfield: 1201

9      Recross Examination By Mr. Donner:      1203

10   JOSEPH MCMULLEN

11     Direct Examination By Mr. Brickfield:   1204

12     Cross-Examination By Mr. Gleason:       1221

13     Redirect Examination By Mr. Brickfield: 1235

14   JOHN C. GALL

15     Direct Examination By Mr. Brickfield:   1240

16     Cross-Examination By Mr. Benedict:      1251

17     Redirect Examination By Mr. Brickfield: 1263

18     Recross Examination By Mr. Benedict:    1265

19                                             PAGE

20   Motions                                  1266

21        WITNESS                             PAGE

22   DANIEL WHITE

23     Direct Examination By Mr. Brickfield:   1269

24     Cross-Examination By Mr. Donner:        1276

25

26

```
 1            I N D E X   O F   P R O C E E D I N G S

 2         WITNESS                                    PAGE

 3    DOMINICK MAZZA

 4      Direct Examination By Mr. Brickfield:     1283

 5      Cross-Examination By Mr. Gleason:         1345

 6      Redirect Examination By Mr. Brickfield:   1381

 7      Recross Examination By Mr. Gleason:       1387

 8                                                 PAGE

 9    Defendant Mazza Rests                       1388

10    Defendant Mazza & Sons, Inc., Rests         1388

11    Motions                                     1392

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26
```

```
 1            I N D E X   O F   E X H I B I T S

 2         EXHIBIT                            PAGE

 3     Defendants' Exhibit 5                  1180

 4     Defendants' Exhibit 5A, 5B            1183

 5     Government's Exhibit 45D              1194

 6     Defendants' Exhibit 96A              1212

 7     Defendants' Exhibit 24, 25           1250

 8     Government's Exhibit 88, 89          1258

 9     Defendants' Exhibit 92               1272

10     Defendants' Exhibit 7                1294

11     Defendants' Exhibit 22               1298

12     Defendants' Exhibit 22A, 22B         1299

13     Defendants' Exhibit 11A, 11B, 11D, 11I   1303

14     Defendants' Exhibit 11J, 11K, 11L    1303

15     Defendants' Exhibit 56H              1308

16     Defendants' Exhibit 11N              1311

17     Defendants' Exhibit 147, 148, 149    1316

18     Defendants' Exhibit 155, 156, 157    1325

19     Defendants' Exhibit 19               1338

20     Government's Exhibit 51              1348

21     Government's Exhibit 84              1354

22     Government's Exhibit 87              1377

23

24

25

26
```

```
 1
 2              WHEREUPON, the proceedings held on
 3              October 11, 2012, were commenced at
 4              9:35 a.m..)
 5              (Whereupon, the proceedings were held in
 6              open court in the presence of the Jury.)
 7
 8              THE COURT:  Good morning again, members of
 9    the jury.  Thank you again for being with us.  You have
10    been terrific being here on time and the delays, and your
11    patience is very much appreciated.
12              As you know, the government has rested its
13    case.  As I told you in my preliminary charge, there is
14    absolutely no obligation on the defendants to offer any
15    evidence whatsoever, and the burden of proof always remains
16    on the government if it seeks to obtain a conviction on one
17    or more of the counts.
18              However, the defendants do have an
19    opportunity, if they wish, to present evidence.  And at
20    this time, we will give them that opportunity.
21              First of all, Mr. Musitano, do you have any
22    witnesses you wish to offer on behalf of
23    Defendant Nicastro?
24              MR. MUSITANO:  Good morning, Your Honor.
25    No, Mr. Nicastro has no witnesses to offer, Judge.  We
26    would respectfully rest.
```

1178

```
1
2                    (Defendant Nicastro rests.)
3                    THE COURT:  So noted.
4                    Mr. Brickfield, do you wish to offer
5    witnesses on behalf of the defendant, Dominick Mazza?
6                    MR. BRICKFIELD:  Yes, we do, Your Honor.
7                    THE COURT:  You may call your first witness.
8                    MR. BRICKFIELD:  Your Honor, I am going to
9    call Mr. Larry Zaayenga on behalf of Dominick Mazza and
10   Mazza and Sons.
11
12       LAWRENCE J. ZAAYENGA, having been called as a
13   Witness, being first duly sworn, was examined and testified
14   as follows under oath:
15
16   DIRECT EXAMINATION BY MR. BRICKFIELD:
17       Q.    Good morning, Mr. Zaayenga.
18       A.    Good morning.
19       Q.    Where are you currently employed?
20       A.    I am employed by the County of Monmouth on their
21   planning board.
22       Q.    Is the County of Monmouth in New Jersey?
23       A.    Yes, it is.
24       Q.    What is your title there?
25       A.    I am a supervisor and planner for the solid
26   waste management.
```

1   LAWRENCE J. ZAAYENGA - Direct By Mr. Brickfield

2        Q.     What are your duties?

3        A.     My duties are development and implementation of

4   the Monmouth County Solid Waste Management Plan pursuant to

5   New Jersey state statute.

6        Q.     And does the -- have you heard of the entity

7   Mazza and Sons?

8        A.     Yes, I am familiar with the company.

9        Q.     Are they located within Monmouth County, New

10  Jersey?

11       A.     Tinton Falls, New Jersey.

12       Q.     Are they required and does the county collect

13  monthly reports from transfer stations within Monmouth

14  County?

15       A.     Every solid waste facility in New Jersey is

16  required to prepare a monthly report on the sources and

17  disposition of waste handled.  They are required to provide

18  a copy of that report to the state and to the county solid

19  waste office.

20       Q.     Is it within your office and your duties to

21  receive and maintain these reports?

22       A.     Yes, it is.

23              MR. BRICKFIELD:  Your Honor, may I approach?

24              THE COURT:  You may.

25  BY MR. BRICKFIELD, CONTINUED:

26       Q.     Now, Mr. Zaayenga, I would like to show you what

1    LAWRENCE J. ZAAYENGA - Direct By Mr. Brickfield

2    is marked as Defendants' Exhibit No. 5.  Do you recognize

3    that document?

4         A.    Yes, I do.

5         Q.    What is that?

6         A.    This is the October 2006 facility report filed

7    by Mazza and Sons with the DEP and my office.

8         Q.    Is this -- what's before you, Exhibit 5, is that

9    a fair and accurate copy of what is maintained in your

10   office?

11        A.    Yes, it is.

12        Q.    And it is kept on file in the ordinary course of

13   the functions of this government agency?

14        A.    Yes.

15              MR. BRICKFIELD:  Your Honor, I move into

16   evidence Defendants' Exhibit 5.

17              THE COURT:  Any objection?

18              MR. DONNER:  No objection.

19              THE COURT:  Received.

20              (Exhibit No. 5, received.)

21   BY MR. BRICKFIELD, CONTINUED:

22        Q.    Now, Mr. Zaayenga, what does Defendants'

23   Exhibit 5 show?

24              MR. BRICKFIELD:  And I would ask if we could

25   have the first page put on the screen.

26   BY MR. BRICKFIELD, CONTINUED:

1   LAWRENCE J. ZAAYENGA - Direct By Mr. Brickfield

2       Q.    I am going to raise the screen for you.

3             Now, this is the first page of the records

4   within your office?

5       A.    Yes.  This letter written by James Brown in my

6   office was put in the file with this report.

7       Q.    And if you can -- who is James Brown?

8       A.    James Brown was our assistant district recycling

9   coordinator.

10      Q.    And could you now, please, go to the second

11  page?  This page is the first page of the actual report?

12      A.    Yes, it is.

13      Q.    As filed in your office?

14      A.    Correct.

15      Q.    Does it indicate in the exhibit before you on or

16  about the time that this report was filed in your office?

17      A.    This particular report was not date stamped.

18      Q.    Going to the records that you brought, going to

19  the first page, do the records indicate when this report

20  was filed in your office?

21      A.    It was filed in November 2006.

22      Q.    And now if you could turn to the third page from

23  the last of this report?  Now, that indicates -- can you

24  see that, sir?

25      A.    Yes, I can.

26      Q.    Now, that indicates -- you indicated each

1    LAWRENCE J. ZAAYENGA - Direct By Mr. Brickfield

2    facility has to report where solid waste and hazardous

3    waste is sent to, correct?

4         A.    Correct.

5         Q.    And this is a listing that was filed by Mazza

6    and Sons?

7         A.    Yes.

8         Q.    In November?

9         A.    That's correct.

10        Q.    And if you go to next page, please.  Is there an

11   entry there for Tannery Road, LLC?

12        A.    Yes, there is.

13        Q.    The numbers to the right, 436.33, what does that

14   mean?

15        A.    That would indicate 436.33 tons accepted by

16   Mazza and Sons was shipped October 2006 to Tannery Road,

17   LLC.

18        Q.    Thank you.  I just have one or two other

19   questions.  I just want to show you two blowups, and ask if

20   you could compare those two blowups to these two page to

21   see if it is accurate.

22             Mr. Zaayenga, I show you what has been marked

23   for identification as 5A and 5B.

24             MR. DONNER:  May I stand where I can see?

25             THE COURT:  You sure can.

26        A.    Yes, that is a copy from the report.

1   LAWRENCE J. ZAAYENGA - Direct By Mr. Brickfield

2   BY MR. BRICKFIELD, CONTINUED:

3       Q.    These appear to be accurate reproductions?

4       A.    Yes, sir.

5             MR. BRICKFIELD:  Your Honor, I move into

6   evidence five 5A and 5B?

7             THE COURT:  Any objection?

8             MR. DONNER:  No objection.

9             THE COURT:  Received.

10            (Exhibit No. 5A, 5B, received.)

11  BY MR. BRICKFIELD, CONTINUED:

12      Q.    Finally, it indicates on Defendants' Exhibit 5

13  that there are certain handwritten notations?

14      A.    That's correct.

15      Q.    What are those handwritten notations according

16  to the exhibit?

17      A.    These reports we receive from the various

18  facilities, we check them for accuracy as they come in, and

19  we do find the reports from different facilities where the

20  numbers had not been added correctly.

21      Q.    So those handwritten notes are by employees of

22  your --

23      A.    They are by Mr. Jim Brown.

24            MR. BRICKFIELD:  Thank you, Your Honor.  I

25  have no further questions.

26            THE COURT:  Mr. Zeller, do you have any

```
1    LAWRENCE J. ZAAYENGA - Direct By Mr. Brickfield
2    questions?
3                    MR. ZELLER:  I do not, Your Honor.
4                    THE COURT:  Mr. Musitano.
5                    MR. MUSITANO:  No thank you, Judge.
6                    THE COURT:  Mr. Donner.
7                    MR. DONNER:  Yes, Your Honor.  Thank you.
8                    THE COURT:  Proceed.
9
10   CROSS-EXAMINATION BY MR. DONNER:
11       Q.    Good morning, Mr. Zaayenga.
12       A.    Good morning.
13       Q.    Mr. Zaayenga, how long have you been working for
14   the Monmouth County Planning Board?
15       A.    For thirty-five years.
16       Q.    In the same capacity as you described here
17   earlier?
18       A.    That's correct.  I was hired as a solid waste
19   planner, and I have been with the county for that length of
20   time.
21       Q.    And you testified earlier about a solid waste
22   facility monthly disposal and materials recovery report; is
23   that correct?
24       A.    Yes, sir.
25       Q.    What is the purpose of the Planning Board
26   receiving a copy of that report?
```

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2         A.    It is a State Department of Environmental

3    Protection requirement that all solid waste facilities in

4    New Jersey prepare and submit one of these reports to the

5    state and to the county.

6              We use them to develop database showing

7    primarily by town where their waste went to and how much

8    was recycled.

9         Q.    The report tells the county how much waste a

10   particular facility took in; is that correct?

11        A.    Correct.

12        Q.    And how much waste, in the case of a recycling

13   facility, how much waste went out; is that correct?

14        A.    That's correct.

15        Q.    And it also tells the location of the waste that

16   is going out; is that correct?

17        A.    That's correct, where the waste came from and

18   where it was disposed.

19        Q.    And the county relies on that information?

20        A.    We use the information primarily to track the

21   municipal waste and the waste that may come to the county

22   landfill for planning purposes.

23        Q.    And the county relies on that information,

24   right?

25        A.    We do.

26        Q.    And for what purpose does the county rely on

1   LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2   that information?

3        A.    We track individual municipal waste generation,

4   recycling practices with the intent of improving the waste

5   management and practices of individual towns and

6   businesses.

7        Q.    Why is that important for the county?

8        A.    It helps the towns focus on strategies that

9   truly work to minimize the amount of waste and maximize

10  recycling.

11       Q.    And it is by statute that the facilities in

12  Monmouth County are required to submit those reports to the

13  county; is that correct?

14       A.    It may be by administrative code.  I am not

15  sure.

16       Q.    By regulation?

17       A.    By regulation.

18       Q.    It is also by regulation that they -- that the

19  facility submit the reports to the state as well?

20       A.    That's correct.

21       Q.    And specifically to the New Jersey Department of

22  Environmental Protection, correct?

23       A.    Yes, sir.

24       Q.    And the information that is submitted on those

25  reports is expected to be relied on?

26       A.    That is correct.

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2        Q.    Is it supposed to be certified by the facility

3    that is submitting reports?

4        A.    Yes.  There are penalties for filing erroneous

5    reports.

6        Q.    Have you ever been involved in seeking penalties

7    from a facility that's filed an erroneous report?

8        A.    No.

9            MR. DONNER:  If we could just bring back up

10   Defense Exhibit 5, please, and the second page.  Thank you.

11   BY MR. DONNER, CONTINUED:

12       Q.    Mr. Zaayenga, if you look at this page there is

13   a signature line on that page; is that correct?

14       A.    Yes.

15       Q.    There is no signature on this particular page?

16       A.    The reports we commonly get are not always

17   signed.

18       Q.    And this one is not?

19       A.    No.  Many of these reports are presently filed

20   electronically.

21       Q.    Do you have a hard copy of the report in front

22   of you?

23       A.    Yes.

24       Q.    Okay, and how many pages does this report

25   consist of?

26       A.    This particular report, sixteen pages.  The

1   LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2   second page of the report was actually prepared by our

3   office, by Mr. Jim Brown, in preparation for entering the

4   data into our database.

5       Q.    I am sorry.  The page that is up on the

6   screen -- I am sorry.  The page that's up on your screen,

7   that's prepared by your office?

8       A.    No, this page is prepared by Mazza and Sons.

9   Our office added those notations on the corrections.

10      Q.    So the handwritten portions on that page are

11  made by somebody in your office?

12      A.    Correct.

13      Q.    The printed part, and specifically in the

14  right-hand column, there are crossed-out numbers, those are

15  provided by the facility, in this case, Mazza; is that

16  correct?

17      A.    That's correct.

18      Q.    Okay, and again, there is no signature on that

19  page?

20      A.    That's correct.

21      Q.    And, in fact, in the entire document, is there a

22  signature by anybody in the Mazza facility indicating that

23  the information on this is reliable or certifying the

24  accuracy of this information?

25      A.    Not that I can see.

26      Q.    Likewise, is there any indication on any of

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2    these pages that would show when this document was

3    submitted to your office?

4         A.    Not on this document.

5         Q.    Okay.  Is there any indication on any of these

6    pages that would indicate how this document was submitted

7    to your office?

8         A.    No, there is no indication in this report on how

9    it was submitted to our office.

10        Q.    Do you know how this document was submitted to

11   your office?

12        A.    It was mailed.

13        Q.    How do you know that?

14        A.    Until the past couple of years, now we receive

15   the reports electronically, we commonly had these reports

16   mailed to us.  Several of the facilities still mail them to

17   us rather than send them electronically.

18        Q.    Do you know whether more than one version of

19   document was sent to your office?

20        A.    This would be the only version of the document

21   that was sent to our office.

22        Q.    How do you know that?

23        A.    Jim Brown was good at documenting any

24   discrepancies in the reports that he had received over the

25   years, and he had made no mention of getting duplicate

26   reports.

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2         Q.    How many years have you worked with Mr. Brown?

3         A.    Mr. Brown was with our office probably between

4    ten and fifteen years.  He had worked with another county

5    agency in a related field before that.

6         Q.    He is no longer with your office?

7         A.    Mr. Brown retired August 31st of this year.

8         Q.    So it is actually Mr. Brown that physically

9    receives monthly reports that are mailed into your office?

10        A.    Correct.  They are usually sent directly to him

11   or more commonly to me, and I give them to him.

12        Q.    Do you review them before you give them to him?

13        A.    I will take a quick look at the overall numbers

14   to see if there is any big jumps or drops in the amount of

15   waste accepted at a particular facility.  Other than that,

16   I do not look at them in detail.

17        Q.    Again, the facility is required to send a copy

18   of this to the state DEP?

19        A.    That's correct.

20        Q.    Do you, in your position as manager, do you have

21   the opportunity to compare the report that is submitted to

22   the county versus the report that's submitted to the state?

23        A.    No.  We do consult with the state on the numbers

24   at the end of the year.  We look at the gross number, and

25   we have actually pointed out mistakes the state has made

26   because we take a very close look at these reports.

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2        Q.    But it is a number comparison; is that correct?

3        A.    That's correct.

4        Q.    Do you compare locations that that waste was

5    sent to?

6        A.    We keep the records in that fashion.

7        Q.    When you say keep the records, what does that

8    mean?

9        A.    Our database can print things out by town, by

10   facility, receiving facility, by county wide numbers.

11       Q.    If we could -- if you could take a look at the

12   page that's before you on the screen.  The middle column

13   there, solids, do you see that?

14       A.    Yes, sir.

15       Q.    That describes the types of wastes that would be

16   handled by a facility in Monmouth County, correct?

17       A.    That's correct.

18       Q.    And the facility is required to put in the

19   right-hand column the amount of that particular type of

20   waste that it has handled, either that has come in or has

21   gone out; is that correct?

22       A.    That's correct.

23       Q.    So a facility -- well, looking at the one in

24   front of you, this represents in the row that's titled

25   Bulky Waste, that the Mazza facility initially told you

26   that it had handled 3004.47 tons; is that right?

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2         A.    Yes.

3         Q.    And that was -- that figure was corrected?

4         A.    Yes.

5         Q.    How does your office know to correct that?

6         A.    Mr. Brown reviews the individual pages to

7    ascertain that the summary numbers are correct.  In this

8    case, the individual pages added up to a different number

9    than was shown on the cover page.

10        Q.    And it is important for the county to have those

11   numbers, right?

12        A.    We feel it is.

13        Q.    And it is important for the county to be able to

14   rely on those numbers?

15             MR. BRICKFIELD:  Objection, Your Honor.  It

16   has been asked and answered already.

17             THE COURT:  Overruled.  Continue.

18        A.    Yes.

19             THE COURT:  You can answer.

20        A.    We use these numbers for planning purposes.

21   BY MR. DONNER, CONTINUED:

22        Q.    And it would be important to know, for instance,

23   if you could go to the bottom half of that column, where it

24   says asbestos, do you see that?

25        A.    I do.

26        Q.    It would be important for you to know, for the

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2    county to know whether or not one of its facilities handled

3    asbestos; is that correct?

4         A.    Yes, to make sure that's part of their permit.

5         Q.    So if a particular facility handled asbestos,

6    either took in asbestos or sent out asbestos in Monmouth

7    County, they would be required by the regulations to put a

8    figure in the right-hand column there; is that correct?

9         A.    That's correct.

10        Q.    So in this case if Mazza and Sons, Inc., handled

11   asbestos, either took in asbestos, sent out asbestos, in

12   the October 2006 timeframe, there should be a figure in

13   that column, correct?

14        A.    Correct.  Actually --

15        Q.    I am sorry.  You answered the question.  Thank

16   you.

17             MR. DONNER:  If we could bring up Government

18   Exhibit 45D in evidence, if it is in evidence.  It is not.

19   BY MR. DONNER, CONTINUED:

20        Q.    Then I will show you what has been marked as

21   Government Exhibit 45D?

22             MR. DONNER:  May I approach, Your Honor?

23             THE COURT:  You may.

24   BY MR. DONNER, CONTINUED:

25        Q.    Mr. Zaayenga, is that another monthly report

26   submitted to your office?

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2         A.    Yes, it is.

3         Q.    And who was it submitted by?

4         A.    Mazza and Sons.

5         Q.    And for what period of time was it submitted?

6         A.    September 2006.

7         Q.    And do you have any reason to believe that

8    doesn't fairly and accurately depict the monthly report

9    that was submitted to your office?

10        A.    I have no reason to believe this is not a copy

11   of the report that was submitted to my office.

12               MR. DONNER:  Your Honor, I would offer 45D

13   into evidence.

14               THE COURT:  Any objection?

15               MR. BRICKFIELD:  Is the government

16   representing this is from Monmouth County?  I don't know if

17   they have established that this actually came from Monmouth

18   County or perhaps the state.

19               THE COURT:  Overruled.  Objection overruled.

20   Received.

21               (Exhibit No. 45D, received.)

22               THE COURT:  Well, just for the record for

23   the jury, Witness, is 45D, September 2006?  Is that the

24   month that we are talking about?  Is that yes or no?

25               THE WITNESS:  Yes, it is.

26               THE COURT:  And the other exhibit,

1   LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2   Defendants' 5, that was for October of 2006, correct?

3               THE WITNESS:  That's correct, Your Honor.

4               THE COURT:  So they are the same document

5   except one is for September 2006 and the other one is for

6   October 2006, correct?

7               THE WITNESS:  That's correct, Your Honor.

8               THE COURT:  All right.

9               MR. DONNER:  Thank you for that

10  clarification.

11              Could we bring up the first page of 45D,

12  please.

13              MR. ZELLER:  Your Honor, could we be heard

14  at sidebar?

15              THE COURT:  No, no, move on.

16  BY MR. DONNER, CONTINUED:

17      Q.    Mr. Zaayenga, this is the first page of 45D.  It

18  is a solid waste facility disposal report submitted to your

19  office by Mazza and Sons, Inc..  If I could direct your

20  attention to the middle column just about halfway down

21  where it says "asbestos."  Do you see that?

22      A.    Yes, sir.

23      Q.    And again, is it fair to say there is no figure

24  in the right-hand column that would indicate that Mazza and

25  Sons, Inc., handled asbestos during the month of September

26  of 2006; is that correct?

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2         A.    This report would indicate they did not accept

3    any asbestos during September 2006.

4         Q.    And once again, looking at the signature line,

5    is there any signature for anybody from Mazza and Sons,

6    Inc., that would suggest to you that this is a fair or an

7    accurate depiction of the waste they handled during that

8    month?

9         A.    This report is not signed.

10        Q.    Just so it is easier for you to flip through, I

11   am going to hand you the hard copy of 45D again.  Is there

12   any signature on any of those pages from anybody from Mazza

13   and Sons, Inc., that would suggest that the -- that

14   certifies to the accuracy of the information in that

15   report.

16        A.    No, there is not.

17        Q.    Okay.  Is there a date that would lead you to

18   believe -- is there a date that would indicate when that

19   report was submitted to your office?

20        A.    No, there is not.

21        Q.    Mr. Zaayenga, if you could take a look at the

22   first page of Government Exhibit 45E.  Do you know what

23   that is?

24        A.    This is a copy of the October 2006 facility

25   monthly report for Mazza and Sons.

26        Q.    Now, we don't have the ability to bring both

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2    exhibits up on the screen, but I am going to hand you

3    the -- or do you still have the hard copy of the exhibit,

4    Defense Exhibit 5?

5        A.    Yes, I do, sir.

6        Q.    Okay.  If you could turn to, I guess, the second

7    page of that exhibit you testified about earlier.  On the

8    bottom it says Mazza 8018?

9        A.    Yes, sir.

10       Q.    On the --

11            MR. DONNER:  Oh, we do have the ability to

12   put both of them together.  Look at that.  Perfect.  Thank

13   you.

14   BY MR. DONNER, CONTINUED:

15       Q.    Looking at these two, Mr. Zaayenga, do these

16   purport to be the same document?

17       A.    The government exhibit, it looks different.

18       Q.    Yes, but let me rephrase the question.  These

19   are both solid waste monthly reports submitted by Mazza and

20   Sons, Inc.; is that correct?

21       A.    Yes.

22       Q.    And they both purport to be or they both purport

23   to provide information on the amount and type of waste that

24   the Mazza and Sons, Inc., facility handled during the month

25   of October 2006; is that correct?

26       A.    That's correct.

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2        Q.    And the version that appears on the left-hand

3    side of the screen, which was Defense Exhibit 5, which has

4    the corrected figures, in fact, the month, it says Oct.

5    2006, and the Government Exhibit 45E has October, spelled

6    out, 2006, right?

7        A.    That's correct.

8        Q.    And there are other differences as well as; is

9    that correct?

10       A.    Yes.

11       Q.    To be fair, which you pointed out the similarity

12   which does not -- neither one has anything for asbestos on

13   that page; is that correct?

14       A.    That's correct.

15       Q.    Now, if we could turn to page -- 45E, pages

16   ending in Mazza -- I am sorry.  Pages ending in page number

17   587.

18            MR. DONNER:  And if we could also bring up

19   45 -- Defense Exhibit 5 8032.  Actually 8033, please.

20   BY MR. DONNER, CONTINUED:

21       Q.    Mr. Zaayenga, maybe it is hard to read.  It is

22   blurry, and I can hand you hard copies if you can't read

23   it.

24            The page on the left, which is from Defense

25   Exhibit 5, you testified earlier has Tannery Road on that?

26       A.    Correct.

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2         Q.    Do you see Tannery Road anywhere on the

3    corresponding page on Government Exhibit 45E?

4         A.    This does not appear to be the corresponding

5    page.  I think that would be the next one on the exhibit.

6                   MR. DONNER:  May I approach the witness,

7    Your Honor?

8                   THE COURT:  Can't she put up the next page?

9                   MR. DONNER:  Can you put up the next page?

10                   I don't know that there is a next page, Your

11   Honor.

12                   THE COURT:  All right.

13                   MR. DONNER:  May I hand the witness the hard

14   copy?

15                   THE COURT:  Yes.

16   BY MR. DONNER, CONTINUED:

17        Q.    Mr. Zaayenga, I am going to hand you what has

18   been marked as Government's Exhibit 45E.  Would you flip

19   through that, and do you see Tannery Road mentioned

20   anywhere in that document?

21        A.    I do not.

22        Q.    Thank you.

23                   MR. DONNER:  Just a couple more questions.

24   If you could bring up Defense Exhibit 5, MAZ 8032.  And if

25   we could zoom in on the top third of the page, please.

26   BY MR. DONNER, CONTINUED:

1    LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2        Q.    Mr. Zaayenga, if I could direct your attention

3    to just below the line that says Division of Solid and

4    Hazardous Waste, do you see that?

5        A.    Yes, sir.

6        Q.    It is unfair to you if I don't put that up.

7    Just below that line on the left, not the left most column,

8    but the second to the left column, it says Part Two,

9    Revised?

10       A.    Yes, sir.

11       Q.    What does that mean?

12       A.    Several times there have been revised reports

13   submitted by this and other facilities.  Either a mistake

14   the facility operator realized they made or the state

15   requested it.  So it is not completely uncommon, but I

16   wasn't aware of this revision.

17       Q.    Do you know when this report was revised?

18       A.    I do not.

19       Q.    Did you bring the unrevised version of this

20   report with you today?

21       A.    Yes, I did.  The copy I have from my files says

22   Part Two, Revised as well.

23       Q.    So it is the same as this one?

24       A.    Could you show me the rest of the page?

25       Q.    Yes.

26       A.    Could you put it up a little bit?  I can't quite

1  LAWRENCE J. ZAAYENGA - Cross by Mr. Donner

2  make it out.  Could you scroll down the page, please?  That

3  looks like the same as this report here from my file.

4       Q.    It is the same?

5       A.    Yes.

6       Q.    So you don't know or you don't have, I should

7  say, a copy of the document that purports to be the initial

8  version or an earlier version of this?

9       A.    What you are showing on the screen is the page

10  from the document that came from my file at the county

11  office.

12       Q.    And you don't know when this was revised?

13       A.    This was, as it was received by my office, to

14  the best of my knowledge.

15            MR. DONNER:  Thank you.  I have no further

16  questions.

17            THE COURT:  Mr. Brickfield, redirect.

18            MR. BRICKFIELD:  Yes, briefly.

19

20  REDIRECT EXAMINATION BY MR. BRICKFIELD:

21       Q.    May I see Exhibit 45E?

22       A.    I don't have a copy of that.

23            MR. BRICKFIELD:  Could I borrow your 45E?  I

24  want to show it to the witness.

25  BY MR. BRICKFIELD, CONTINUED:

26       Q.    So, Mr. Zaayenga, the one that you received of

1    LAWRENCE J. ZAAYENGA - Redirect by Mr. Brickfield

2    which you have the original today, your records indicate

3    that was received in November of 2006, correct?

4         A.    That's correct.

5         Q.    And that did contain where it said Revised,

6    Tannery Road, correct, Tannery Road, LLC?

7         A.    Yes, that page in that report.

8         Q.    Now, what the government showed you as

9    Government Exhibit 45E, I would ask if you would turn to

10   the last page of that?  Now, that has a fax cover sheet,

11   does it not?

12        A.    Yes.

13        Q.    Does that indicate whether that was faxed to you

14   or to the New York State agency?

15        A.    This was --

16        Q.    I am sorry, New Jersey State DEP?

17        A.    This was faxed to Pat Elias, who works for the

18   DEP and handles these records for them.

19        Q.    So this was not sent to you.  This was sent to

20   New Jersey?

21        A.    That's correct.

22        Q.    And does it indicate who sent it?

23        A.    Peter Dellera, Junior.

24        Q.    Do you know who Peter Dellera is?

25        A.    I do.  He works for Mazza and Sons.

26        Q.    Does it indicate when it was faxed, the date of

1203

1    LAWRENCE J. ZAAYENGA - Redirect by Mr. Brickfield

2    the fax?

3         A.    It is dated May 10, 2007.

4         Q.    Okay.  Thank you.  And finally, on the first

5    page of the monthly report, you were asked about asbestos?

6         A.    Yes, sir.

7         Q.    There is no category, is there not, for

8    suspected asbestos, is there?

9         A.    No, it is a state classification for asbestos

10   waste.

11        Q.    And you would only put down that you had

12   asbestos if you believed that you had asbestos, correct?

13        A.    Yes.

14             MR. BRICKFIELD:  All right.  Thank you.  No

15   further questions.

16             THE COURT:  Anything further with this

17   witness, Mr. Donner?

18

19   RECROSS-EXAMINATION BY MR. DONNER:

20        Q.    You testified a moment ago that Government

21   Exhibit 45E was faxed by someone at Mazza and Sons,

22   Incorporated, to the New York State Department of --

23        A.    New Jersey.

24        Q.    I am sorry, New Jersey State Department of

25   Environmental Protection in May of 2007; is that correct?

26        A.    Yes, sir.

1   LAWRENCE J. ZAAYENGA - Recross by Mr. Donner

2        Q.    And are you aware of whether Mazza and Sons,

3   Inc., was under a criminal investigation at that time?

4        A.    No, sir.

5        Q.    You are not aware?

6        A.    That, I only became aware of that last year.

7        Q.    Thank you.

8              MR. DONNER:  No further questions.

9              THE COURT:  Okay.  You may step down.  Thank

10  you.

11             (Whereupon, the Witness is excused.)

12             THE COURT:  Mr. Brickfield, next witness.

13             MR. BRICKFIELD:  Thank you.  The defense

14  calls yes Your Honor, we call Joseph McMullen.

15

16        JOSEPH MCMULLEN, having been called as a Witness,

17  being first duly sworn, was examined and testified as

18  follows under oath:

19

20  DIRECT EXAMINATION BY MR. BRICKFIELD:

21        Q.    Good morning, Mr. McMullen.  How are you doing?

22        A.    Good morning.

23        Q.    What is your profession?

24        A.    I am an environmental scientist.

25        Q.    Where do you work?

26        A.    I work for an environmental consulting firm

1205

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    called Terrestrial Environmental Specialists, Incorporated.

3         Q.    Where are you located?

4         A.    We are located in Phoenix, New York, which is

5    just north of Syracuse.

6         Q.    How many years have you been with this company?

7         A.    Since the company was founded thirty-seven years

8    ago.

9         Q.    Are you one of the founders?

10        A.    I am one of the founding fathers.

11        Q.    What type of work do they do with regards to

12   wetlands?

13        A.    We are a specially environmental consulting

14   firm, and we do a lot of wetlands work.  We have done

15   wetlands work since the beginning.  Wetlands work involves

16   identifying wetlands, mapping wetland delineations.

17        Q.    Just slow down a little bit.

18              THE COURT:  Slow down.

19        A.    Wetlands permitting.  We also do a lot of

20   wetlands restoration and mitigation, wetlands creation

21   plans, all aspect of wetlands work we have done.

22   BY MR. BRICKFIELD, CONTINUED:

23        Q.    And what do you mean by wetlands delineations?

24        A.    Wetlands delineation is the marking of the

25   wetland boundaries in the field.

26        Q.    What is your professional training and

1206

1   JOSEPH MCMULLEN - Direct By Mr. Brickfield

2   educational background?

3        A.    I have a Master of Science degree from Saint

4   Francis College in Pennsylvania and Master of Science

5   degree from West Virginia University.  And my -- both

6   degrees are in biology, and my concentration is in botany.

7             I have extensive experience in wetlands,

8   wetlands mapping, vegetation mapping, vegetation surveys,

9   endangered or threatened species survey, a lot of different

10  aspects of environmental consulting.

11       Q.    Have you ever held any professor position with

12  regards to wetlands?

13       A.    I am a certified professional wetland scientist

14  from the Society of Wetlands Scientists.  I am also on the

15  board of directors for the New York State Wetlands Forum

16  and the longest standing board member and the oldest.

17       Q.    And do you teach anywhere?

18       A.    I work as an adjunct professor at Rochester

19  Institute of Technology.  I teach a wetland class there.  I

20  have taught it for seven years.  It is a class in -- I

21  teach wetlands identification.  Basically I teach the

22  federal methodology for wetlands identification.

23       Q.    And have you lectured on wetlands and related

24  subjects?

25       A.    I frequently speak at conferences.  The New York

26  State Wetlands Forum has a conference every year.  I

1  JOSEPH MCMULLEN - Direct By Mr. Brickfield

2  usually speak on the wetland subject.  I have talked a lot

3  about the last few years with the changes in the

4  delineation manuals.  I have given seven presentations on

5  that and other at conferences I spoke at.

6       Q.    Have you written articles in this field?

7       A.    Yes, I have published many articles, wetlands

8  and rare plants, vegetation mapping, aerial photo

9  interpretation.  Many, many different ones over the years.

10      Q.    What type of entities are your clients?

11      A.    We have worked for hundreds and hundreds of

12  clients over the years.  We do a lot of work for

13  developers, mall developers like Pyramid, big boxes,

14  Wal-Mart, Lowe's, Home Depot.

15            We have done work for universities, Colgate,

16  Cornell, Clarkson, William and Smith, a lot of different

17  universities, institutions.  We do a lot of work for the

18  utility industry.  New York Power.  We have done a lot of

19  work for National Grid, a lot of wetlands-related work.

20  The mining industry.  We do a lot of work with the mining

21  industry, whether expanding mines or siting mines.

22      Q.    Have you ever testified in court as an expert in

23  wetlands?

24      A.    Yes, I have.

25      Q.    What type of proceedings?

26      A.    These were mostly state proceedings where there

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    was an administrative law judge and issues with wetlands in

3    Adirondack Park or water resources.

4            MR. BRICKFIELD:  Your Honor, I would move

5    Mr. McMullen as an expert pursuant to 702 on wetlands and

6    wetlands delineations.

7            MR. GLEASON:  Well, Your Honor, I have no

8    objection, but I don't think it is appropriate for the

9    Court to recognize the person as the expert.  The jury can

10   make that determination as to their qualifications on their

11   own.

12           THE COURT:  So noted.  Proceed.

13   BY MR. BRICKFIELD, CONTINUED:

14       Q.    Now, Mr. McMullen, were you retained to do an

15   investigation into the wetlands in Frankfort, New York?

16       A.    Yes, I was.

17       Q.    What basically did you do to conduct your

18   investigation, what were the components?

19       A.    The basic components are, first of all, review

20   of all of the background natural resource maps for the

21   area.  The second component -- and aerial photographs as

22   well.  The second component would be a field investigation.

23   And after that, we also investigate some additional aerial

24   photographs.  And the third component would be a report.

25       Q.    What do you mean by field investigation?

26       A.    The field investigation was to take all the

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    background natural resource maps we have and information

3    and aerial photographs and go out into the field and to

4    assess the area in the field to see where the wetlands are

5    and where they aren't.

6         Q.    Let me -- did you do a report in this case?

7         A.    Yes, I did.

8         Q.    Showing you what has been marked for

9    identification as Defendant's Exhibit 96A.

10              MR. BRICKFIELD:  May I approach, Your Honor?

11              THE COURT:  Yes.

12   BY MR. BRICKFIELD, CONTINUED:

13        Q.    Now, Mr. McMullen, is that a fair and accurate

14   copy of the report?

15        A.    Yes, it is.

16        Q.    Now, let me show you what has been marked in

17   evidence already as 24L, which is the blowup to your left.

18        A.    Okay.

19        Q.    Can you see that there?

20        A.    Yes.

21        Q.    And had you seen this before, this is from the

22   government report, is it not?

23        A.    Yes, this is from the Corps of Engineers June

24   2011 wetlands report on the site.

25        Q.    And that indicates -- in your work, did you

26   focus on Wetland Number 1?

1210

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2         A.    Yes, the wetlands that we focused on during our

3    field investigation in particular was Wetland Number 1,

4    which is on the southern part of the site.

5         Q.    And is it fair to say that you agree with the

6    delineation of the Wetland 1 area as indicated on -- by the

7    black lines and the horizontal lines?

8         A.    Yes, we do.  We agree with that.

9         Q.    And when you went on your field investigation,

10   was there any separation between the Wetlands Number 1 and

11   the site containing dirt and other debris to your right?

12        A.    Yes, there is a hedgerow and a stone wall along

13   the eastern edge of Wetland 1 that separates it from the

14   fill area.

15        Q.    Okay, and just for people like me I guess, what

16   is a hedgerow?

17        A.    A hedgerow is a linear feature.  It usually

18   contains shrubs and trees.  We frequently see them between

19   fields or along the edges of fields or along property

20   lines.  Sometimes they can contain stone walls.  This one

21   did contain a stone wall.

22        Q.    And your testimony then was the -- to the

23   immediate right of Wetland Number 1 is the bulk material in

24   the field.  Is it your testimony that the Wetlands Number 1

25   Number 1 is separated from that area?

26                  MR. GLEASON:  Objection.  Leading.

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2                    THE COURT:  Yes.  Sustained.

3    BY MR. BRICKFIELD, CONTINUED:

4         Q.    What is your conclusion as to the relationship

5    between Wetland 1 as delineated by you and the government

6    and the bulky area to the right?

7         A.    The area of fill is separated from the wetland

8    by this hedgerow and the stone wall.

9         Q.    Did you see any evidence of wetlands on the

10   other side of the stone wall going towards the bulky

11   portion?

12        A.    No.

13        Q.    Now, you indicated that you conducted a field

14   investigation.  Did you also obtain certain maps and

15   photographs to determine whether or not there ever was a

16   wetlands underneath what I called the bulky area, the fill

17   area?

18        A.    Yes, as I mentioned earlier, the existing

19   natural background in what we call background natural

20   resource maps, which is wetlands maps that exist, soil

21   surveys, things of that nature, and also aerial photos from

22   different years, we can go back in time and look in the

23   past and see what area was like back in time.

24        Q.    Are these maps and aerial photographs available

25   to the general public?

26        A.    Yes, they are.

1212

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2        Q.    Are they available to government agencies like

3    the Army Corps of Engineers?

4        A.    They are readily available to everybody.

5              MR. BRICKFIELD:  Your Honor, I would ask to

6    mark a number of exhibits from 96A, and I will bring them

7    up there.  I will start with the first five.

8              MR. GLEASON:  May I see them?

9              MR. BRICKFIELD:  The first six I mean.  May

10   I approach, Your Honor?

11             THE COURT:  Yes.

12   BY MR. BRICKFIELD, CONTINUED:

13       Q.    Mr. McMullen --

14             MR. GLEASON:  Your Honor, I will actually --

15   this isn't an objection.  We don't need to go through the

16   foundation.  The government has no objection to the

17   introduction of the exhibits if that's what Mr. Brickfield

18   wants to do.  I would like to shorten this up if we can.

19             MR. BRICKFIELD:  Good, Your Honor.  Then I

20   will move in as Exhibit 96A, the six pages of maps and four

21   pages of photos.

22             THE COURT:  Defendants' 96A is received.

23             (Exhibit No. 96A, received.)

24   BY MR. BRICKFIELD, CONTINUED:

25       Q.    Now, let's go to, if we could go to 96A, page

26   twelve.  Let's go to the first one.  What does this figure

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    one show?

3        A.    This figure one is an USGS New York State DOT

4    topographic map.  The properties that were initially

5    identified by the Corps report were identified on this map

6    that are shown as approximate study areas.

7            This map, it is the standard topographic map.

8    It shows topographic features.  It shows waterways and

9    streams.  It identifies the Mohawk River to the north of

10   this, what we call the study area.  It doesn't show any

11   streams or waterways on the particular site.  It shows an

12   abandoned railroad grade that crosses the site, kind of the

13   south central portion of the site.

14       Q.    And that railroad grade is down towards the

15   river, correct?

16       A.    Yes.  It is on the river side of Wetland 1 and

17   also the fill area.

18       Q.    And is there any indication from this map that,

19   what I am calling the fill site, was in wetlands?

20       A.    No.  There is no indications there is wetlands.

21   This map more shows stream features than anything else, but

22   there was no stream features in the fill area.

23       Q.    Okay, and then please go to figure number two.

24   And just if you could show -- what is this document?

25       A.    This figure two is the New York State freshwater

26   wetlands map.  The state has published wetlands map for the

1   JOSEPH MCMULLEN - Direct By Mr. Brickfield

2   entire state.  And this map indicates that there is no

3   state mapped wetlands in the fill area or any portions of

4   the study areas actually.

5            The wetlands that do exist are shown here in

6   this gray shading that you see.  Those are -- would be

7   mapped wetlands.  I don't know if I can point to one.

8   That's kind of where -- that's one of the -- there is none

9   on this site.

10       Q.    The fill site?  All these questions are related

11   to the fill site.

12       A.    Okay.  Thank you.

13       Q.    Now, go to figure number three, which is on page

14   fifteen.  What is that document?

15       A.    This is another wetlands map.  It is produced by

16   the U.S. Fish and Wildlife Service.  It is called a Natural

17   Wetlands Inventory Map.  This is another source of

18   identifying wetlands.  This map also doesn't show any

19   wetlands on the field site or the area south of the

20   abandoned railroad grade.  It does show some wetlands north

21   of that area.

22       Q.    And the next, figure four, what does this show?

23       A.    This is a soil survey map.  Herkimer County does

24   not have a published soil survey, but these are preliminary

25   soil maps.  The -- what these show are different soil types

26   and some of the soil types are classified as hydric soils.

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    And hydric soils are wetland soils.  And we them have

3    highlighted in blue on this figure.

4            And there is one soil that pretty much

5    corresponds with Wetland 1 south of the railroad grade

6    there.  It is called freedon (phonetically) soil, a fine

7    sandy loam, but that's not in the fill area.  It is

8    primarily in the Wetland 1.

9        Q.    What is on Government Exhibit 24 is Wetland 1?

10       A.    Yes.

11            THE COURT:  Where is that?  Can you point

12   that out?

13   BY MR. BRICKFIELD, CONTINUED:

14       Q.    Which of the blue segments?  Just touch the

15   screen.

16       A.    That's freedon soil right there in the blue.

17   That is the area of hydric soil south of the railroad

18   grade.

19       Q.    Now, if we can go to number five, figure five,

20   and what does that show?

21       A.    Figure five is the surface water classification

22   maps produced by the New York State Department of

23   Environmental Conservation.  These show -- these are

24   available for the entire state, and they show stream

25   courses.  And they also -- you can go to regulations and

26   they provide water quality classification for these

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    different stream courses, but what is of note on this map

3    is that there are no streams shown on the site.

4          Q.    On the fill area?

5          A.    That's correct.

6          Q.    And please now go to figure six at page

7    seventeen.  What is this map?

8          A.    This is a flood insurance rate map.  They

9    basically show flood plains.  This identifies the one

10   hundred year flood plain, which in this instance is north

11   of the abandoned railroad grade and not in the fill area.

12         Q.    Now, did you also look at a series of aerial

13   photographs?

14         A.    Yes, I did.

15         Q.    Let's go to the first one.  It is at page

16   eighteen, please.  Do you see that?

17         A.    Yes.

18         Q.    What is that photo, what is the area and what

19   does it depict?

20         A.    This is a 1995 aerial photograph.  This is a

21   color infrared aerial photograph.  It is taken with film

22   that is sensitive to color, the infrared range.  They are

23   very good maps.  They are used a lot in wetlands mapping.

24               Some of the things that this shows, if I can

25   point out this building here.  Just to the north of that

26   arrow, the building along the road.  And basically there

1  JOSEPH MCMULLEN - Direct By Mr. Brickfield

2  is, at that time in 1995, there is no fill around the

3  building.

4          The other thing I was just going to point out is

5  the Mohawk River.  Color infrared photos, water has a real

6  low infrared reflectance, so it will show up black.  Water

7  shows up black.  That's one of the reasons we use them a

8  lot in wetlands mapping.  The other -- a couple of other

9  things that are of significance on this aerial.

10         Wetland 1 is, I will point to the center of it

11  there.  As you can see, it is a different tone, a different

12  shade than the surrounding area.  And if you look at the

13  boundaries of that area, especially the east side of it,

14  and this hedgerow, if I can point it out.  Well, it is just

15  to the -- a little bit to the west where that arrow is.

16      Q.    You missed it.

17              MR. GLEASON:  Objection to the "you missed

18  it" from Mr. Brickfield.

19              MR. BRICKFIELD:  I am sorry.

20              THE COURT:  Strike that.  Come on.  Move on.

21      A.    Okay.  There is a little clump of trees at the

22  southern end of that hedgerow there.  It will show up on a

23  lot of the aerial photos.  If you look at the boundaries of

24  the -- what you can see here of Wetland 1 is very similar

25  to what the Corps of Engineers identified, a very straight

26  edge on the east side and a straight edge on the south

1218

1  JOSEPH MCMULLEN - Direct By Mr. Brickfield

2  side.

3          The other thing of significance is surrounding

4  that area and the fill area is under agricultural

5  production with no evidence of wetlands.  You can see it is

6  a brighter pink color.  It is probably something like

7  winter wheat was planted there.  It has a very smooth even

8  tone to it.  So it is in agricultural production with no

9  evidence of wetlands.

10  BY MR. BRICKFIELD, CONTINUED:

11      Q.    Thank you.  Now, can we go to figure eight,

12  which is on page nineteen.  If you touch the screen, will

13  it move the arrows?  What is figure eight?

14      A.    Figure eight is a 2003 aerial photograph.  This

15  is a true color aerial.  The color in this photo is what we

16  see in our visual spectrum.

17          Both of these photographs, the 1995 aerial and

18  the 2003 photos, they are early spring photography.  You

19  can notice that they are before full leafout.  This is

20  usually a wet time of the year.  So that if there is

21  evidence of water, we would usually see it during that

22  time.

23          You can notice on this photograph around the

24  building next to the road there, that there has been some

25  fill placed north and west of the building.  The area

26  outside of that towards Wetland 1 and south of Wetland 1 is

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2    still in agricultural production, and there is no evidence

3    of wetlands there.

4         Q.    Do you still see the tree there?

5         A.    Yes, yes, you can see that tree, a little arrow

6    right there where that spot is, there is a tree at the end

7    of that hedgerow, that clump of trees.

8         Q.    Now, if you go, please, to figure nine, which is

9    at page twenty.  Now, this was an aerial photograph taken

10   August 17, 2006, correct?

11        A.    That's correct.  Again, another true color

12   aerial.  You can see that this is in August obviously.  So

13   it is full leafout.  And you can see that the fill has

14   expanded from the 2003 aerial quite a bit to the north and

15   to the west from the building.

16             We can still see agricultural production outside

17   of Wetland 1 to the east and south.  Those little, what

18   appear as, white lines on there, are actually those large

19   hay bales that are wrapped in white plastic.  That little

20   clump of trees, if it is all right to point it out, well,

21   it is just to the left of that, northwest of that point.

22        Q.    Thank you.  Now, can we go to figure ten at page

23   twenty-one.  What does this picture depict?

24        A.    This is a 2008 aerial photograph.  It is another

25   spring photograph.  It shows that the fill area has

26   expanded quite a bit, and it pretty much corresponds with

1  JOSEPH MCMULLEN - Direct By Mr. Brickfield

2  the fill that I saw when we did our field investigation,

3  which was in November of 2011.

4         You can see that hedgerow to the west of the

5  fill area and Wetland 1 to the west of that.  And if I

6  could point out that tree where that little dot is, that's

7  at the end of that hedgerow.  That pretty much -- after you

8  get to the wetland, the stone wall extends to the north,

9  northeast from that.  The area south of Wetland 1 between

10  Wetland 1 and the road is still in agricultural production.

11     Q.    So, Mr. McMullen, based on these natural

12  resource maps, your fieldwork, and these photographs you

13  just discussed, what is your conclusion as to whether or

14  not the fill area ever contained any wetlands?

15     A.    It is my conclusion based on all that

16  investigation that the fill area never contained wetlands.

17              MR. BRICKFIELD:  All right.  Thank you.  I

18  have no further questions, Your Honor.

19              THE COURT:  Mr. Gleason.

20              MR. GLEASON:  Thank you, Your Honor.

21              THE COURT:  You may examine.

22              MR. GLEASON:  Would Mr. Musitano like to

23  cross-examine at all?

24              THE COURT:  Well, I am sorry.  Mr. Zeller,

25  do you have any questions?

26              MR. ZELLER:  No, I do not, Judge.

1    JOSEPH MCMULLEN - Direct By Mr. Brickfield

2                    MR. MUSITANO:  No, thank you, Judge.

3                    THE COURT:  Okay.  Mr. Gleason.

4

5    CROSS-EXAMINATION BY MR. GLEASON:

6        Q.    Good morning, Mr. McMullen.

7        A.    Good morning.

8        Q.    How long have you lived in the Syracuse area?

9        A.    I have lived there since 1976.

10       Q.    And you said you were the founding father of TES

11   or one of them, I should say?

12       A.    I am one of them, yes.  I am the last remaining

13   one.

14       Q.    And TES is an environmental consulting firm you

15   said?

16       A.    That's correct.

17       Q.    And you did mention that they do quite a bit of

18   wetland delineation work?

19       A.    Yes.  We are a specialty firm.  We specialize in

20   ecological resources, natural resources, wetlands,

21   vegetation and wildlife surveys.

22       Q.    So you mentioned you have done both delineation

23   and permitting work; is that right?

24       A.    That's correct.

25       Q.    And your firm also assists clients with

26   negotiating the resolution of wetland violations; isn't

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    that correct?

3         A.    Yes.

4         Q.    And in this particular case, you are assisting

5    with the defense of the Mazza defendants, correct?

6         A.    I am assisting them, yes.

7         Q.    And you understand they are -- Mazza and Sons,

8    Inc., to be a private commercial enterprise, correct?

9         A.    That's correct.

10        Q.    You were engaged by the Brickfield and Donahue

11   law firm?

12        A.    Pardon me?

13        Q.    You were engaged by the Brickfield and Donahue

14   law firm?

15        A.    Yes, yes, I am. I am sorry.

16        Q.    That's the attorney for the Mazza defendants,

17   correct?

18        A.    Yes.

19        Q.    And specifically you were asked to evaluate a

20   property located north of old State Route 5S in the Town

21   Frankfort; isn't that right?

22        A.    Yes.

23        Q.    As part of that evaluation, you were asked

24   review a report for the same property that was prepared by

25   the Army Corps of Engineers, is that fair?

26        A.    That's correct.

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2        Q.    It is a delineation report?

3        A.    Yes, it is.

4        Q.    Is it fair to say that you were asked to

5    critique that report?

6        A.    I was.

7        Q.    Now, as part of your evaluation you testified on

8    direct you didn't just run out to the site, right, you did

9    some homework first, is that fair?

10       A.    Yes, we always do before we visit a site.

11       Q.    So, for instance, as you spoke of to

12   Mr. Brickfield, you consulted background natural resource

13   maps; is that right?

14       A.    Yes.

15       Q.    Aerial photographs as well; isn't that right?

16       A.    Yes.

17       Q.    Now, I would like to talk to you a little bit

18   about those aerial photographs if I may.  I think on direct

19   you testified to reviewing four aerial photographs; is that

20   right?

21       A.    Four different years, yes.

22       Q.    Specifically 1995?

23       A.    Yes.

24       Q.    2003?

25       A.    Yes.

26       Q.    2006?

1     JOSEPH MCMULLEN - Cross by Mr. Gleason

2          A.     Yes.

3          Q.     And 2008; isn't that right?

4          A.     Yes.

5          Q.     Let's start with the 1995 aerial photograph.

6     You mentioned that was an infrared aerial photograph; isn't

7     that right?

8          A.     Yes.

9          Q.     And you reviewed that photograph?

10         A.     Yes.

11         Q.     Carefully, I presume?

12         A.     Yes.

13         Q.     And after you consulted that aerial, you

14    concluded the 1995 aerial distinctly indicated an area of

15    wetlands that closely corresponds to the Corps' delineated

16    Wetland 1; isn't that right?

17         A.     That's correct.

18         Q.     The same Wetland 1 that's depicted on that

19    blowup; is that correct?

20         A.     That's correct.

21         Q.     So then you consulted a 2003 aerial photograph?

22         A.     Yes.

23         Q.     And that was what is known as a true color

24    photograph?

25         A.     Yes.

26         Q.     And again, after you consulted that aerial

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    photograph you concluded that Wetland 1 was evident from

3    that photograph?

4          A.    Yes, it is.

5          Q.    And then you looked next at the August 17, 2006

6    aerial, correct?

7          A.    Yes.

8          Q.    And you reached the same conclusion with respect

9    to Wetland 1?

10         A.    I did.

11         Q.    And finally 2008, you consulted that photograph

12   as well?

13         A.    Yes.

14         Q.    Same conclusion with respect to Wetland 1?

15         A.    That's correct.

16         Q.    Okay.  So after you consulted those aerials,

17   after you consulted all those aerials your previous

18   conclusions with respect to the wetland boundaries didn't

19   change, right?

20         A.    Relative to Wetland 1, no.

21         Q.    Okay.  So after you consulted the maps and

22   aerials, you said you went out and did some fieldwork

23   yourself; isn't that right?

24         A.    Yes.

25         Q.    The same way the Army Corps of Engineers did?

26         A.    Yes.

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2         Q.    In fact, the Army Corps of Engineers and your

3    methodology, doing homework first by consulting maps and

4    then going in the field, that's generally the same; isn't

5    that right?

6         A.    That is the normal procedure for wetland

7    delineation.

8         Q.    Okay.  So when you are out in the field, you

9    look for, among other things, the presence of hydrological

10   indicators on the site; isn't that right?

11        A.    Yes.

12        Q.    Hydrophytic vegetation, correct?

13        A.    That's correct.

14        Q.    Same types -- very same indicators that

15   Joshua Frost from the Army Corps of Engineers used; isn't

16   that right?

17        A.    The methodology is the same.

18        Q.    So that's a yes?

19        A.    Yes.

20        Q.    And you recorded those, you recorded your

21   observations on the site on what you call wetland

22   delineation forms; isn't that right?

23        A.    That's correct.

24        Q.    The very same types of forms that Joshua Frost

25   from the Army Corps of Engineers used; correct?

26        A.    We use the same procedure, that's correct.

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2        Q.    And based on your fieldwork -- well, let me back

3    up for just a moment.  I would like to talk about figure

4    four in your report just briefly, which I think is

5    Government's Exhibit 25.  It has been marked.  I think it

6    is consistent with what is in evidence as a defense

7    exhibit.  But looking at figure four, that's a 2011 hydric

8    soil survey; is that right?

9        A.    Yes.

10       Q.    And that hydric soil survey was conducted in

11   2011; isn't that right?

12       A.    Well, the maps are -- I think they were

13   downloaded from 2011.  I don't know what the actual date

14   the maps were prepared is.

15       Q.    So you are aware that in 2011 the fill pad that

16   you looked at was already present on the site; isn't that

17   right?

18       A.    Yes.

19       Q.    And if the fill pad was present on the site, you

20   are aware that they couldn't survey it for hydric soils,

21   correct?

22       A.    Well, this map wasn't produced in 2011.  I am

23   sure it was produced many years prior to that.

24       Q.    But it is dated 2011?

25       A.    That is when it was downloaded.

26       Q.    Okay.  But nonetheless, the date on that map is

1   JOSEPH MCMULLEN - Cross by Mr. Gleason

2   2011?

3         A.     The date that is shown is 2011.

4         Q.     So you also mentioned that there didn't appear

5   to be wetlands listed on the National Wetland Inventory map

6   that corresponded to the fill pad, correct?

7         A.     That's correct.

8         Q.     Fair to say you have a lot of experience with

9   the National Wetland Inventory?

10        A.     Yes, extensive.

11        Q.     All right.  Not all federal wetlands are listed

12  on that inventory, are they?

13        A.     There are errors in the map.

14        Q.     Likewise, you included in your report a New York

15  State freshwater wetlands map, correct?

16        A.     That's correct.

17        Q.     And again, New York State and federal wetlands

18  are not necessarily coextensive, are they?

19        A.     They are not the same.

20        Q.     Now that we have finished talking about the maps

21  hopefully and the photographs, you went to the field.  You

22  reviewed the maps.  You reviewed the aerials.  You did some

23  fieldwork.  And based on that fieldwork, you also

24  determined that the -- I want to get this right.  You

25  concluded that the field review confirmed that the limits

26  of Wetland 1 as shown by the Army Corps of Engineers

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    appeared to be accurate with respect to Wetland 1, correct?

3         A.    That's correct.

4         Q.    And likewise, you concluded that the drainage

5    features depicted on the blowup, the blowup behind you,

6    coming out of Wetland 1 are also accurate, correct?

7         A.    That's is correct.

8         Q.    And those are listed on that map as Streams 1

9    and 2, correct?

10        A.    Yes.

11        Q.    Now, I want to make sure I understand this next

12   part clearly.  You did a lot of work with Wetland 1.  You

13   didn't make any conclusions with respect to Wetland 2 on

14   that blowup, did you?

15        A.    I did not.

16        Q.    You did not make any conclusions with respect to

17   Stream Number 3, did you?

18        A.    I did not.

19        Q.    Wetland 3, you didn't make any conclusions

20   there, did you?

21        A.    I did not.

22        Q.    You weren't asked to evaluate those areas by

23   Mr. Brickfield, were you?

24        A.    I was not.

25        Q.    When was the first report dated, the first,

26   which I believe is Government's Exhibit 25, but it is the

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    report in front of you, when was that dated, is it December

3    2011?

4         A.    Yes.

5         Q.    That's not the last evaluation you did in

6    connection with this case though, right?

7         A.    I did another critique.

8         Q.    Okay.  Did you do a critique dated September 12,

9    2012?

10        A.    Yes.

11        Q.    And specifically you were asked by

12   Mr. Brickfield to review certain Grand Jury materials;

13   isn't that right?

14        A.    Pardon me?

15        Q.    Certain Grand Jury materials?

16        A.    Yes.

17        Q.    Specifically connected with another EPA wetland

18   delineator; isn't that right?

19        A.    Yes.

20        Q.    Mr. Pete Stokley (phonetically)?

21        A.    Yes.

22        Q.    An individual with experience examining and

23   evaluating historic aerial photographs and maps, correct?

24        A.    Yes.

25        Q.    And he provided to you certain materials,

26   correct?

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2        A.    Yes.

3        Q.    Is it fair to say that most of the case-related

4    materials you got in connection with this case came from

5    Mr. Brickfield?

6        A.    Yes.

7        Q.    For instance, you weren't at the courthouse

8    gathering files yourself?

9        A.    No, I did not.

10       Q.    You didn't conduct any interviews of any

11   individuals?

12       A.    I did not.

13       Q.    In your 2012 evaluation, is it fair to say you

14   contested some of Mr. Stokely's findings that the aerial

15   photographs indicated there were wetlands present

16   underneath the fill pad?

17       A.    There was one statement in his testimony

18   relative to that one sentence where he indicated that the

19   fill area extended and touched in to the wetland, I believe

20   is what was stated.

21       Q.    And as part of that critique of Mr. Stokely's

22   transcript, you noted that there were aerial photographs

23   upon which Mr. Stokely was relying?

24       A.    Yes.  The copies that I had were not very good,

25   but, yes, there were some aerial photographs included.

26       Q.    But you stated -- even you admit that you didn't

1232

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    have all the same materials that Mr. Stokely was relying

3    on, correct?

4         A.    I don't know if I had all of the materials that

5    Mr. Stokely relied upon.  His aerial photographs were never

6    dated.

7         Q.    Okay, and you didn't even get all those aerial

8    photographs, did you?

9         A.    I don't know.

10        Q.    Didn't you note in your letter, didn't you note

11   in the September 12, 2012, critique that you didn't have

12   all that information?

13        A.    Well, the testimony was such that there were --

14   the way the testimony was spoken, it was pointed to

15   exhibits, and I didn't get the -- obviously I didn't have

16   those exhibits.  I didn't have color versions of everything

17   that he had.

18        Q.    And again, those were not provided to you by

19   Mr. Brickfield either, correct?

20        A.    No.

21        Q.    So not all of the materials in Mr. Brickfield's

22   possession made it to you?

23        A.    I don't know.

24        Q.    Okay.  You mentioned before that you had quite a

25   bit of experience in permitting wetlands; is that right?

26        A.    Yes.

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2         Q.    Fair to say that there is federal permits

3    required for wetlands permits?

4         A.    Wetlands under federal jurisdiction, yes.

5         Q.    Likewise, there is New York State permits for

6    filling wetlands in the state jurisdiction, correct?

7         A.    Wetlands under state jurisdiction, that's

8    correct.

9         Q.    And would it be illegal to fill either New York

10   State or federal wetlands without such permits?

11        A.    Yes.

12        Q.    All right.  So if, for instance, using the

13   blowup behind you, which is marked as 24L, so is it fair to

14   say that if individuals conspired to continue filling west,

15   they would need a permit to get into Wetland 1?

16             MR. MUSITANO:  Objection.  Calls for

17   speculation.

18             MR. GLEASON:  It is a hypothetical.

19             THE COURT:  Overruled.  You may answer.

20        A.    Yes, that's is correct.

21   BY MR. GLEASON, CONTINUED:

22        Q.    As a matter of fact, with respect to Wetland 1,

23   you concluded in your report that it was a wetland and

24   drainage features subject to federal jurisdiction, correct?

25        A.    That's correct.

26        Q.    You mentioned with Mr. Brickfield that you have

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    done quite a bit of commercial and industrial work,

3    correct?

4         A.    Yes.

5         Q.    For instance, at least seventeen projects

6    associated with commercial and industrial development

7    projects, correct?

8         A.    At least.

9         Q.    Eight electric power generation projects?

10        A.    At least.

11        Q.    Twelve hydroelectric projects?

12        A.    Yes.

13        Q.    Eight hazardous and solid waste management

14   projects?

15        A.    Yes.

16        Q.    So that's, by my math, that's at least fifty

17   different projects, correct?

18        A.    From my resume, I believe, and there is many,

19   many more.

20        Q.    And most of those projects, is it fair to say,

21   was either getting permits for filling wetlands or permits

22   or negotiating violations of wetlands, correct?

23        A.    Probably the majority of them, but not all of

24   them.

25        Q.    Okay.  You were contacted -- well, we have

26   already been over that, but you didn't do your work for

1    JOSEPH MCMULLEN - Cross by Mr. Gleason

2    free here, I am assuming?

3         A.    That's correct.

4         Q.    You were under a contract with Mr. Brickfield;

5    is that correct?

6         A.    Yes.

7         Q.    At some point he contacted you and asked you to

8    do some work, correct?

9         A.    That's correct.

10        Q.    Did he let you know what he wanted in writing at

11   some point?

12        A.    Yes.

13        Q.    Do you have that with you here today?

14        A.    I do not.

15        Q.    Do you know whether or not that engagement

16   letter and what you were asked to do was provided to the

17   United States?

18        A.    I do not know.

19             MR. GLEASON:  I have nothing further, Your

20   Honor.

21             THE COURT:  Mr. Brickfield, redirect, if

22   any.

23             MR. BRICKFIELD:  Yes, Your Honor.

24

25   REDIRECT EXAMINATION BY MR. BRICKFIELD:

26        Q.    Mr. McMullen, you had an opportunity to look at

1   JOSEPH MCMULLEN - Redirect by Mr. Brickfield

2   the government's Joshua Frost report, did you not?

3       A.   Yes.

4       Q.   Did he have any natural resource maps?

5       A.   Yes, he did.

6       Q.   Did he have any aerial photographs similar to

7   what you had?

8       A.   The only aerials was just basically that the

9   wetlands map was produced from.

10      Q.   So he didn't have the 1995 ones, the 2003, and

11  the other ones, correct?

12      A.   That's correct.

13      Q.   Where did you get them from?

14      A.   If I remember, the 1995 aerial is available from

15  the USGS, U.S. Geological Survey.  The 2003 and 2008, I

16  believe, are from the New York State GIS Clearinghouse.

17  These are all available online.  And I believe the 2006

18  aerial, we purchased from an agricultural group.

19      Q.   So I didn't give you any maps, I didn't give you

20  photos, you were retained to do your own investigation;

21  correct?

22      A.   That's correct.

23      Q.   Did anyone steer you and tell you what your

24  conclusions should be?

25      A.   No.

26      Q.   Do you know if anyone at Brickfield and Donahue

1   JOSEPH MCMULLEN - Redirect by Mr. Brickfield

2   knows anything about wetlands?

3        A.    I don't know.

4        Q.    Did you even know me prior to this case?

5        A.    No.

6        Q.    And your conclusion, is that based on your

7   testimony of the photographs, the field observations, and

8   the natural resources?

9        A.    Yes, that's correct.

10       Q.    Was it affected by anything whatsoever other

11  than your scientific background and experience?

12       A.    Absolutely not.

13       Q.    Now, Mr. Gleason mentioned Stokely.  Do you know

14  if Peter Stokely testified in this case?

15            MR. GLEASON:  Objection.

16            THE COURT:  If he knows.

17  BY MR. BRICKFIELD, CONTINUED:

18       Q.    At this trial, do you know, yes or no?

19       A.    I don't know if he testified.

20       Q.    And do you recall that --

21            MR. BRICKFIELD:  If I may approach, Your

22  Honor.

23  BY MR. BRICKFIELD, CONTINUED:

24       Q.    -- that in May of 2012, I sent you a letter

25  containing Mr. Stokely's Grand Jury testimony, including

26  three maps that he had referred to in his testimony?

1    JOSEPH MCMULLEN - Redirect by Mr. Brickfield

2         A.    Yes.

3         Q.    And from looking at that transcript you can see

4    that he only referred to three maps; correct?

5                   MR. GLEASON:  Objection.  Leading.

6                   THE COURT:  Yes, sustained.

7    BY MR. BRICKFIELD, CONTINUED:

8         Q.    Did you have an opportunity to review

9    Mr. Stokely's Grand Jury testimony?

10        A.    Yes, there are three maps included.

11        Q.    And is that the only three maps referred to

12   during his testimony?

13        A.    Yes.

14        Q.    So you got a copy of his testimony, and you got

15   the maps?

16        A.    Yes.

17        Q.    Did anyone from my firm tell you -- what did we

18   ask you to do once we gave them to you?

19        A.    You asked me to evaluate the testimony.

20        Q.    And after you evaluated that testimony, what

21   conclusion did you reach about whether or not the fill area

22   had ever been in the wetlands?

23        A.    My conclusion was that the fill area did not

24   contain wetlands.

25                   MR. BRICKFIELD:  Thank you, Your Honor.  I

26   have no further questions.

1   JOSEPH MCMULLEN - Redirect by Mr. Brickfield

2                  MR. ZELLER:  None, Your Honor.

3                  MR. MUSITANO:  None, Your Honor.

4                  MR. GLEASON:  Nothing further, Your Honor.

5                  THE COURT:  Okay.  You may step down.  Thank

6   you.

7                  (Whereupon, the Witness is excused.)

8                  THE COURT:  All right.  Members of the jury,

9   we will take our morning break now, and advise you not to

10  the discuss the case, of course, among yourselves or anyone

11  else.  We will be back shortly.

12                 Mr. Minor.

13                 COURT CLERK:  Court stands for the morning

14  recess.

15                 (Whereupon, a brief recess was taken.)

16                 (Whereupon, the proceedings were held in

17                 open court in the presence of the Jury.)

18

19                 THE COURT:  Mr. Brickfield, you may call

20  your next witness.

21                 MR. BRICKFIELD:  Your Honor, at this time we

22  call Jack Gall.

23

24      JOHN C. GALL, having been called as a Witness, being

25  first duly sworn, was examined and testified as follows

26  under oath:

1

2

3    DIRECT EXAMINATION BY MR. BRICKFIELD:

4        Q.    Good morning, Mr. Gall.  How are you doing?

5        A.    Good morning.  I am good.

6        Q.    Do you go by John or Jack?

7        A.    I go by Jack.

8        Q.    Now, what is your profession?

9        A.    We remove asbestos.  We are an asbestos

10   abatement contractor.

11       Q.    Asbestos removal contractor?

12       A.    Yes.

13       Q.    Keep your voice up.  How many years have you

14   been in this field?

15       A.    Since 1991.

16       Q.    And are you licensed by the State of New Jersey?

17       A.    My company is licensed by the State of New

18   Jersey.

19       Q.    What's the name of the company?

20       A.    Ace Insulation Company.

21       Q.    How many employees do you have?

22       A.    It varies, but roughly five.

23       Q.    And what is your title in the company?

24       A.    I am the operations manager.

25       Q.    Where is the company?

26       A.    Colts Neck, New Jersey.

```
 1    JOHN C. GALL - Direct By Mr. Brickfield
 2         Q.    In that in Monmouth County?
 3         A.    Yes.
 4         Q.    Now, do you know a company, Mazza and Sons?
 5         A.    Yes.
 6         Q.    Do you know Dominick Mazza?
 7         A.    Yes.
 8         Q.    Have you been doing business with Mazza and Sons
 9    for a number of years?
10         A.    A number of years.
11         Q.    When approximately did you start doing business?
12         A.    I believe it was around 2003.
13         Q.    What business do you do with Mazza and Sons?
14         A.    We do their asbestos abatement for their
15    demolition contracts that they have.
16         Q.    And by demolition contracts, what do you mean?
17         A.    They bid on a project that is going to come
18    down.  If there is asbestos in it, we go in and take the
19    asbestos out.
20         Q.    I am sorry.  Let me restate this.  By
21    demolition, they are not blowing up buildings, they are
22    using equipment to take them down?
23         A.    Yes.
24         Q.    And so you have been hired by Mazza and Sons,
25    your company, to do the asbestos removal work for them?
26         A.    Yes.
```

1    JOHN C. GALL - Direct By Mr. Brickfield

2        Q.    And approximately how many jobs have you done

3    for Mazza and Sons from 2003 to the present?

4        A.    I really couldn't tell you the number.  We do

5    probably ten, twelve jobs a year for them.

6        Q.    Are these substantial jobs or what?

7        A.    Sometimes they are houses.  Sometimes they are

8    major buildings.

9        Q.    What is it that you actually do, you and your

10   company?

11       A.    I am sorry.

12       Q.    What is it that you do when you get a contract

13   from Mazza and Sons to do some work?

14       A.    Right.

15       Q.    Is the asbestos work done before the building

16   can be demolished?

17       A.    Yes, which is part of the recycling process.  We

18   go in first, and we take the asbestos out, certify that the

19   asbestos is gone, and then the demo contractor can do his

20   thing.

21       Q.    What do you mean by certify?

22       A.    Show the records that the materials had been

23   removed properly, that it has been taken to a proper

24   landfill, air tests were taken.

25       Q.    What do the air tests do?

26       A.    Air clearances just to make sure there is no

1    JOHN C. GALL - Direct By Mr. Brickfield

2    danger for anybody to work in there after we are finished.

3         Q.    When you certify it, it is certification that

4    all the asbestos is removed?

5         A.    Yes.

6         Q.    And that it is now safe to start the demolition

7    process?

8         A.    Yes.

9         Q.    Can you give the jury an estimate of the dollar

10   amount in business that your company has done for Mazza and

11   Sons?

12        A.    Probably half a million dollars over the last

13   ten years.

14        Q.    Now, in addition to -- on those demolition jobs,

15   you go on site, do you not?

16        A.    Yes.

17        Q.    And the asbestos that you remove, is it brought

18   back to Mazza and Sons at the present time?

19        A.    No, no.

20        Q.    Is it is removed on site?

21        A.    It depends on what we are taking out.  If it is

22   a friable material, meaning pipe covering or plaster, we

23   will take it to a facility called IESI which is located in

24   Bethlehem, Pennsylvania.  If it is a non-friable material,

25   we either take it to GROWS, which is in Tullytown,

26   Pennsylvania or a Chrin's Landfill in Easton, Pennsylvania.

1    JOHN C. GALL - Direct By Mr. Brickfield

2         Q.    You just said friable versus non-friable.  What

3    is your understanding of the difference?

4         A.    Friable would mean, the definition would mean

5    that you can crush it into powder with hand pressure.

6         Q.    And non-friable is?

7         A.    You can't crush it.

8         Q.    Are you familiar with transite?

9         A.    Yes.

10        Q.    What is an example of transite?

11        A.    Transite is a cement type product that has

12   asbestos in it to bind it together.

13        Q.    Now, in addition to the number of demolition

14   jobs, have you ever had occasion to go to the Mazza and

15   Sons facility, itself?

16        A.    Yes, he has asked me to pick up material he

17   finds in his yard on occasion.

18        Q.    Who do you mean by he?

19        A.    Either Dominick or his contracting manager,

20   Kerry Carlos (phonetically).

21        Q.    What do you do when you get that call?

22        A.    We will notify DEP that we are going to take an

23   asbestos load to whatever landfill we are taking it to.  We

24   manifest it, the load.  We go to the property.  Usually it

25   is set aside for us, and we will package it and make sure

26   it is wet when we package it and then take it to the

1245

1   JOHN C. GALL - Direct By Mr. Brickfield

2   landfill.

3        Q.    And how often a year are you asked to do that

4   process?

5        A.    It varies.  It probably averages about three

6   times a year.

7        Q.    What type of quantity are we talking about?

8        A.    Again, it varies.  Sometimes it is only a few

9   bags.  Sometimes it is a few yards.

10       Q.    By bags, what type of bags?

11       A.    Well, I package it.  It would be thirty-two by

12   fifty in size, six mil abatement bags.

13       Q.    Thirty-two by fifty inches?

14       A.    Yes.

15       Q.    So would it be fair to say less than a cubic

16   yard?

17       A.    Oh, yes.  You would need probably four or five

18   bags to equal a cubic yard.

19       Q.    What type of asbestos was this?

20       A.    It all seems to transite, transite pipe,

21   non-friable I will call it.

22       Q.    Have you ever picked up anything friable from

23   Mazza and Sons?

24       A.    I have never picked up anything friable from

25   them.

26       Q.    How often in between these calls do you go,

1    JOHN C. GALL - Direct By Mr. Brickfield

2    what's the frequency?

3         A.    Again, it varies.  Sometimes it could be a month

4    apart.  Other times it could be four or five months apart.

5         Q.    Now, let me show you what we have marked, what

6    has been marked as Defendants' Exhibits 155, 156 and 157.

7                   MR. BRICKFIELD:  Your Honor, may I approach?

8                   THE COURT:  You may.

9    BY MR. BRICKFIELD, CONTINUED:

10        Q.    Now, Mr. Gall, do you recognize those

11   photographs?

12        A.    Not offhand, but that's typical of the type of

13   material that we will pick up.

14        Q.    Can you describe what type of material it is?

15        A.    Again, it is a transite material.  It is in

16   fairly large pieces.  I would say it is a non-friable, in a

17   non-friable state at this point.

18        Q.    Now, when you -- let me direct your attention to

19   the fall of 2006.  Did there come a time that you were

20   called by Mazza and Sons to come pick up some materials?

21        A.    Yes.

22        Q.    Let me show you what has been marked for

23   identification as Defendants' Exhibit 24, and ask if you

24   would identify that document?

25        A.    Yes.

26        Q.    What is Defendants' Exhibit 24?

1    JOHN C. GALL - Direct By Mr. Brickfield

2         A.    This was a document -- I was subpoenaed.  My

3    records were subpoenaed by the State of New York, and I

4    went through my archives and thought I found everything

5    that I had.

6              And you had come to my office several months

7    later and mentioned that you had an invoice that didn't

8    match any documents.  And you asked me to look through it

9    again, and I went through my 2006, I think it was,

10   archives, and I found this document paperclipped behind

11   another document.

12        Q.    And then did you provide me a copy?

13        A.    Yes.

14        Q.    And did you subsequently provide a copy to the

15   government?

16        A.    I believe you did.

17        Q.    Let me show you what has been marked for

18   identification as Defendants' Exhibit 25.  This is page

19   sixty-six.  Now, before you look at that exhibit, Mr. Gall,

20   when you go pick up a couple of bags from Mazza and Sons,

21   what type of fee would you charge Mazza and Sons?

22        A.    It would depend on how much I am taking away.

23   Normally it is around a five hundred fee.

24        Q.    What type of fee would you charge for these

25   demolition jobs, what would the range on those fees be?

26        A.    I have unit pricing.  Again, if it is prevailing

1    JOHN C. GALL - Direct By Mr. Brickfield

2    wage or non-prevailing wage, normally I get a dollar a

3    square foot to take siding off.  I get three dollars a

4    square foot to take roofing off.  I get ten dollars a

5    linear foot to take piping off.  Three dollars a square

6    foot for floor tile.

7         Q.    Okay.  Can you give the jury a general range of

8    the size of the payments?

9         A.    I am sorry.  Anywhere from $1,600.00 to

10   $150,000.00.

11        Q.    Depending on the size?

12        A.    Depending on the size of the project.

13        Q.    Now, I placed before you Defendants' Exhibit 25.

14   Do you recognize that exhibit?

15        A.    Yes.

16        Q.    What is that?

17        A.    It is an invoice for -- it is a proposal to

18   Mazza and Sons.  This should have been an invoice.  I don't

19   know why I put it on a proposal form.  I don't charge six

20   hundred dollars to take a quantity of asbestos shingles

21   away.

22        Q.    And that's -- is that something you prepared

23   yourself?

24        A.    Yes.

25              MR. BRICKFIELD:  Your Honor, move into

26   evidence Defendants' Exhibit 25?

1    JOHN C. GALL - Direct By Mr. Brickfield

2                  THE COURT:  Any objection?

3                  MR. BENEDICT:  May I see the document?

4                  Judge, without a further showing of

5    relevance, we object, but if he can make that showing, we

6    won't object.

7                  MR. BRICKFIELD:  Okay.

8    BY MR. BRICKFIELD, CONTINUED:

9        Q.   Go now to Defendants' Exhibit 24, which I

10   previously showed you.  What is Defendants' Exhibit 24?

11       A.   It is a fax to you showing that I found this

12   material.

13       Q.   And --

14       A.   And then it is the copy of the notification

15   letter to DEP and a copy of the dump manifest and dump

16   receipt for that invoice.

17       Q.   Are those records that you maintain in the

18   ordinary course of business?

19       A.   I am sorry.

20       Q.   Are those records that you keep in your

21   business?

22       A.   Yes.

23       Q.   Are they accurate as to the information they

24   contain?

25       A.   Yes.

26                 MR. BRICKFIELD:  Your Honor, move into

1    JOHN C. GALL - Direct By Mr. Brickfield

2    evidence Defendants' Exhibit 24.

3              MR. BENEDICT:  It is not a matter of

4    foundation.  It is a matter of just a simple showing of how

5    this relates to the issue of this case.

6              THE COURT:  Overruled.  24 and 25 are

7    received.  Let's move on.

8              (Exhibit No. 24, 25, received.)

9    BY MR. BRICKFIELD, CONTINUED:

10        Q.    Now, 25 this is the proposal of six hundred

11   dollars.  What is the relationship between that and 24?

12        A.    This was document that you brought over stating

13   that you had an invoice from me that had no documentation

14   it matched up to.

15        Q.    What's the relationship between 24 and 25, do

16   those documents relate to each other?

17        A.    Yes.

18        Q.    How do they relate to each other?

19        A.    This is the invoice for the material that I took

20   away on -- I have to look at the date.

21        Q.    We are going to go into that now.

22        A.    Okay.

23        Q.    So what does Defendants' Exhibit 24 indicate are

24   the services you provided to Mazza and Sons?  Give the date

25   and give the details.

26        A.    It indicates that I took material away from

1    JOHN C. GALL - Direct By Mr. Brickfield

2    Mr. Mazza's site.  I took it to Chrin's Landfill.  It says

3    that there was only three bags of non-friable material that

4    I took, and a corresponding dump receipt that goes with it.

5        Q.    You took it to a --

6              THE COURT:  What was the date you did that?

7    BY MR. BRICKFIELD, CONTINUED:

8        Q.    What is the date you did that?  I am sorry.

9        A.    I believe it says November 2nd.

10       Q.    Of what year?

11       A.    Of 2006.

12       Q.    Okay.  So based on those documents then, do you

13   recall that you removed three bags out around that time

14   from Mazza and Sons?

15       A.    Yes, I am sure we did.

16       Q.    Was it friable or non-friable?

17       A.    It was a non-friable product.

18             MR. BRICKFIELD:  May I approach, Your Honor?

19             THE COURT:  Yes.

20             MR. BRICKFIELD:  Thank you.  I have no

21   further questions at this time.

22             THE COURT:  Mr. Zeller.

23             MR. BRICKFIELD:  No questions, Your Honor.

24             MR. MUSITANO:  No thank you.

25             THE COURT:  Mr. Benedict.

26

1252

1   JOHN C. GALL - Cross by Mr. Benedict

2   CROSS-EXAMINATION BY MR. BENEDICT:

3        Q.   We are still in the morning.  So good morning,

4   Mr. Gall.

5        A.   Good morning.

6        Q.   We have chatted previously, haven't we?

7        A.   Yes.

8        Q.   In fact, we chatted last night at the Utica

9   Hotel, correct?

10       A.   Yes.

11       Q.   Now, you have just said on direct examination

12  that you did approximately ten to twelve jobs per year

13  since 2003 for Mazza and Sons, correct?

14       A.   Correct.

15       Q.   Do you recall telling us last night, and let me

16  back up a little bit.  With me was Special Agent Derx of

17  the EPA and Special Agent Stuart of the EPA.  Do you recall

18  that?

19       A.   Yes.

20       Q.   Do you recall telling us last night that you

21  picked up from Mazza and Sons approximately three to four

22  times a year?

23       A.   We are not talking about the same thing.

24       Q.   Okay.

25       A.   He asked me how many jobs we do in the

26  contracting end.

1253

1    JOHN C. GALL - Cross by Mr. Benedict

2        Q.    Okay.  I see what you are saying.  So you do ten

3    to twelve contract jobs per year?

4        A.    Per year.

5        Q.    But three or four times a year, you showed up to

6    their site to just pick up some asbestos that they found?

7        A.    When I am called for, yes.

8        Q.    Now, you testified here about a pickup that you

9    did in November of 2006, correct?

10       A.    Yes.

11       Q.    Three bags?

12       A.    Yes.

13       Q.    Right?  In point of fact, you didn't pick up

14   anything at their facility?

15       A.    My company picked it up.

16       Q.    Your company picked it up.  And you weren't

17   there, were you?

18       A.    No.

19       Q.    And an individual from your company picked up

20   some material that was transite and removed it for

21   disposal, correct?

22       A.    Correct.

23       Q.    Now, again, you didn't see it, you didn't

24   inspect it, you didn't analyze it, correct?

25       A.    Correct.

26       Q.    And your employee didn't send it out for

1   JOHN C. GALL - Cross by Mr. Benedict

2   testing, correct?

3       A.    I don't know that there is any mandate that says

4   we have to.

5       Q.    Just yes or no.

6       A.    No.

7       Q.    Okay.  Now, there is no mandate that says you

8   have to, correct?

9       A.    Correct.

10      Q.    So we will do it one at a time.  Transite that

11  came from Mazza that you would generally pick up, was not

12  material that had been put through a grinder or a shredder,

13  had it?

14      A.    No, in the pictures that I was shown, they are

15  usually in decent sized chunks.

16      Q.    Yes.  And in fact, when you have gone and you

17  picked up previously, that's typically what you get from

18  him?

19      A.    Yes.

20      Q.    Pieces as large as sometimes three to four feet,

21  correct?

22      A.    Yes.

23      Q.    Now, you understand, do you not, and you would

24  agree with the proposition that you can render any asbestos

25  friable by pulverizing it?

26      A.    I agree.

1255

1    JOHN C. GALL - Cross by Mr. Benedict

2                MR. BENEDICT:  Now, would you bring up

3    Government Exhibit 34D.  And would you zero in for size

4    wise.

5    BY MR. BENEDICT, CONTINUED:

6        Q.    Now do you have any idea whether or not Mazza

7    and Sons have had thirty-two loads of asbestos rejected

8    from a landfill in Delaware in a five month period in 2006?

9        A.    Until you told me last night, no, I had no idea.

10       Q.    Well, forget what I said to you because that is

11   irrelevant here.  Of your own knowledge, you don't know

12   whether or not Mazza and Sons has had thirty-two loads

13   rejected at Delaware, correct?

14       A.    I had no idea.

15       Q.    And when you would come over or an employee of

16   yours would come over to Mazza and Sons, you guys are the

17   asbestos abatement experts, correct?

18       A.    Yes.

19       Q.    You weren't asked to dig through the trucks or

20   to work through the truck piles that had brought material

21   back and pull out asbestos, were you?

22       A.    No, sir.

23       Q.    That had already been done by Mazza employees,

24   correct?

25       A.    I don't know.

26                MR. BRICKFIELD:  Objection, Your Honor.

1   JOHN C. GALL - Cross by Mr. Benedict

2        A.    I don't know who did that.  I have to assume

3   yes.

4   BY MR. BENEDICT, CONTINUED:

5        Q.    Now, you have no idea whether or not all the

6   materials were removed or not, do you?

7        A.    No.

8        Q.    And you don't know -- well, let me just back up

9   here for one moment.  So basically what would happen is --

10  I am sorry.  You don't know of your own personal knowledge

11  whether or not anybody at Mazza and Sons was licensed or

12  had proper respiratory protection or any of the other

13  requirements for disturbing asbestos products, do you?

14       A.    No, I don't.

15       Q.    And you wouldn't know whether any trucks coming

16  back to Mazza and Sons, a rejected load, whether or not

17  that was friable or non-friable because that's not

18  something you were involved in?

19       A.    Correct.

20       Q.    What you do know is the approximate weight of

21  transite because you have to dispose of it, don't you?

22       A.    Yes.

23       Q.    How much does it cost in New Jersey to dispose

24  of transite asbestos?

25       A.    There is not too many places in New Jersey that

26  will accept it.  We take it to Pennsylvania.  It costs me

1    JOHN C. GALL - Cross by Mr. Benedict

2    one hundred dollars a ton.

3        Q.    I am pretty sure everybody can do this quickly,

4    but do you know what the cost to dispose of asbestos at

5    Southside Road in Frankfort, New York was?

6        A.    I don't have any idea.

7        Q.    Do you know what the cost to do any disposal at

8    all per ton at Frankfort, New York?

9        A.    I have no idea.

10       Q.    Do you know whether or not Frankfort, New York

11   was a listed facility allowed to handle asbestos?

12       A.    I would have no knowledge of that.

13       Q.    And similarly, you would have no knowledge of

14   whether or not it was licensed to handle anything?

15       A.    Correct.

16       Q.    Okay.  I would like to show you what is marked

17   as Government's Exhibit 27.  I am sorry.  I am sorry.

18   Government's Exhibit 89.

19            MR. BENEDICT:  If you can bring up

20   Government's Exhibit 89.  I am sorry.  All right.  Let me

21   set some foundation then.

22   BY MR. BENEDICT, CONTINUED:

23       Q.    What is government -- let me just look at it for

24   one moment if I may.  What is this document?

25       A.    This looks like a project that we did for

26   Mr. Mazza for one of the demolition jobs.

1258

1    JOHN C. GALL - Cross by Mr. Benedict

2         Q.    Would you turn to the last page?

3         A.    Okay.

4         Q.    Does it reflect on it what the weight of the

5    disposal was?

6         A.    Yes.

7         Q.    And on the front page, does it reflect about the

8    size of the project?

9         A.    Yes.

10        Q.    And let me show you at the same time so we can

11   do this simultaneously, Government's Exhibit 88.  Does that

12   also have the same information with regard to the size of

13   the project and the weight of the asbestos and also the

14   disposal costs?

15        A.    Yes.

16              MR. BENEDICT:  I would offer both of those

17   into evidence, Your Honor.

18              THE COURT:  Any objection?

19              MR. BRICKFIELD:  May we see them, please?

20              No objection, Your Honor.

21              MR. ZELLER:  No problem, Your Honor.

22              MR. MUSITANO:  No objection, Judge.

23              THE COURT:  Received.  Government's 88 and

24   89.

25              (Exhibit No. 88, 89, received.)

26              MR. BENEDICT:  Could you please bring them

1259

1    JOHN C. GALL - Cross by Mr. Benedict

2    up on the screen?  88 would be good.  I don't care.  We are

3    going to do both of them.

4    BY MR. BENEDICT, CONTINUED:

5        Q.   So we are looking at Government's Exhibit 88,

6    correct?

7        A.   Correct.

8        Q.   All right.  Now, how much asbestos was being

9    removed?

10       A.   It says sixteen hundred square feet, sixteen

11   hundred and fifty square feet.

12       Q.   Would you turn to the last page, please, second

13   to the last page?  Mazza 43 is the bates number on it.  And

14   does it indicate -- right where it says net, does it

15   indicate the poundage that -- this comes from a house,

16   correct?

17       A.   Yes.

18       Q.   So this is a sixteen hundred and fifty square

19   foot house, correct?

20       A.   There is sixteen hundred and fifty square feet

21   of wall space.

22       Q.   Okay.  So that's how much asbestos is being

23   removed?

24       A.   Yes.

25       Q.   Okay, and how much does that much weigh?

26       A.   It says that it was 678.14 under the tons, but I

1260

1    JOHN C. GALL - Cross by Mr. Benedict

2    can't imagine that there was six hundred and seventy-eight

3    tons.

4         Q.    No, no, no.  Let me direct you, if I can, where

5    it talks about the net?

6         A.    Okay.  1.31 tons.

7         Q.    Okay, and that is how much?

8         A.    Two thousand, six hundred and twenty pounds.

9              MR. BENEDICT:  And Government's Exhibit 89.

10   I am sorry, 88.  I am sorry.  Let's go back to 89, please.

11   BY MR. BENEDICT, CONTINUED:

12        Q.    Okay.  Now, this house is about sixteen hundred

13   square feet, is it not?

14        A.    Yes.

15        Q.    And turning to the last page, the weight here?

16        A.    1.2.

17        Q.    The weight is?

18        A.    1.32 tons.

19        Q.    Okay, and that's two thousand, six hundred and

20   forty pounds, correct?

21        A.    Right.

22        Q.    Now, your disposal amount is how much?

23        A.    I am trying to find it on here?

24        Q.    Check the bottom right.

25        A.    One hundred and thirty-two dollars.

26        Q.    Per ton?

1  JOHN C. GALL - Cross by Mr. Benedict

2       A.    Right.

3       Q.    Okay.  Now, just very briefly, when you remove

4  transite paneling, you don't smash it to pieces, do you?

5       A.    Normally, no.

6       Q.    Well, that's the very serious effort that you

7  make, not to smash it to pieces, correct?

8       A.    Correct.

9       Q.    In fact, what you attempt to do is pop it off?

10      A.    In full pieces.

11      Q.    In full pieces in a manner that disturbs it as

12  little as possible?

13      A.    Correct.

14      Q.    And describe any wetting process?

15      A.    If there is water on the site, we will use a

16  hose or you borrow it from the neighbor or we bring our own

17  water.

18      Q.    And that is specifically to avoid any kind --

19            THE COURT:  Wait a minute.  You can't both

20  talk at the same time.

21  BY MR. BENEDICT, CONTINUED:

22      Q.    That is specifically to avoid any friable

23  asbestos particles that might be generated inadvertently?

24      A.    Correct.

25      Q.    From getting into the air and being breathed

26  into lungs, correct?

1   JOHN C. GALL - Cross by Mr. Benedict

2        A.    Correct.

3        Q.    Okay, and that's without -- that's a concern

4   that you have without intentionally smashing or grinding or

5   pulverizing the material, correct?

6        A.    Correct.

7              MR. BENEDICT:  One moment.

8              THE COURT:  You may.

9   BY MR. BENEDICT, CONTINUED:

10       Q.    When you went to -- excuse me, an employee of

11  yours went to Mr. Mazza's in November of 2006 to remove

12  those bags, there were only three bags that were removed,

13  correct?

14       A.    Correct.

15       Q.    Do you know how many trucks -- again, were you

16  given any information as to how many trucks had rejected

17  loads?

18       A.    No.

19       Q.    So you don't know whether or not those three

20  bags were enough to cover asbestos found in multiple

21  truckloads, do you?

22       A.    No.

23              MR. BENEDICT:  May I have just one moment,

24  Your Honor?

25              Nothing further.

26              THE COURT:  Redirect, if any.

1    JOHN C. GALL - Cross by Mr. Benedict

2              MR. BRICKFIELD:  Yes, Your Honor.

3

4    REDIRECT EXAMINATION BY MR. BRICKFIELD:

5        Q.    Now, Mr. Gall, these bags on these jobs when you

6    bag it up and remove it from these jobs, you indicated you

7    use water?

8        A.    Yes.

9        Q.    Is there water in the bags too?

10       A.    I am sorry.

11       Q.    Is there water in the bags also?

12       A.    It is going to be on the product when we put it

13   into the bag.

14       Q.    So some of the weight is going to be the water

15   just from the process, right?

16       A.    Yes.

17       Q.    And you were asked about the rate of one hundred

18   dollars a ton to dispose of this, correct?

19       A.    Yes.

20       Q.    Is it fair to say that during the years that you

21   have known Mazza and Sons, I think you said you they paid

22   you over a half a million dollars to go to these sites and

23   remove it, correct?

24       A.    Correct.

25              MR. BRICKFIELD:  May I have Government's

26   Exhibits 88 and 89 for a moment.  If you could put up

1    JOHN C. GALL - Redirect by Mr. Brickfield

2    Government's Exhibit 89, please.

3         A.    Okay.

4    BY MR. BRICKFIELD, CONTINUED:

5         Q.    Now, you see that, that indicates that's a job

6    you did for Mazza and Sons regarding the demolishing of a

7    house, correct?

8         A.    Yes.

9         Q.    And you were hired by the Mazza and Sons

10   business to go to this house and remove the asbestos?

11        A.    Correct.

12        Q.    And to remove all the asbestos?

13        A.    Correct.

14        Q.    And it was only then that they demolished the

15   house?

16        A.    Correct.

17        Q.    So in August of 2006, they paid you $2,900.00 to

18   do it the right way, correct?

19        A.    Correct.

20        Q.    All right.

21             MR. BRICKFIELD:  Could we go to Government's

22   Exhibit 88?

23   BY MR. BRICKFIELD, CONTINUED:

24        Q.    This is another job, November 2nd, 2006,

25   correct?

26        A.    Correct.

1    JOHN C. GALL - Redirect by Mr. Brickfield

2        Q.    This was another house, you believe?

3        A.    Yes.

4        Q.    And again, were you hired by Mazza and Sons to

5    go to this house and properly and correctly remove all the

6    asbestos?

7        A.    Correct.

8        Q.    And only then was it then demolished?

9        A.    Correct.

10              MR. BRICKFIELD:  Thank you.  I have no

11   further questions.

12              THE COURT:  Mr. Zeller.

13              MR. BRICKFIELD:  No questions.

14              MR. MUSITANO:  No thank you, Your Honor.

15              MR. BENEDICT:  One quick follow-up.

16              THE COURT:  Recross.

17

18   RECROSS-EXAMINATION BY MR. BENEDICT:

19       Q.    Transite asbestos is a mixture of cement and

20   asbestos fibers, correct?

21       A.    Yes.

22       Q.    As a general matter you said that you would wet

23   it down as it is coming down and then you would put it in

24   the bag, correct?

25       A.    Correct.

26       Q.    How much water does a cement type mixture

1    JOHN C. GALL - Recross by Mr. Benedict

2    absorb?

3         A.    It really doesn't absorb a lot.

4         Q.    So you are not paying hazardous and toxic waste

5    fees for asbestos disposal containing significant

6    quantities of water, are you?

7         A.    It depends on what the product is, but, no.

8              MR. BENEDICT:  Nothing further.

9              THE COURT:  Okay.  You may step down.  And

10   members of the jury, we will take our afternoon or lunch

11   break until one o'clock.

12             I, again, remind you not to discuss the case

13   among yourselves or anyone else.  And we will see you back

14   here at one o'clock where more witnesses will be heard.

15             Mr. Minor.

16             COURT CLERK:  Court stands in recess until

17   one o'clock.

18             (Whereupon, the luncheon recess was taken.)

19             (Whereupon, the proceedings were held in

20             open court out of the presence of the Jury.)

21             THE COURT:  Do we have an issue?

22             MR. GLEASON:  Yes, Your Honor.  About

23   fifteen minutes ago, Mr. Zeller, for the first time,

24   notified us that he will be calling a witness who is not on

25   the list.  His name is Daniel White.  He is from South

26   Plainfield.

1   Motions

2           We object, one, to the timeliness of the

3   notice.  We were not notified yesterday during the

4   chamber's conference, and we were not notified until

5   fifteen minutes before they intend to call him that he

6   wishes to testify.

7           Furthermore, Your Honor, my understanding is

8   that he is going to testify in essence that he believed

9   that the permit was valid.  This is an individual who is

10  not charged.  He is not a party to this case.   His

11  testimony is completely irrelevant to the issues at bar.

12          It is subject to the 403 balancing test.

13  The balancing test tips in our favor.  Coupled with the

14  fact that this notice was completely untimely, the witness

15  should not be permitted to testify.

16          MR. BRICKFIELD:  Your Honor, that is not the

17  subject matter of the area at all.  He is a custodian of

18  the record.  We have subpoenaed records from South

19  Plainfield Transfer Recycling.  We were told through the

20  company's attorneys that they were going to send a

21  custodian named John Gault (phonetically) who is also the

22  owner of the company.

23          Over the lunchtime, a witness arrived, and

24  his name is Daniel White.  He is the custodian of the

25  records.  He came in lieu of Mr. Gault.   He is going to be

26  asked to authentic the South Plainfield business records

1   Motions

2   showing what loads that they delivered up there.

3                THE COURT:  So what could be your objection

4   now?  He is just a substitute for somebody else that you

5   had notice of who will testify to the same thing.

6                MR. GLEASON:  Again, we will come back to

7   what is the relevance of what a non -- an uncharged

8   conspirator or an uncharged party what they delivered at

9   the site.  There is no relevance to it.

10               And again, Your Honor, we geared an entire

11  cross-examination based on the representations made by

12  Mr. Brickfield and Mr. Zeller.  They have waited until now

13  to spring this on us.

14               THE COURT:  No, now wait a minute.  They

15  just said that they sent the wrong person.  I mean, it

16  wasn't exactly an intentional hiding of something.  They

17  sent the wrong person and this Daniel White is in place of

18  John Gault.

19               We are just going to testify as to the

20  custodian of the records.  And if the records are

21  irrelevant, that's something else.  But why shouldn't he be

22  allowed to testify in place of that?

23               MR. GLEASON:  Well, we again have been

24  denied a chance to fairly prepare a cross-examination.

25               THE COURT:  Well, what is the difference in

26  preparing?  As I understand it, it is just substituting for

1  Motions

2  this other person, and he is only going to testify about

3  the records which the other person was going to testify,

4  and you had notice of.

5          MR. GLEASON:  Well, we had no notice that

6  that was going to be the scope of the testimony.

7          THE COURT:  All right.  You may call

8  Daniel White.  Is that who your next witness is?

9          MR. BRICKFIELD:  Yes, it is, Your Honor.

10          THE COURT:  All right.  Summon the jury,

11  Larry.

12          (Whereupon, the proceedings were held in

13          open court in the presence of the Jury.)

14          THE COURT:  Mr. Brickfield, you may call

15  your next witness.

16          MR. BRICKFIELD:  Yes, Your Honor

17  Daniel White.

18

19      DANIEL WHITE, having been called as a Witness, being

20  first duly sworn, was examined and testified as follows

21  under oath:

22

23  DIRECT EXAMINATION BY MR. BRICKFIELD:

24      Q.   Good afternoon, Mr. White.

25          THE COURT:  Move the mike over and speak up.

26  BY MR. BRICKFIELD, CONTINUED:

1   DANIEL WHITE - Direct By Mr. Brickfield

2      Q.    Are you from the South Plainfield Transfer

3   Recycling Company?

4      A.    Yes.

5      Q.    And they are located in New Jersey?

6      A.    Yes.

7      Q.    Among your duties, are you involved -- what is

8   your position there?  I am sorry.

9      A.    Operations manager.

10     Q.    And your duties include supervision and

11  maintenance of records relating to the company's business?

12     A.    Yes.

13     Q.    Now, I am going to place before you what has

14  been marked for identification as Defendant's Exhibit 92.

15  Do you recognize that document?

16     A.    Yes.

17     Q.    And are those records of South Plainfield

18  Transfer Recycling related to business dealings with JAD?

19     A.    Yes.

20     Q.    For a period in 2006?

21     A.    Yes.

22     Q.    Does that include bills, invoices, and scale

23  tickets?

24     A.    Yes.

25     Q.    Are these maintained in the ordinary course of

26  business in the company?

1    DANIEL WHITE - Direct By Mr. Brickfield

2         A.    Yes.

3         Q.    Are they maintained in an accurate and correct

4    fashion?

5         A.    Yes.

6              MR. BRICKFIELD:  Your Honor, move into

7    evidence.

8              THE COURT:  Let's have a little more detail

9    about what they are.

10   BY MR. BRICKFIELD, CONTINUED:

11        Q.    Do those records contain a printout of all of

12   the transactions that South Plainfield Transfer Recycling

13   had with a company called JAD in 2006?

14        A.    Yes.

15        Q.    And that includes invoices sent and received,

16   payments made?

17        A.    Yes.

18        Q.    Does it also include scale tickets showing what

19   was sent and where?

20        A.    Yes.

21        Q.    All these documents are maintained in the

22   ordinary course of business at the company?

23        A.    Yes, sir.

24             MR. BRICKFIELD:  Your Honor, move into

25   evidence Exhibit 92.

26             THE COURT:  Mr. Brickfield, what is the

1   DANIEL WHITE - Direct By Mr. Brickfield

2   relevance of records at JAD in this case involving Mazza

3   and Sons, Inc.?

4              MR. BRICKFIELD:  Your Honor, the relevance

5   is there is a series of transactions relating to a delivery

6   that occurred on October 11, 2006, in Frankfort, New York.

7              THE COURT:  Okay.  Mr. Gleason or whoever

8   is -- Mr. Donner, any objection?

9              MR. DONNER:  I would object to the relevance

10  of the testimony, Your Honor, and to the documents.  They

11  don't relate at all to this particular defendant, to any of

12  the defendants rather.

13             THE COURT:  Defendants' 92 is received.

14             (Exhibit No. 92, received.)

15             THE COURT:  Proceed.

16  BY MR. BRICKFIELD, CONTINUED:

17      Q.   Now, Mr. White, if you can look at the first two

18  pages of that exhibit.

19      A.   Yes.

20      Q.   Is that a summary of the transactions that South

21  Plainfield had with JAD?

22      A.   Yes.

23      Q.   What is the time -- the first date of the first

24  transaction and the last date of the last transaction?

25      A.   Excuse me.  Say the question again.

26      Q.   When did the transactions start and when did

1    DANIEL WHITE - Direct By Mr. Brickfield

2    they end?

3         A.    September 21, 2006 to December 10, 2006.

4         Q.    October 10, 2006?

5         A.    Excuse me, October 10, 2006.

6         Q.    And what were these -- what did these

7    transactions relate to, what was being shipped?

8         A.    Demolition material.

9         Q.    It was being shipped from where to where?

10        A.    South Plainfield Transportation to Tannery Road.

11        Q.    And how many shipments were there altogether?

12        A.    Twenty-five.

13        Q.    Now, let me direct your attention to just two

14   pages in particular.

15             MR. BRICKFIELD:  And if you could please

16   call up page forty-five, Ron.

17   BY MR. BRICKFIELD, CONTINUED:

18        Q.    Now, Mr. White, do you recognize this as a scale

19   ticket?

20        A.    Yes.

21        Q.    And is this generated by South Plainfield

22   Transfer Recycling whenever a load of materials leaves the

23   plant?

24        A.    Yes.

25        Q.    And what does this one indicate as to when it

26   originated?

1   DANIEL WHITE - Direct By Mr. Brickfield

2        A.    It is hard -- I think the 10th, correct.  It is

3   hard to read.

4        Q.    10th of October 2006?

5        A.    Yes.  Thank you.

6        Q.    And there is an entry time and an exit time?

7        A.    Yes.

8        Q.    And does it indicate -- in the center there is

9   handwriting, I am sorry.  Above the handwriting, it says,

10  designation Tannery Road?

11       A.    Yes.

12       Q.    And does it indicate when this load of materials

13  was delivered to Tannery Road?

14       A.    Yes.

15       Q.    When is that?

16       A.    Delivered on the 11th of October at 6:30 a.m.

17       Q.    What was the tonnage materials that was

18  delivered that day on the quantity on the left side?

19       A.    It is hard to read from the screen.  29.96 tons.

20       Q.    And in terms of pounds then, that would be sixty

21  thousand pounds approximately?

22       A.    The gross weight on the ticket is ninety-five

23  thousand, four hundred and eighty pounds.

24       Q.    What would be the -- after gross weight to the

25  right is tare weight?

26       A.    Fifty-nine thousand, five hundred, and twenty

1    DANIEL WHITE - Direct By Mr. Brickfield

2    pounds.

3         Q.    No.  I think you read the net weight.  The tare

4    weight is the weight --

5         A.    Thirty-five thousand, five hundred and sixty

6    pounds.

7         Q.    So what was the total weight of the material

8    that actually -- that this invoice says was delivered?

9         A.    Twenty-nine tons.

10        Q.    And that's the fifty-nine thousand, nine hundred

11   and twenty pounds?

12        A.    Yes.

13        Q.    And if --

14             MR. BRICKFIELD:  Please if we could go to

15   page forty-three, two pages earlier.

16   BY MR. BRICKFIELD, CONTINUED:

17        Q.    Now, is that an invoice that was received from

18   JAD on October 16, 2006?

19        A.    Yes.

20        Q.    Does that reference the -- in the second line of

21   invoice number 43435?

22        A.    Yes.

23        Q.    Does that appear to be the same as the document

24   I just showed you before?

25        A.    Yes.

26             MR. BRICKFIELD:  Thank you, Your Honor.  I

```
1    DANIEL WHITE - Direct By Mr. Brickfield
2    have no further questions.
3              THE COURT:  Mr. Donner, you may examine.
4              MR. DONNER:  Thank you, Your Honor.
5
6    CROSS-EXAMINATION BY MR. DONNER:
7         Q.   Good afternoon, Mr. White.
8         A.   Hello.
9         Q.   We have never met?
10        A.   No.
11        Q.   We have never spoken?
12        A.   No.
13        Q.   How long have you worked for, is it Ace
14   Transport Resources?
15        A.   I don't work for Ace Transport Resources.
16        Q.   The invoice that you just testified to is on Ace
17   Transport Resources letterhead, is it not?
18        A.   It is a trucking company that I do not work for.
19   I work for South Plainfield Transfer Recycling.
20              MR. BRICKFIELD:  Objection, Your Honor.  I
21   think you are on the wrong invoice.  The invoice is JAD,
22   the invoice of October 16th.
23              MR. DONNER:  Could we bring that back,
24   please?
25              THE COURT:  What are you waiting for?
26              MR. DONNER:  I am just waiting for a
```

1   DANIEL WHITE - Cross by Mr. Donner

2   document to come up.

3                 MR. BRICKFIELD:  Judge, we have it.

4                 THE COURT:  What document are you talking

5   about?

6                 MR. DONNER:  It was Exhibit 92, page --

7                 MR. BRICKFIELD:  Put it back up again.

8                 MR. DONNER:  There you go.

9   BY MR. DONNER, CONTINUED:

10       Q.    Do you work for JAD, Inc.?

11       A.    No, sir.

12       Q.    How long have you worked for South Plainfield

13   Transfer and Recycling?

14       A.    Since 2005.

15       Q.    And other than a records custodian, what is your

16   position there?

17       A.    Operations manager.

18       Q.    What are some of your other job responsibilities

19   other than handling documents?

20       A.    Maintenance of the facility, the equipment, the

21   men.

22       Q.    About how many employees are there at South

23   Plainfield Transfer Recycling?

24       A.    Currently or at the time?

25       Q.    Currently?

26       A.    About twenty.

1   DANIEL WHITE - Cross by Mr. Donner

2        Q.    And how many were at the time when you started?

3        A.    Probably double that.

4        Q.    Did you start as vice-president?

5        A.    No.

6        Q.    What was your position when you started?

7        A.    Operations manager.

8        Q.    When did you become vice-president?

9        A.    I don't remember the exact date.

10       Q.    Was it sometime after 2005?

11       A.    Yes.

12       Q.    Was it 2010?

13       A.    No.

14       Q.    2011?

15       A.    No, sir.  About 2006.

16       Q.    What is the nature of the business conducted by

17  South Plainfield Transfer Recycling?

18       A.    To source separate demolition material.

19       Q.    Can you explain to the jury what that means?

20       A.    To take material that is dumped -- is knocked

21  down from, say, an old house, to dump it into a facility

22  that we have.  It is automated.  It grinds and separates.

23  We pulls the metal, cardboards, woods, bricks, masonry,

24  asphalt, dirt, and sell off the material or get rid of them

25  at a cheaper rate.

26       Q.    Waste comes into your facility?

1    DANIEL WHITE - Cross by Mr. Donner

2        A.    Yes.

3        Q.    You process it at your facility?

4        A.    Yes.

5        Q.    How do you process it?

6        A.    The exact way I just said.

7        Q.    Well, do you have machinery at your facility?

8        A.    Yes.

9        Q.    What type of machinery?

10       A.    Grinders, shredders, magnets, manual labor,

11   excavators, wheel loaders, bobcats.

12       Q.    I am sorry?  I didn't get that last one.

13       A.    Bobcats.

14       Q.    So waste comes into your facility, you put it

15   through that machinery?

16       A.    Yes.

17       Q.    And then what happens to it?

18       A.    It goes through the process that I just said.

19   It gets separated through an automated machine, gets

20   grinded, separated through conveyer belts and magnets,

21   manually by hand.

22       Q.    And then at some point it leaves your facility?

23       A.    Yes.

24       Q.    And how does it leave your facility?

25       A.    It gets loaded in with a wheel loader into a

26   trailer.

1   DANIEL WHITE - Cross by Mr. Donner

2        Q.    And that trailer takes it where?

3        A.    To a destination.

4        Q.    Any particular designation?

5        A.    Wherever.  It depends on who the trucker is or

6   the type of material.

7        Q.    Okay.  Does it take it to a school?

8        A.    No, sir.

9        Q.    Where would a trucker take it, the waste that's

10  processed at your facility?

11       A.    To a designated legal facility.

12       Q.    A landfill?

13       A.    Yes.

14       Q.    When you say a designated legal facility, what

15  determines whether a facility is legal?

16       A.    Its permit.

17       Q.    So you are familiar with permitting?

18       A.    Somewhat.

19            MR. BRICKFIELD:  Objection, Your Honor.

20  This is way beyond the scope.

21            THE COURT:  It certainly is.  This is way

22  beyond the scope of the direct.  I thought this witness was

23  just for the custodian of these records.  That is all that

24  was testified on direct.

25  BY MR. DONNER, CONTINUED:

26       Q.    The records that your company keeps, you

1    DANIEL WHITE - Cross by Mr. Donner

2    described earlier that it is a waste manifest?

3         A.    Yes.

4         Q.    Who generates the waste manifest?

5         A.    Scale master.

6         Q.    Is that at your facility?

7         A.    Yes.

8         Q.    And there are multiple copies of each waste

9    manifest?

10        A.    Yes.

11        Q.    And your company retains one copy?

12        A.    Sometimes one or two.

13        Q.    And the trucker gets one company?

14        A.    Yes, or two.

15        Q.    And who else?

16        A.    Landfill gets a copy.

17        Q.    And it is important for you to maintain those

18   waste manifests, is it not?

19        A.    Yes.

20        Q.    And you are required by law to maintain those

21   waste manifests?

22                   MR. BRICKFIELD:  Objection, Your Honor.

23                   MR. ZELLER:  Objection, Your Honor.

24                   THE COURT:  Overruled.  But let's move on.

25   You are going way beyond the direct here.

26   BY MR. DONNER, CONTINUED:

1    DANIEL WHITE - Cross by Mr. Donner

2         Q.    Are you required by law to maintain those?

3         A.    Yes.

4         Q.    And in fact, in this case you received a Grand

5    Jury subpoena, did you not?

6         A.    Yes.

7         Q.    And did you assist in complying with that Grand

8    Jury subpoena?

9         A.    Yes.

10        Q.    Did you provide all documents that South

11   Plainfield Transfer Recycling Corporation had in its

12   possession in compliance with that subpoena?

13        A.    Yes.

14        Q.    Did you withhold any documents?

15        A.    No, sir.

16        Q.    Does South Plainfield Transfer Recycling

17   Corporation have a permit to handle asbestos material?

18              MR. BRICKFIELD:  Judge, same objection.

19              THE COURT:  Do you want to make this your

20   own witness, Mr. Donner?  I didn't hear any testimony about

21   this.  If you are going to keep it up, we are going to stop

22   your cross.  It is simple as that.  Just like I did with

23   Mr. Zeller, went way beyond.

24              MR. DONNER:  May I have a moment, Your

25   Honor?

26              THE COURT:  You may.

1    DANIEL WHITE - Cross by Mr. Donner

2                    MR. DONNER:  Nothing further, Your Honor.

3                    THE COURT:  Anything further?

4                    MR. BRICKFIELD:  No, Your Honor.  Thank you.

5                    THE COURT:  Anything else?

6                    MR. MUSITANO:  No.  Thank you, Judge.

7                    THE COURT:  You may step down.

8                    (Whereupon, the Witness is excused.)

9                    THE COURT:  Next witness.

10                    MR. BRICKFIELD:  Yes, Your Honor.  We now

11   call Dominick Mazza.

12

13        DOMINICK MAZZA, having been called as a Witness,

14   being first duly sworn, was examined and testified as

15   follows under oath:

16

17   DIRECT EXAMINATION BY MR. BRICKFIELD:

18        Q.    Good afternoon, Dominick.

19        A.    Good afternoon.

20        Q.    What is your current age?

21        A.    Sixty years old.

22        Q.    Where you were born?

23        A.    Long Branch, New Jersey.

24        Q.    Are you married?

25        A.    Yes.

26        Q.    What is your wife's name?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    Nancy.

3         Q.    Are you a little nervous?

4         A.    I have a cold.  My mouth is very dry, and I have

5    got a severe chest ailment last night.  So I am dealing

6    with it.

7         Q.    Do you have children?

8         A.    Yes, I have three children.

9         Q.    What's their names?

10        A.    I have Dominick Junior, graduated from Hofstra

11   University as a certified public accountant.

12        Q.    Does he work with the company, Mazza and Sons?

13        A.    Yes, he does.

14        Q.    Who else?

15        A.    My second son is Joseph, he graduated from

16   Ryder.

17        Q.    Does he work for Mazza and Sons?

18        A.    Yes, he works for scrap metal.

19        Q.    How about -- do you have a daughter?

20        A.    Kristen.  She went to Saint Joe's University,

21   and she went to cooking school.

22        Q.    Is she working now or is she looking for a job?

23        A.    She works for a tiny deli.

24        Q.    And your wife, Nancy, does she work?

25        A.    Yes, she works for Colonial American Bank.

26        Q.    What is her position there?

1285

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    Senior vice-president.

3        Q.    Was does she do at the bank?

4        A.    I believe it is retail.  She is the head of

5   retail.

6        Q.    And how many years has she worked at the bank?

7        A.    There were a number of different banks so

8   probably thirty plus years.

9        Q.    Just give us briefly your educational

10   background?

11        A.    Went to high school.  Excuse me.  I graduated

12   from Villanova University.

13        Q.    What year was that?

14        A.    1975.

15        Q.    What did you major in?

16        A.    Bachelor's of Science.

17        Q.    Now, Mazza and Sons, you are one of the owners

18   of the company?

19        A.    Yes.

20        Q.    Who else is the owner?

21        A.    My brother, Jimmy.

22        Q.    That's Jimmy in the courtroom here?

23        A.    Yes.

24        Q.    What position do you have?

25        A.    My day-to-day activities?

26        Q.    No.  What is your title?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    I am president.

3         Q.    What's Jimmy?

4         A.    Vice-president.

5         Q.    And now, has this -- is this company, does it

6    trace its roots back to your father?

7         A.    Yes, it does.

8         Q.    When did your father start the company?

9         A.    Probably early 1930s.  Then in 1964 we

10   incorporated as Mazza and Sons.

11        Q.    And in the early years, what was the company's

12   business?

13        A.    Scrap metal business.  And then in the mid-1950s

14   started demolition business.

15        Q.    And demolition again, so it is clear, is taking

16   down houses and buildings and things like that?

17        A.    That's correct.

18        Q.    And when did you first start working the

19   business?

20        A.    I started working about eight years old.

21        Q.    What would you do?

22        A.    Clean scrap metal.

23        Q.    And what is the scrap metal business briefly?

24        A.    Basically scrap cars, do what they call Number 1

25   steel, number two steel, light iron, refrigerators, washing

26   machines, that kind of stuff.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        Q.    And it is just basically resold?

3        A.    We prepare it and then ship it out as prepared

4    scrap metal.

5        Q.    And do you have a number of brothers in addition

6    to Jimmy?

7        A.    Yes, I have four other brothers.

8        Q.    Were they at various times in the Mazza and Sons

9    business?

10       A.    Yes.

11       Q.    Now, at some point your father passed away?

12       A.    1975.

13       Q.    And then what happened in terms of the ownership

14   of the company?

15       A.    Four of the brothers remained in the business,

16   and 1985, I bought my oldest brother out.  1987, I bought

17   my, not middle bother, but the one above me, I bought him

18   out in 1987.  So then Jimmy and I ended up owning the

19   company.

20       Q.    And from the period 1975 through approximately

21   1987, what was the business of Mazza and Sons?

22       A.    Give me that again, please.

23       Q.    What was the business activities from 1975 after

24   your father passed away up through approximately 1987, did

25   the business focus change?

26       A.    Yes.  We moved the operation.  We moved from one

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    scrap operation in Long Branch, shut that down.  We

3    purchased a -- the current facility that we are at right

4    now, which is approximately fifty-five acres.  And then we

5    eventually changed the business into different types of

6    business at that location.

7         Q.    And so that's the Tinton Falls facility that we

8    have been hearing about?

9         A.    Yes.

10        Q.    How did the business change starting in 1990?

11        A.    Recycling came in approximately like the late

12   1980s, 1987, and we acquired it and went to the state and

13   got a permit for recycling --

14        Q.    What types -- go ahead.

15        A.    -- in 1992.  And at that time we applied for a

16   concrete grinding operation and a wood mulch, stumps, brush

17   type operation.

18        Q.    And the concrete grinding, what does that do?

19        A.    It is a very large concrete grinder that -- it

20   is called an impactor concrete grinder.  Basically it takes

21   a two foot piece of concrete, and it -- inside the working

22   elements of it, it looks like a paddle boat.

23             It has four major impact plates on the inside.

24   So as the concrete comes in from top, it drops into the

25   spinning wheel, and it beats it into smaller pieces until

26   it falls out the bottom, and it goes up conveyors.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    Is that material resold?

3         A.    Yes.

4         Q.    What is it sold for?

5         A.    Subbase material.

6         Q.    What's that?

7         A.    Subbase material is anything -- in New Jersey,

8    we are allowed to use the concrete to make parking lots and

9    under foundations and stuff like that.  If you have bad

10   soil, for instance, you could replace it with this recycled

11   concrete.  And you have different kinds.

12        Q.    Now, in 2001, did Mazza and Sons start a

13   transfer facility?

14        A.    Yes.

15        Q.    And what is a transfer facility?

16        A.    It was a -- actually it is a transferring MRF

17   operation, and basically we applied.  We applied to the

18   state for a forty-six thousand square foot building.  In

19   this building we were able to take construction and

20   demolition waste.  We would dump it on the tipping floor.

21              We could separate it by, mostly by hand, take

22   out the wood, take out the cardboard, take out the metal,

23   and then we would push the remaining part of the product to

24   the very end, and then we load it into trucks.

25        Q.    What does MRF mean?

26        A.    Material Recovery Facility.  Where I explained

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    to you, we take out the various products.

3         Q.    That's another form of recycling basically?

4         A.    Yes.

5         Q.    And then what do you do with these various

6    things that are recycled?

7         A.    Well, actually at the time wood would contain

8    two by fours, two by sixes, that type of product.  We would

9    grind it up, and we would make either mulch out of it or we

10   would make a boiler fuel out of it.

11        Q.    What about cardboard?

12        A.    Cardboard would be taken to a cardboard facility

13   and be sold.

14        Q.    And metals?

15        A.    Metals, we bought the yard.  Our company had a

16   licensed scrap yard attached to the permit.  And we always

17   bought scrap metal.  So that was always a part of our

18   operation.  So we would send it to that division.

19        Q.    Who brings material to your transfer station,

20   who are your customers?

21        A.    Smaller contractors, container outfits,

22   municipal accounts.  They are like towns, the Monmouth

23   County Bridge and Road Departments.  We basically deal with

24   all -- with everybody, even the homeowner.

25        Q.    And they bring it in and then they pay a fee to

26   basically dump it in the transfer station?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    Yes.

3        Q.    And that includes government agencies?

4        A.    Yes.

5        Q.    All right.  Now, during the years that you had

6    the transfer station, you still have it now, correct?

7        A.    That is correct.

8        Q.    During those years, what happened to your

9    demolition business?

10       A.    It still remains.

11       Q.    And so from, for example, 2001 through 2006,

12   were you continuing to demolish buildings?

13       A.    Yes.

14       Q.    Okay.  When you demolished buildings that was

15   off site obviously, that was wherever you had the contract,

16   correct?

17       A.    That's correct.

18       Q.    Generally what did you do with the materials

19   from buildings that were demolished?

20       A.    At that time we took it right to a landfill.

21       Q.    Why didn't you bring it back to Mazza and Sons?

22       A.    Because very simply, I don't want to handle it

23   twice.  I don't want to go to the job site, load the debris

24   onto a truck, take it back to my transfer station, dump it

25   on the ground only to re-load it onto to a truck and take

26   it somewhere else.  That would be dumb on my part.  So we

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    just truck the material right out to a landfill.

3         Q.    And so then the material being brought to your

4    transfer station, that is from mainly outside customers

5    then?

6         A.    Yes.

7         Q.    Now, in 2006, did you expand the facility

8    further?

9         A.    Yes, I did.

10        Q.    What was the expansion?

11        A.    We built a thirty thousand square foot recycling

12   building, and we housed a 1.7 million dollar Sherbrooke

13   sorting system.  And I had it running around beginning May

14   of 2006.

15        Q.    And what is the recycling system what is that?

16        A.    Basically what happens is inside -- first of

17   all, we built the recycling building right against the

18   transfer station building, so they are side by side.  And

19   we put a very large conveyer inside the transfer station,

20   and it went up through the wall and went to the building.

21             On the building it was, what they call, finger

22   screening, approximately fifty feet long and very high in

23   the air.  It is probably about thirty feet in the air.

24             So what happens is when the gravel over the

25   excavator loads up the material, puts it on a steel

26   conveyer, and it goes up, goes on to this finger screen.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    What happens is it separates the material.  It separates

3    larger than eight inch pieces to smaller than eight inch

4    pieces.

5         What happens is bigger stuff goes on that

6    conveyer that goes strictly right out where the picking is

7    done.  And the 8A conveyer, which takes the bigger stuff,

8    we have pickers on both sides of the conveyer.  And what

9    happens is two guys on each side of the conveyer.  It has a

10   chute on the side of it.  So if they are standing on the

11   side of the conveyor, they have a chute to the right side

12   of them, what they would do is the first guy would pick,

13   for instance, cardboard or the second guy would pick

14   concrete, and the third guy would pick metal and plastics.

15   And whatever else we decided that we wanted to pick for

16   that week.

17        Q.    And those things are be picked to be recycled?

18        A.    Yes.

19        Q.    By picked, you mean employees stand in like an

20   assembly line, they pull it out?

21        A.    That is correct.

22        Q.    Now, let me ask if I can show you what has been

23   marked as Defendants' Exhibit 7.

24             MR. BRICKFIELD:  May I approach, Your Honor?

25             THE COURT:  Yes.

26   BY MR. BRICKFIELD, CONTINUED:

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    What is Defendants' Exhibit 7?

3         A.    I didn't hear you, sir.

4         Q.    What is that a photograph of?

5         A.    That's a picture of our facility.

6         Q.    Does that picture fairly depict the facility,

7    the main features you just described in 2006?

8         A.    Yes.

9               MR. BRICKFIELD:  Your Honor, I move into

10   evidence D7.

11              THE COURT:  Any objection?

12              MR. GLEASON:  No, Your Honor.

13              THE COURT:  Defendants' 7 received.

14              (Exhibit No. 7, received.)

15              MR. BRICKFIELD:  I would ask that it be

16   published to the jury.  I am just going to raise your

17   screen.

18        A.    Okay.

19   BY MR. BRICKFIELD, CONTINUED:

20        Q.    So this is the Mazza and Sons facility?

21        A.    Yes, it is.

22        Q.    And to the left you can see a roadway, part of a

23   roadway?

24        A.    Yes.

25        Q.    In the upper left.  Where is the entrance to the

26   facility?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    Excuse me.

3        Q.    You can point to the screen?

4        A.    Can I draw?

5        Q.    I just want you to tell the jury the flow of the

6    materials?

7        A.    Okay.  As you came down the driveway where the

8    arrow is, you would come -- and that little black dot that

9    you see there is a scale house.  There is two scales on

10   both sides of that trail.

11            And then you would proceed to go where those

12   white things are right there going into the building.  The

13   big building is the forty-six thousand square foot building

14   that -- where the actually tipping floor is where people

15   would dump into that building right in there.

16       Q.    Let me stop you.  Is that the building that was

17   built first in 2001?

18       A.    Yes.

19       Q.    Now, just backing up, when you said there is a

20   scale, the second arrow you put on there?

21       A.    Yes.

22       Q.    Does every incoming customer go over the scale?

23       A.    Yes, but I have to also point out to you, the

24   very top right there where that other arrow is pointing,

25   there is another scale right there too.

26       Q.    What is that scale for?

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2       A.    That's for the scrap metal business.

3       Q.    So is the scrap metal business located at the

4   top of the picture past the two buildings so to speak?

5       A.    Yes.

6       Q.    Now, going back to the second area, that's the

7   scale for consumers coming in that want to dump stuff

8   there, right?

9       A.    Yes, two scales.  One for in and one for out.

10      Q.    Coming in, do they pay?  How do they pay?

11      A.    Usually what happens is that they go in, and

12  they present their O and D forms.  And the scale masters

13  weigh the truck up, and we have a computerized system where

14  they just punch it in, and their truck and the license

15  plate number comes up, and basically they take the weights.

16  They then proceed to go dump into the big building.

17      Q.    They pay by the weight basically?

18      A.    Yes.

19      Q.    So once they pay, then it goes -- they go to

20  where?

21      A.    Then they proceed to go to the big building.

22      Q.    And the -- what happens when they get to the big

23  building?

24      A.    Where that arrow is showing, that's where the

25  entrance of the buildings are.  There are four huge doors

26  at the beginning of that building, and they proceed to go

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   into the building.  They do kind of like a half U-turn and

3   they back up to the upper part of the building.  And that's

4   where they dump the load.

5        Q.    Once they dump, they leave?

6        A.    Then they come out to this door on the end,

7   right there (indicating), and then they proceed to go back

8   to the scale houses where the second arrow is on the out

9   scale.

10       Q.    And then the process -- basically your company

11  takes over then in terms of the next step?

12       A.    That's correct.

13       Q.    Now, you indicated that in 2005 you got this

14  recycling system for 1.6 million dollars?

15       A.    Yes, 1.7.

16       Q.    I am sorry.  And that's this second building

17  now?

18       A.    That's correct.

19       Q.    Now, and let me show you what has been marked

20  for identification as Defendants' Exhibit 22.

21            MR. BRICKFIELD:  May I approach, Your Honor?

22            THE COURT:  Yes.

23  BY MR. BRICKFIELD, CONTINUED:

24       Q.    What is Defendants' Exhibit 22?

25       A.    Did you want to put it on the screen?

26       Q.    You have identify it first.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    Okay.  It is the Sherbrooke system that we

3    purchased.

4         Q.    That's the system that you were discussing, the

5    pickers and stuff?

6         A.    Yes.

7         Q.    Is that fair and accurate schematic of what was

8    installed?

9         A.    Yes.

10                 MR. BRICKFIELD:  Your Honor, I move into

11   evidence Defendants' 22.

12                 THE COURT:  Any objection?

13                 MR. GLEASON:  I don't, Your Honor.

14                 THE COURT:  Received.

15                 (Exhibit No. 22, received.)

16   BY MR. BRICKFIELD, CONTINUED:

17        Q.    Now, if I may, Mr. Mazza, let me show you what I

18   have or what I will mark as Defendants' 22A and B, which is

19   a blow up of what you just looked at.  Are these fair and

20   accurate blowup of the system?

21        A.    Yes.

22                 MR. BRICKFIELD:  Your Honor, I move into

23   evidence 22A and B.

24                 THE COURT:  Any objection?

25                 MR. GLEASON:  No, Your Honor.

26                 THE COURT:  Received.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2                    (Exhibit No. 22A, 22B, received.)

3    BY MR. BRICKFIELD, CONTINUED:

4        Q.    Now, I want you to, using this chart, if you

5    could explain to the jury the flow once the materials

6    dropped on the floor the transfer station, what happens in

7    this system?

8        A.    Okay.  Let me use my left hand to kind of

9    demonstrate what is going on here.  The two buildings split

10   right here.

11       Q.    Hold on, let me hold this for you.

12       A.    Okay.  The two buildings split right here.  This

13   is the incoming material that gets loaded on the conveyer

14   that goes up through the next building.  This the finger

15   screen I just told you about.

16       Q.    What's a finger screen?

17       A.    A finger screen is exactly how it is described.

18   It is about eight foot wide and about fifty feet long.  And

19   it has fingers on it like this at various stages.  So it

20   keeps them going down and down and down.  So as the

21   material bounces off these fingers, the small stuff falls

22   down through it.  Now --

23       Q.    And what are those fingers made of?

24       A.    Steel.  And it comes -- see it right here how it

25   just declines.  Okay.  The smaller-than-eight-inch material

26   falls in this excavator right there, and then goes up to a

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   star screen.

3        Q.    What's a star screen?

4        A.    And the star screen is approximately five feet

5   wide and about twelve feet long.  It has about forty shafts

6   on it that actually have a rubber star about that big.  And

7   actually if you take your fingers and kind of like put them

8   on a slant a little bit, it has an upper section of it with

9   about, say, twenty rollers.  And right below it, off

10  center, the middle section of it, there is another whole

11  section of them, of rubber stars.

12            What happens is when material comes from this

13  and onto the, the star is -- actually it is right there.

14  You can see it, but you don't see this in the front view,

15  but that is the star screen right there.  So that material

16  comes up the conveyor, falls onto that star screen.  And

17  then smaller pieces go on what is called B belt for

18  material.

19            Now, normally we don't pick the B belt because

20  the stuff is so small that it just goes out, but the

21  majority of recyclables happens when the material from the

22  A belt gets picked.  That's where you get your wood, your

23  cardboard, your metal, your concrete, and your plastics.

24       Q.    If I show you 22B, that might show a little

25  better the two belt system?

26       A.    Yes, okay.  This is the A belt.  This is the B

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    belt.  Here is the star screen.  And whatever we don't want

3    goes right off the very end over here, and we load it onto

4    a truck and take to a landfill.

5         Q.    Now, are there any grinders on this system?

6         A.    No.

7         Q.    Are there any shredders?

8         A.    No.

9         Q.    Any pulverizers?

10        A.    No.

11        Q.    Now, there is these little bays here.  What goes

12   down into the bays?  You say the pickers pick, what do they

13   do --

14        A.    Okay.  Our pickers would stand right on the side

15   of the belt right here, and they would drop through this

16   chute -- maybe we should get the other one.  I can show

17   them the height difference, what it is.

18             These are the bins underneath.  So the pickers

19   stand up here and dumps it into the chute.  It comes down

20   into that bin.

21        Q.    How high is it?

22        A.    I would say it is about fourteen, fifteen high.

23        Q.    What type of things do they pick out?

24        A.    You can see it right here.  We have -- this is

25   OCC's cardboard, rock or concrete, steel, wood.  We have a

26   plastic one.  We have -- I think I named most of them.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        Q.    Then those things are taken off for what use?

3        A.    To be recycled.

4        Q.    And the remaining stuff, what happens to that?

5        A.    It goes to the landfill.

6        Q.    Now, we have heard the word fines a lot in this

7    trial.  What is your understanding of what fines are?

8        A.    With this particular system, the first bin with

9    the star screen I explained to you, takes off fines.

10       Q.    Okay.  That's the rubber --

11       A.    That is the rubber stars that -- they turn at a

12   very fast revolution, and they are all attached by chains

13   on the side, which they all move in unison.

14       Q.    What does fines consist of?

15       A.    Usually dirt and small rock.

16       Q.    Is there a size that is created?

17       A.    When the system was brand new it was virtually

18   sand coming out of it.  As things wear like everything

19   else, the stars wear down and pieces are getting bigger.

20       Q.    But in 2006, what was being produced by the

21   rubber stars?

22       A.    Pretty much a lot of sand.

23       Q.    Now, let me show you additional pictures.

24             MR. BRICKFIELD:  First, I will move in for

25   identification 11A, 11B, and 11D, I, K, J, and L.  If I may

26   approach, Your Honor.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2              THE COURT:  You may.

3    BY MR. BRICKFIELD, CONTINUED:

4        Q.    Mr. Mazza, are these additional photographs of

5    the various locations, can you describe them?

6        A.    Yes.

7        Q.    They are a fair and accurate depiction of the

8    various locations?

9        A.    Yes.

10             MR. BRICKFIELD:  Your Honor, I move into

11   evidence those exhibits.

12             THE COURT:  Any objection?

13             MR. GLEASON:  No, Your Honor.

14             THE COURT:  Received. 11A, 11B, and 11D, I,

15   K, J, and L.

16             (Exhibit No. 11A, 11B, 11D, 11I, received.)

17             (Exhibit No. 11J, 11K, 11L, received.)

18             MR. BRICKFIELD:  I would ask that you

19   publish 11A first, please.

20   BY MR. BRICKFIELD, CONTINUED:

21       Q.    Now what does 11A show?

22       A.    That's the two scales I was describing before

23   with the trailer in the middle.

24       Q.    Okay, and incoming and outgoing?

25       A.    Incoming and outgoing.

26       Q.    Now, whenever a truck goes in, what type of

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    document is created for -- to record the trucks so you can

3    bill them for whatever they are dropping off?

4         A.    First, whoever the person is driving must

5    possess an O and D form, and after that, the scale master

6    takes his information, plugs it into a computer, and prints

7    out a weight slip.

8         Q.    You indicated at some point that the remaining

9    stuff and recycling center is loaded onto trucks and taken

10   to landfills, correct?  Is there a weighing of that truck

11   on the way out?

12        A.    Yes, but I have got to clarify that,

13   Mr. Brickfield.  Our facility is very unique in the sense

14   that we have a transfer station within a recycling

15   facility.  So many times, like for instance, scrap metal

16   goes to the scrap metal division.  The mulch would go to

17   the mulch division, and concrete goes obviously to the

18   concrete division.  So even though it was weighed, it was

19   handled internally.

20        Q.    Okay, but my question was if a truck was leaving

21   with C and D that has gone to the transfer station and

22   recycling facility, is a scale ticket created when it

23   leaves?

24        A.    Yes.

25        Q.    What's that scale ticket based on, what does it

26   consist of in terms of weight and information?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2       A.    Oh, it basically shows what it was, the weight

3    of it, where it was going, and that's basically just the

4    general information.

5       Q.    Now, let me show you --

6             MR. BRICKFIELD:  If you could please publish

7    11D, as in dog.

8    BY MR. BRICKFIELD, CONTINUED:

9       Q.    What does that show?

10      A.    This is the four doors to the transfer station

11   that I described before.  This is where, after the scale,

12   the truck left the scale house.  It would come right around

13   to those four doors, and it would dump.

14            Now, you notice the two pickups to the left.

15   This was just -- this is a recent addition to our facility.

16   We were able to make a bin that came out and away from the

17   building, that a small pickup would take their stuff off

18   and not interrupt the operation in the building.

19            The reason for that is because they take a long

20   time to unload their pickups.  And big trucks are here, but

21   at this time in 2006, we had a lot of trucks in there,

22   maybe three fifty, four hundred trucks a day would come in,

23   from all sizes.  It could be tractor trailers.  It could be

24   rolloff trucks.  They could be small dump trucks.  But the

25   whole goal was to get them in as fast and as quickly as

26   possible.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2              MR. BRICKFIELD:  And then if you could go to

3    11I, please.

4    BY MR. BRICKFIELD, CONTINUED:

5        Q.    What is that?

6        A.    That is the finger screening that I was telling

7    you about.  When we installed that under -- believe it or

8    not we had to take four cranes to lift it.  It is about

9    fifty tons, just that upper tan piece.  That takes the

10   brunt of the stuff that comes from the conveyer belt.  That

11   is where the sorting comes in.  That is where it splits

12   eight inch from minus-to-eight-inch product.

13             And to the right of that, you will see the --

14   that's part of the A belt that it falls onto.

15       Q.    And then 11J, please.

16       A.    That's the upper part of the -- with the metal

17   stand, and it is actually dropped through -- do you see the

18   box where it says fines and wood and another wood.  Guys

19   would stand on the side of that bin, and it will drop right

20   through the floor into the bottom.

21       Q.    And then 11J, please?  I am sorry, L.  What does

22   that show?

23       A.    That shows the bottom of the -- where the bins

24   are where they drop all the material through the chutes

25   down to the bottom.  What happens here is that rotor type

26   of loader will go right into the -- like where the wood is

1  DOMINICK MAZZA - Direct By Mr. Brickfield

2  and move that continuously.  As fast as they pick, the

3  loader would be in there taking out the items.  For

4  instance, you have wood, construction wood, then you have

5  cardboard.  I really don't know what the next three or four

6  are, metal or concrete.

7          When the bins got filled, they were put on a

8  truck and taken out.  That truck would then proceed to a

9  scale and get weighed.  And then it would be a trip over to

10  the recycling tonnages.

11     Q.    Now, there was testimony early in this trial

12  about what someone called a tub grinder.  Does Mazza and

13  Sons have a tub grinder?

14     A.    No.

15     Q.    What type of product do you have to use with

16  wood?

17     A.    The wood -- I am sorry.

18     Q.    Let me restate.  The wood is picked out of the

19  conveyer belt system for recycling, what is then done with

20  the wood?

21     A.    It is ground up.  However, are you referring to

22  a tub grinder --

23     Q.    How is it ground up?

24     A.    Well, in our particular case, we use a

25  horizontal grinder.  Okay, and in the case of a tub

26  grinder, that was designed to do stumps.  A tub grinder

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   is -- actually looks like an open hole, has about fourteen

3   feet diameter, spins around, high velocity, and on the

4   floor is a rotor that spins around with teeth on it.  So as

5   it moves the material around into the tub, it actually

6   would grind on to the rotor and spit it out.

7       Q.    Let me show you what has been marked as

8   Government's Exhibit 56H.

9               MR. BRICKFIELD:  May I approach, Your Honor?

10              THE COURT:  Yes.

11  BY MR. BRICKFIELD, CONTINUED:

12      Q.    Do you recognize that item?

13      A.    The picture, yes.

14      Q.    What is that?

15      A.    That's our two horizontal grinders.  They are

16  called dob stats.

17      Q.    And is that the type of wood grinder that Mazza

18  and Sons had in 2006?

19      A.    Yes.

20              MR. BRICKFIELD:  Your Honor, move into

21  evidence Government's Exhibit 56H.

22              THE COURT:  Any objection?

23              MR. GLEASON:  None, Your Honor.

24              THE COURT:  Received.

25              (Exhibit No. 56H, received.)

26              MR. BRICKFIELD:  Your Honor, can that could

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    be published to the jury, please?

3              THE COURT:  Proceed.

4    BY MR. BRICKFIELD, CONTINUED:

5         Q.    Now, this picture is dated November 16, 2006?

6         A.    Yes.

7         Q.    What was ground in this machine?

8         A.    That was -- if you go back to the Sherbrooke

9    system, you see in that picture of the wood bin, that wood

10   was brought back to the back of the building and ground up.

11        Q.    To your knowledge, did Mazza and Sons ever grind

12   anything else other than wood?

13        A.    Not at this time.

14        Q.    What are these big piles to the left and right

15   of the grinder?

16        A.    That was wood chips.  At that time we put the

17   Sherbrooke system in, we were generating a lot of two by

18   fours and stuff like that.  And we managed to get a

19   contract with two companies, one in Pennsylvania, and I

20   forgot where the other one was, but we were supplying them

21   with boiler fuel and shipping the boiler fuel for a

22   nursery, I believe it was.

23        Q.    What is boiler fuel?

24        A.    Boiler fuel is -- they had three burners for the

25   greenhouses, and they would burn these chips to produce

26   heat for the greenhouses.

1  DOMINICK MAZZA - Direct By Mr. Brickfield

2      Q.    Now, you mentioned earlier that you have a

3  concrete business where you grind concrete?

4      A.    Yes.

5      Q.    Is that separate and apart from the transfer

6  recycling facility?

7      A.    Yes, I mentioned before our operation is

8  designed as a transfer station in the middle and a

9  recycling facility around it.  We have -- as you came in

10  the driveway on the right, we have a concrete operation

11  that strictly takes concrete and grinds it and makes the

12  subbase products I told you about.

13      Q.    Is that separate and apart from the transfer

14  recycling facility?

15      A.    Absolutely.

16      Q.    Let me show you what has been marked as

17  Defendants' Exhibit 11N.

18              MR. BRICKFIELD:  May I approach, Your Honor?

19              THE COURT:  Yes.

20  BY MR. BRICKFIELD, CONTINUED:

21      Q.    Now, you recognize that photograph?

22      A.    Yes, that's our concrete operation.

23              MR. BRICKFIELD:  Your Honor, move into

24  evidence that exhibit.

25              THE COURT:  Any objection?

26              MR. GLEASON:  No, Your Honor.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2                    THE COURT:  Received.

3                    (Exhibit No. 11N, received.)

4                    MR. BRICKFIELD:  I ask that that be

5    published to the jury.

6                    THE COURT:  Proceed.

7                    MR. BRICKFIELD:  That is the wrong number.

8    11N, as in Nancy.

9    BY MR. BRICKFIELD, CONTINUED:

10        Q.    So that's the concrete section where you make

11   the subbase?

12        A.    Yes.

13        Q.    Did you ever grind anything in there other than

14   concrete?

15        A.    No.

16        Q.    The company?

17        A.    No.

18        Q.    And could we go back to Defendants' Exhibit 7

19   for a moment, please.  Okay.  I indicate where on this

20   overall picture of the facility would be that portion of

21   the operation?

22        A.    Are we talking about the concrete operation?

23        Q.    Yes, yes.

24        A.    Right there.

25        Q.    Where would the wood grinding portion of the

26   operation be?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    Well, the boiler fuel is here and mulch is back

3    here.  This whole area back here is mulch.

4        Q.    Now, you indicated a MRF,

5    recycling/manufacturing system was put into place in 2006?

6        A.    Yes.

7        Q.    As a result of that, did the nature of the

8    treatment of fines change from prior to 2006?

9        A.    Yes.

10       Q.    Prior to this machine, would you develop fines

11   any other way?  Prior to the recycling system, how would

12   you get fines?

13       A.    They would come in as loads, but we never did

14   anything with them.  They went out with loads.

15       Q.    So there was no attempt to separate it or

16   anything?

17       A.    No.

18       Q.    What was different in 2006 with 2006 with fines?

19       A.    Well, the installation of the star screen and

20   the Sherbrooke system generated fines.

21       Q.    Is there a market for fines?

22       A.    We had a hard time in the very beginning getting

23   rid of them.  So what we would do is top off the loads of C

24   and D going out to the landfills, and we would sprinkle on

25   a little bit on each load just to make sure that the truck

26   went out under eighty thousand pounds.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    What's the magic of eighty thousand pounds?

3         A.    Well, in New Jersey you can't cross eighty

4    thousand.

5         Q.    The truck's total weight cannot exceed eighty

6    thousand?

7         A.    The truck and whatever it is carrying.

8         Q.    Do you know what the weight restrictions are in

9    New York?

10        A.    I have been told they are one hundred and twenty

11   thousand pounds.

12        Q.    And so was a use developed for the fines?

13        A.    Excuse me?

14        Q.    Once you got the material recycling system, you

15   started to have fines separated from the C and D, correct?

16        A.    That's correct.

17        Q.    Did you find a market for those fines?

18        A.    Yes, we had.  Jon Deck came to me and said he

19   had a market for fines.

20        Q.    Separate and a part from Jon Deck, was there any

21   other use that you learned of through the industry where

22   finds could be used?

23        A.    We tried several different places, but they just

24   didn't last.

25        Q.    What was the use of the fines?

26        A.    As landfill cover.

1314

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    And that is called alternate daily cover?

3         A.    That's correct.

4         Q.    Was does that mean?

5         A.    Well, they save them from bringing in clean

6    fill.  You know, dirt,  for instance, right now is a

7    national resource that you have to buy and truck.  And if

8    somebody is willing to give you the fines for nothing or

9    just for trucking, I mean, it does the same purpose because

10   alternately it is covering the land for that day to meet

11   the requirements of the landfill.

12        Q.    Why would the landfill need alternate daily

13   cover?

14        A.    Because the requirements of a landfill everyday

15   has to be covered.  They can never leave an exposed work

16   face open.

17        Q.    So in other words, the fines is put on top of it

18   to cap it for the day?

19        A.    Yes.

20        Q.    Now, I want to direct your attention to the

21   period of 2005 and 2006, and I will show you what is marked

22   as Defendants' Exhibits 147, 148, and 149.

23              MR. BRICKFIELD:  Your Honor, may I approach

24   again?

25              THE COURT:  Yes.

26   BY MR. BRICKFIELD, CONTINUED:

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    Mr. Mazza, I would like to show you 147 and 148

3    and 149.  Now, you indicated earlier that there is a scale

4    base system that creates a scale ticket?

5         A.    Yes.

6         Q.    Do you know the name of the accounting system

7    used by Mazza and Sons in 2005 and 2006?

8         A.    It just went out of my mind.

9         Q.    Is it Waste Works?

10        A.    It is Waste Works.

11        Q.    And is that system able to print out for each

12   year the total amount of outbound loads of C and D and

13   fines from other materials sent out from the company?

14        A.    Yes, it is.

15        Q.    Do you have before you as Defense Exhibit 147,

16   148, and 149, a summary by location and number of the

17   amount of C and D and fine loads shipped out by Mazza and

18   Sons for those two years?

19        A.    Yes.

20             MR. BRICKFIELD:  Your Honor, I move into

21   evidence 147, 148, and 149.

22             THE COURT:  Any objection?

23             MR. GLEASON:  Yes, Your Honor.  All these

24   appear to deal with shipments in 2005.  It is not relevant

25   to the facts of this case which occurred exclusively in

26   2006 and 2007.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2              MR. BRICKFIELD:  One exhibit deals with 2005

3    and two exhibits deal with 2006, Your Honor.

4              THE COURT:  147, 148, 149 are received.

5              (Exhibit No. 147, 148, 149, received.)

6    BY MR. BRICKFIELD, CONTINUED:

7        Q.   Now, Mr. Mazza --

8              MR. BRICKFIELD:  First, if you could publish

9    Defendants' Exhibit 147.

10   BY MR. BRICKFIELD, CONTINUED:

11       Q.   Now, Mr. Mazza, is that what they call a

12   material origin report?

13       A.   Yes.

14       Q.   And is that for the period of 2005 start to

15   finish?

16       A.   Yes.

17       Q.   Okay.  What -- on the origin, it says materials

18   thirteen, I believe?

19       A.   Thirteen zero.

20       Q.   What is that?

21       A.   That's outgoing materials.

22       Q.   Would that be the C and D?

23       A.   That would be thirteen outgoing, which means it

24   is C and D or bulky waste.

25       Q.   Would that also include the fines at that time?

26       A.   Yes.

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2        Q.    Please tell the jury what the total amount of

3   shipments of C and D that left from Mazza and Sons for the

4   entire year 2005?

5        A.    Eight thousand, six hundred and seventy-six

6   loads.

7        Q.    So that's eight thousand, six hundred and

8   seventy-six trucks?

9        A.    Tractor trailer loads.

10       Q.    How many alone were sent to the -- where it says

11  Delaware Count, Delaware County, is that the DPRI that we

12  have been discussing, the Delaware facility?

13       A.    Yes, there is seven thousand, four hundred and

14  forty-seven loads.

15       Q.    And if you can go to Exhibit 148.  Now, that's,

16  I am sorry.  That's for the period, for the entire period

17  of 2006, correct?

18       A.    Yes.

19       Q.    And now this is -- is the, again, materials 130?

20       A.    Yes, it is thirteen, but yes.

21       Q.    What is the total amount of loads that was

22  shipped out from Mazza and Sons for the year 2006, start to

23  finish?

24       A.    Seven thousand, nine hundred and twenty-five

25  tractor trailer loads.

26       Q.    Of those, how many went again to the Delaware

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   facility?

3       A.    Four thousand, eight hundred and ninety-four

4   loads.

5       Q.    And prior to the period that has been discussed

6   in 2006, have you ever had any loads rejected from Delaware

7   to your recollection?

8       A.    Not to my recollection, no.

9       Q.    So of the -- in 2005, the eight thousand --

10  excuse me, the seven thousand or so loads, there were no

11  rejects?

12      A.    Not that I am aware of.

13      Q.    Now, also if you go to Exhibit 149.  Now, that's

14  the -- that's for 2006, that relates to fines?

15      A.    Yes.

16      Q.    Why was fines now a separate category separate

17  from the C and D in 2006?

18      A.    Because we developed markets for these, for this

19  product.

20      Q.    That is the alternate daily cover?

21      A.    Yes.

22      Q.    So in 2006, is it fair to say Mazza and Sons

23  shipped out six hundred and fifty trucks loads to various

24  locations?

25      A.    Yes.

26      Q.    And those are the -- it includes Delaware,

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    Tannery Road, and other locations?

3         A.    Yes.

4         Q.    Now, in addition to these shipments, are there

5    separate shipments of scrap metal, concrete, and other

6    products?

7         A.    Yes.  Our company from this division -- let's

8    take for instance the concrete division, we do one hundred

9    and seventy-five thousand tons of concrete product a year.

10   Back then we --

11        Q.    How many truckloads would that be?

12        A.    I can't do it off the top of my head to be frank

13   with you.  I couldn't do it off the to top of my head.

14        Q.    How about the scrap metal?

15        A.    Scrap metal, we do about forty to fifty thousand

16   tons a year, which I think, if I am not mistaken, it turned

17   out to be like eight thousand loads.  You know, without an

18   accurate number, I don't think I could really do it in my

19   head.  It is quite a bit.

20        Q.    And in 2006, how many employees did Mazza and

21   Sons have?

22        A.    Over a hundred.  And also all of the truckers

23   that dealt with our company were independents.

24        Q.    So you always used outside truckers?

25        A.    We always used outside truckers.

26        Q.    That's not included in the hundred people?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    No.  However, also, you have got to remember, we

3    used for our demolition, for instance, asbestos companies

4    with their employees, we used plumbers in Schenectady.

5    We -- anybody associated, landscapers for filter, topsoil.

6    So we supplied or a lot of people to work for us.

7         Q.    In addition to your employees?

8         A.    In additional to our employees.

9         Q.    Now, in 2006, were you the president of the

10   company at that time?

11        A.    Yes.

12        Q.    What were your duties, tell the jury what would

13   you do on regular basis in 2006 running the company I?

14        A.    I was running our demolition company.  That

15   means I bid jobs.  I pick up the specs.  I go to job

16   meetings.  I put the numbers together with them.  I hire.

17   I get all the subcontractors to give us prices.  I put

18   approximately thirty-two to thirty-four thousand miles on a

19   car every year.  That's basically probably ninety-eight

20   percent of my function is dealing with the demolition

21   division.

22        Q.    And are these demolition jobs -- I apologize if

23   I asked this already.  In 2006, were those materials being

24   brought back to the Mazza facility?

25        A.    No.

26        Q.    Who was --

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    Well, let me clarify that.  Demolition

3    construction, demolition waste from buildings went out to

4    the landfills.  If we had concrete I would bring concrete

5    back from that.

6        Q.    So the C and D went directly to the landfill?

7        A.    Right in the landfill.

8        Q.    Concrete that was coming back to the Mazza

9    facility would come back to Mazza?

10       A.    Right, but it also depends on where the job was.

11   For instance, if I am on a job up in Orange, I sure

12   wouldn't take concrete all the way back to Tinton Falls.

13   It is just too far.  I would use the recycling facility

14   that's right there.

15       Q.    What role did you have with regard to running

16   the transfer station and the associated recycling facility

17   in 2006?

18       A.    I mean, other than -- let me put it this way, my

19   brother took some time off for a year, so my hands were

20   really full.  I mean I was doing demolition, kind of

21   overlooking all the other stuff at the end of the day.

22            Didn't really have my thumb on it to be frank

23   with you, but, you know, we had managers and, you know, I

24   did the best I could.

25       Q.    Now, let's talk about asbestos.  Do you have

26   prior experience deal with asbestos prior to 2006?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    Absolutely.

3         Q.    What experience did you have in asbestos?

4         A.    I was in the business in, I think it was, 1998,

5    and I got out of it by 1992.

6         Q.    And what is the policy of Mazza and Sons in 2005

7    and 2006 about accepting asbestos?

8         A.    We were very -- we tried to be as diligent as we

9    could not to accept it.

10        Q.    Why not?

11        A.    We couldn't take it.

12        Q.    Were you permitted under your permit to have

13   asbestos?

14        A.    No, but there is a clause in our O and D manual,

15   which is the operations and maintenance manual, that if we

16   get something such as asbestos, maybe asbestos chips, we

17   would have to actually pick it up and put it in containers

18   and have it shipped out.  Now, I am not saying we are

19   taking whole loads of asbestos.  It is an incidental amount

20   of material.

21        Q.    Were you soliciting asbestos business in 2005

22   and 2006?

23        A.    Absolutely not.

24        Q.    In your experience, how did these asbestos chips

25   get into the plant in 2006 whenever they did?

26        A.    It is -- let me explain what happens.  When you

1323

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    have three hundred and fifty, four hundred trucks a day

3    come in which dump approximately every five minutes, and we

4    are talking about twenty, thirty, fifty, hundred yard

5    trucks coming in every single five minutes of the day.

6              They dump.  They dump on the tipping floor.  We

7    have a certain amount of time to go through it and try to

8    find whatever is in there.  And hopefully, you know, there

9    is nothing in there, but if we do come across some chips,

10   we have got to pick them up.  You have got to put them into

11   that hazardous waste container.

12   Q.    Now, at the scale where the homeowner or a

13   customer first arrives, do the scale people make any

14   efforts to see if they have asbestos?

15   A.    They can ask.  There is no way you can look into

16   a truck that is not dumped.

17   Q.    In your experience, is it easy for homeowners to

18   know whether they have asbestos or not?

19   A.    A lot of times if I go to a demolition project

20   for a homeowner, I will say to him, you know, you have got

21   asbestos shingles on your house.  He said I didn't know

22   that or a lot of times they have vinyl siding on the

23   outside of the house.  And underneath the vinyl siding is

24   asbestos shingles.

25             So a lot of the houses that I go to are already

26   vacant.  There is nobody living there.  So I always make it

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    a habit of always ripping up the vinyl siding to see what

3    is underneath.  If I do find it, you know, I will measure

4    it out, and I will give Jack Ace (phonetically) the

5    measurement so he can give a price.  And then if we do the

6    demolition job, then we go through the whole procedure of

7    getting rid of it.

8         Q.    Now, Mr. Gall was shown Government's Exhibits 88

9    and 89, which were demolition of homes in August and

10   November of 2006?

11        A.    Yes.

12        Q.    Was that some typical transaction, in that you

13   had retained him first to clear out the asbestos and then

14   demolish after that?

15        A.    That's correct.

16        Q.    Had you been using Mr. Gall for many years at

17   that point?

18        A.    Absolutely.

19        Q.    Can you estimate how much hundreds of thousands

20   of dollars Mazza and Sons had paid him to remove asbestos

21   from demolition jobs?

22        A.    I think we were up to about seven hundred

23   thousand.

24        Q.    Now, you indicated that on occasion if a chip is

25   found or a small piece, that it is picked up and placed

26   into a barrel?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    That's correct.

3         Q.    Let me show you what has been marked as

4    Defendants' Exhibits 155, 156, and 157.

5                   MR. BRICKFIELD:  Your Honor, may I approach?

6                   THE COURT:  You may.

7    BY MR. BRICKFIELD, CONTINUED:

8         Q.    Mr. Mazza, take a look at those.  Do you

9    recognize those photographs?

10        A.    Yes.

11        Q.    What are those?

12        A.    They are the drums that we have to put the

13   hazardous waste in.

14        Q.    Are those fair and accurate pictures as they

15   existed?

16        A.    Yes, sir.

17        Q.    In I believe 2007?

18        A.    Yes.

19                   MR. BRICKFIELD:  Your Honor, I move 155, 156

20   and 157 into evidence.

21                   MR. GLEASON:  No objection.

22                   THE COURT:  Received.

23                   (Exhibit No. 155, 156, 157, received.)

24                   MR. BRICKFIELD:  Now, please publish

25   Exhibit 155.

26   BY MR. BRICKFIELD, CONTINUED:

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    What is that, what does that show?

3         A.    That shot shows one of the containers having

4    some -- I am assuming could be asbestos pipe.  The shingles

5    in there not necessarily can be asbestos.  I know for a

6    fact.  That's one of the issues we are having in finding

7    shingles.

8              Right now you can go to Home Depot or to Lowe's

9    and buy that same exact shingle that looks exactly like the

10   asbestos shingle that doesn't contain asbestos in it.

11             Now, what do we do?  We have to take it out

12   whether it is or it is not.  We have to get rid of it.  So

13   I have instructed my employees to pick it up and put it in

14   drums and be done with it.  Ship it out properly.

15        Q.    Who then do you contact to take it away?

16        A.    Jack from Ace Insulation.

17             MR. BRICKFIELD:  If you could publish 156,

18   please.

19   BY MR. BRICKFIELD, CONTINUED:

20        Q.    What does that show?

21        A.    That some -- it could be asbestos pipe.

22        Q.    And again, is that stuff that is --

23        A.    It is non-friable, very hard to break.  And

24   again, if we came across a load, we would pick it up and

25   put it in the dumpsters and get rid of it properly.

26        Q.    If you find it before the customer leaves, what

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   did you do with it?

3       A.    Put it back on the truck and tell them to take

4   it to a legal landfill.

5       Q.    If you find it once they have dumped it, what do

6   you do with it?

7       A.    We have to handle it.

8            MR. BRICKFIELD:  And finally if you could

9   publish 157, please.

10  BY MR. BRICKFIELD, CONTINUED:

11      Q.    What does that show?

12      A.    They are the same containers basically with the

13  material inside of it.

14      Q.    Now, I am going to ask you a series of questions

15  concerning Delaware in 2006.  You have already indicated

16  the thousands and thousands of loads --

17           THE COURT:  Let's take our afternoon break

18  now.  We will move on with this.

19           Members of the jury, we will take a break

20  now and pick up with this witness in a few minutes.  Don't

21  discuss the case among yourselves or anyone else.

22           (Whereupon, the proceedings were held in

23           open court out of the presence of the Jury.)

24           THE COURT:  Mr. Mazza, don't discuss your

25  testimony during the break.  Do you understand?

26           THE WITNESS:  Okay.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2                    THE COURT:  Mr. Minor.

3                    COURT CLERK:  Court stands for the afternoon

4    recess.

5                    (Whereupon, a brief recess was taken.)

6                    (Whereupon, the proceedings were held in

7                    open court in the presence of the Jury.)

8                    THE COURT:  Mr. Brickfield, you may

9    continue.

10                   MR. BRICKFIELD:  Thank you, Your Honor.

11   BY MR. BRICKFIELD, CONTINUED:

12        Q.    Now, Dominick, just before the break you started

13   to tell me about the Delaware facility, the DRPI facility?

14        A.    Yes.

15        Q.    How many years had you been shipping materials

16   to Delaware?

17        A.    I believe before 2001.

18        Q.    And you indicated that according to the exhibits

19   that there was thousands and thousands of loads that you

20   would send there, correct?

21        A.    Yes.

22        Q.    To your recollection, there was no rejections

23   prior to 2006?

24        A.    Not that I am aware of.

25        Q.    Now, did there come a time in 2006 that you

26   became aware of an issue?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    Yes.

3         Q.    Tell the jury what you recall about it?

4         A.    I was in south Jersey, and I got a phonecall in

5    the afternoon that two loads were initially rejected in

6    Delaware, and as a result of those two loads being

7    rejected, the remaining loads behind it automatically got

8    rejected.

9         Q.    Why were they being rejected?

10        A.    They found some asbestos chips, suspected

11   asbestos chips on top of the load.

12        Q.    When you said the rest of the loads were being

13   rejected, was that because of something that was in the

14   loads or because they did it through a management decision.

15        A.    They never had a chance to even go into the

16   facility.  They got to the scale house and they were turned

17   around.

18        Q.    And to your understanding, did those loads come

19   back to Mazza and Sons?

20        A.    I was told from my office staff that two loads

21   did come back.

22        Q.    What happened then?

23        A.    I was told that they picked up like a baggie

24   full of asbestos chips off the load and that it was

25   reloaded and sent out again.

26        Q.    What happened next in Delaware, if you recall?

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    We had some additional loads rejected, and we

3   tried to rectify the situation with Delaware and to come up

4   with a game plan to be a little bit more assertive in

5   looking for asbestos.

6              And basically what we did was we had a meeting

7   with the Delaware officials and with the owners of the

8   landfill or manager of the landfill.  And I went to the

9   initial meeting down in Delaware with Pete Dellera and my

10  oldest son.  And then they basically came up with a game

11  plan.

12             The game plan was to try to educate the public

13  on asbestos siding and stuff like that.  So we designed a

14  brochure.  We put big signs up in the transfer station, and

15  we made our guys more aware of any type of shipment that

16  comes through, to recheck the loads.

17       Q.    What was your understanding as to the amount of

18  suspected asbestos that was in the rejected loads?

19       A.    I was told it was a baggie full.

20       Q.    And there was testimony at the trial about a

21  November 2006 load that was tested and ultimately found

22  positive for asbestos?

23       A.    I wasn't aware of it.

24       Q.    And how did it resolve with Delaware, in other

25  words, you said you were going to do training, you were

26  going to do better?

1331

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    We tried to make it work, and it was found

3    out -- well, you have to understand Waste Management owns

4    both landfills.  They own GROWS Landfill in Pennsylvania.

5              And what we ended up deciding to do, believe it

6    or not, is to go to GROWS because first of all, they take

7    asbestos, not that I wanted to keep on generating it, but

8    they gave me a cheaper price.  It was close to our

9    facility.  Overall it was a better deal for us.

10       Q.    And GROWS, how do you spell that?

11       A.    It think it G-R-O-V-E-S Landfill, which is a

12   waste management facility in Tullytown.

13       Q.    And you said they could take loads of having

14   incidental amounts of asbestos?

15       A.    Yes.

16       Q.    Were you going into the asbestos business at

17   that time?

18       A.    No, absolutely not.

19       Q.    Mr. Mazza, have you ever knowingly sent any load

20   containing any type of asbestos?

21       A.    With the amount, how big my operation is, what I

22   have invested in my lifetime, I would never do that.  I

23   would never jeopardize my company.  I would never

24   jeopardize my kids' future.  Never.

25       Q.    Now, let me direct your attention to October of

26   2008.  Did there come a time in that month that you came to

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   Syracuse, New York?

3        A.    Yes.

4        Q.    What was the purpose of coming to Syracuse?

5        A.    My lawyer received a notice that they wanted me

6   to go up and have a conference with them.

7        Q.    Did you go voluntarily?

8        A.    Absolutely.

9        Q.    What was your purpose in going?

10       A.    To help them in their investigation.

11       Q.    Investigation into what?

12       A.    To this Frankfort dumping matter.

13       Q.    Who was at this meeting from the government, if

14   you can recall?

15       A.    I really don't remember.  Craig Benedict was

16   there.  I believe Clarke was there.  I didn't really

17   remember this guy Derx that testified yesterday.  I didn't

18   remember him.  I know there was a girl there too.

19       Q.    And Mr. Gleason was there also?

20       A.    I really don't remember.

21       Q.    Now, what do you recall happening at this

22   meeting?

23       A.    They asked me questions about how I got material

24   to -- basically up to Frankfort, and I indicated to them

25   that Jon Deck came down to see me, and said he had a

26   facility up in Frankfort, showed me an exemption permit,

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    that he had a testing lab two, three weeks later come down

3    and test our material.  It came back, and he said it was

4    the greatest stuff he has ever seen.

5              I didn't hear from him for about another two,

6    three weeks.  And then he called me and said that he had to

7    do some improvements, that was taking him so long.  He put

8    some stuff up, put some fences up, and he was going to

9    contact me shortly.

10   Q.    When he called you about the testing, was that

11   before the company started to ship or after?

12   A.    He said he had to do improvements, the

13   improvements had to be done.  I mean, he didn't necessarily

14   mention fences, but he said improvements had to be done.

15   Q.    Now, so you told them about Deck and your

16   experience with him at that meeting?

17   A.    Yes.

18   Q.    At some point, did the topic of the meeting

19   change to photographs of the material in Frankfort?

20   A.    Yes.  Mr. Benedict kind of got a little

21   aggressive and threw the pictures in my face and said:  Is

22   this your material?  Is this your material?

23             I got kind of rattled because I thought I was

24   helping him, and he turns out to be the culprit coming

25   after me.

26   Q.    Did you believe it was your material?

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    No.  I told him at the meeting it wasn't my

3   material.

4        Q.    What happened after that?

5        A.    I believe my lawyer took me outside the room.

6   We went back in, and then I believe they asked me about

7   Delaware, and I was pretty frazzled about the whole thing.

8   I gave them an answer no about Delaware.  After I got my

9   composure, then I realized that I said the wrong thing.

10        Q.    After you said no, did they show you some other

11   rejection notices from Delaware?

12        A.    Yes, they did.

13        Q.    And then after that, you answered additional

14   questions?

15        A.    They asked me a question about sometime in

16   November, which to this day I still don't know about it.

17   If I didn't know about it, I said no to the answer.  I did

18   not lie about it because I didn't know about it.

19        Q.    Okay.  At that meeting in October of 2008, did

20   you have knowledge about that specific question about a

21   load being rejected in November 6, 2006?

22        A.    Well, I was shown evidence of it later on.

23        Q.    But prior to being shown the lab report when

24   Mr. Benedict asked you or Mr. Clarke asked you, did you

25   have knowledge whether or not there was, in fact, a load

26   rejected in November 6, 2006?

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2        A.    I had no knowledge of that.

3        Q.    Did you have any attempt to mislead them at that

4   time?

5        A.    Absolutely not.  I was only there to help them.

6        Q.    Now, let's go back to Mr. Deck.  How did you

7   first meet Mr. Deck?

8        A.    Sometime after the system was up and running, we

9   have a lot of brokers that have to come down to our

10  building, and we will say we are generating demolition

11  fines here now, do you know anybody that will take them?

12  And I may have said something to one of the other brokers

13  and he may have sent me to Deck.  I don't know how he got

14  to me, but it is probably through word of mouth that I was

15  looking for a place to dump fines.

16       Q.    Did you know Mr. Deck before he approached you?

17       A.    Absolutely not.

18       Q.    And what happened?  How did you meet him then?

19       A.    He came down to the yard, said that he had an

20  outlet for fines.  I said give me the permit, and he -- and

21  after about two, three weeks, gave me what he called, I

22  guess, an exemption letter.  I read it.  And one of my

23  habits of doing demolition specs, I read very quickly.  I

24  read it very quickly.  And when the testing guy came down

25  to test our material, I honestly thought that our material

26  was good to go because it met his criteria.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2        Q.    And who had provided this testing person?

3        A.    I don't remember his name.  It was Berkowitz, I

4    believe was his name.

5        Q.    Was this somebody that you suggested or somebody

6    that Mr. Deck suggested?

7        A.    Mr. Deck brought him in.

8        Q.    Let me place before you what has been marked in

9    evidence already Defendants' Exhibit 3A.

10               MR. BRICKFIELD:  I would ask that it be

11   published.

12   BY MR. BRICKFIELD, CONTINUED:

13       Q.    Now, is this the exemption letter that Mr. Deck

14   gave you?

15       A.    Yes.

16       Q.    Did he tell you at any time that it was

17   fraudulent?

18       A.    No.

19       Q.    Did he tell you at any time that he had concerns

20   about it?

21       A.    No.

22       Q.    Prior to this time, had you done any major

23   business in New York at all?

24       A.    No.  We did have some material go for different

25   places, but very small amounts.

26       Q.    And the copy that's before you was the cover

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    letter and then certain various regulations?

3         A.    Yes.

4         Q.    Was there any misspelling of New York on it?  It

5    didn't say New Y-A-K State, did it?

6         A.    I don't know where that was on the other permit,

7    but it doesn't appear to be here though.

8         Q.    Okay.  Do you know where Frankfort is?

9         A.    Believe it or not, I thought it was just above

10   the state of New Jersey.  I didn't realize until coming up

11   to this area here how far it was away.

12        Q.    You had never been to Frankfort before?

13        A.    Never been to Frankfort.

14        Q.    Now, you said you reviewed it.  How carefully

15   did you review it?

16        A.    I said I read it very quickly.

17        Q.    Did you have any reason to believe that there

18   was something fraudulent going on?

19        A.    No, I am a very trusting soul.  I do a lot of

20   business with a lot of people every day, and I put my faith

21   in a lot people.  I do demolition jobs every day.  I do

22   work, you know, I have never asked for deposits.  Everybody

23   asks for deposits.  I very seldom ask for deposits.  I am a

24   very trusting person.  I basically do what I say I am going

25   to do.

26        Q.    Had anyone prior to your business career ever

1   DOMINICK MAZZA - Direct By Mr. Brickfield

2   come in and pitched you on a fraudulent landfill?

3        A.    No.

4        Q.    Now, let me show you what has been marked for

5   identification as Defendants' Exhibit 19.

6               MR. BRICKFIELD:  May I approach?

7               THE COURT:  Yes.

8   BY MR. BRICKFIELD, CONTINUED:

9        Q.    Take a look at Defendants' Exhibit 19 for

10  identification and ask what that is?

11       A.    Back in June of 2005, we applied for a land

12  clearing activity exemption for the State Department of

13  Environmental Protection.

14       Q.    In New Jersey?

15       A.    In New Jersey.

16       Q.    And did you get approval?

17       A.    Yes, we did.

18       Q.    Is Defendants' D19 a copy of the approval you

19  received from the New Jersey DEP?

20       A.    Yes.

21              MR. BRICKFIELD:  Your Honor, move into

22  evidence Defendants' Exhibit 19.

23              THE COURT:  Any objection?

24              MR. GLEASON:  No, Your Honor.

25              THE COURT:  Received.

26              (Exhibit No. 19, received.)

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2              MR. BRICKFIELD:  I would ask that that be

3    published.

4              THE COURT:  Okay.

5    BY MR. BRICKFIELD, CONTINUED:

6        Q.    Now, Mr. Mazza, this is a two-page document, is

7    it not?

8        A.    Yes, it is.

9        Q.    Page one is just the transmittal fax?

10       A.    Yes.

11             MR. BRICKFIELD:  And could you publish page

12   two?

13   BY MR. BRICKFIELD, CONTINUED:

14       Q.    That's entitled notification of exempt recycling

15   activities, does it not?

16       A.    Yes, it is.

17       Q.    Is this something that you received, an

18   exemption for some type of work you were going to do at

19   your plant at Mazza and Sons?

20       A.    That's correct.

21       Q.    And you had received this approximately a year

22   or so before your dealing with Mr. Deck?

23       A.    That's correct.

24       Q.    So is there anything about what Mr. Deck said to

25   you that you believed you were engaging in fraudulent

26   activity?

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    He said nothing to me other than give me a

3    fraudulent permit.  I thought it was very real especially

4    when he brought the tester.  I thought I was just doing

5    business with an honest guy.

6         Q.    And Mazza and Sons then shipped a number of

7    loads then, correct?

8         A.    That's correct.

9         Q.    Do you know how many?

10        A.    I believe it was twenty-one.

11        Q.    Were you continuing to ship fines to other

12   locations?

13        A.    Without seeing paperwork, I would say yes, but I

14   would have to see paperwork.

15        Q.    And who provided the truckers for the loads that

16   went from Mazza and Sons to Frankfort?

17        A.    Jon Deck did.

18        Q.    So these were not your employees?

19        A.    No.

20        Q.    They were arranged by Mr. Deck?

21        A.    That's correct.

22        Q.    At any time during the eight days or so that

23   Mazza and Sons had shipped, had any truck come back or

24   driver come back and said there was a problem?

25        A.    No.

26        Q.    What is the price that Mr. Deck quoted you?

1341

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         A.    Fifty-two dollars.  That is inclusive of the

3    trucking.

4         Q.    What was the price generally you were paying for

5    fines to ship elsewhere at the time?

6         A.    Sixty.

7         Q.    Was there anything about the price that

8    indicated to you that something was amiss?

9         A.    No, it was a savings, but we gave it a try.  Our

10   markets come and go every day.

11        Q.    On a typical truck, how much would you save?

12        A.    Money wise?

13        Q.    Yes.

14        A.    Approximately one hundred and sixty dollars a

15   load.

16        Q.    Now, you indicated that after a couple of days

17   that Mr. Deck contacted you after it shipped for eight or

18   nine days, did you have contact with him?

19        A.    Yes.

20        Q.    What did he tell you then?

21        A.    He said to me that the landfill, the location

22   got temporarily closed because they didn't do any

23   improvements.  They didn't put the fences up.  They didn't

24   put gates up.  They had to do improvements before they

25   reopened, but to be frank, I never heard from him anymore

26   after that.

1342

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2         Q.    Subsequent to that, did there come a time that

3    the environmental investigators from New York came down to

4    speak to you?

5         A.    Yes.

6         Q.    Did that include Investigator Clarke?

7         A.    The first time I wasn't there.  I was told that

8    him and Dick Marfey (phonetically) came down.

9         Q.    And did you speak to them?

10        A.    I don't believe I spoke to them the first time.

11        Q.    The second time?

12        A.    The second time they contacted because I was on

13   a demolition job.  I came back.  I made arrangements to

14   meet them.

15        Q.    Did you tell them about what Deck had told you?

16        A.    Absolutely.

17        Q.    And did they ask you for documents?

18        A.    Yes.

19        Q.    And what directions did you give your employees

20   about documents?

21        A.    I told them to give them anything they wanted.  I

22   had nothing to hide.

23        Q.    Now, finally let me ask to show you a couple of

24   government exhibits.

25             MR. BRICKFIELD:  If we could first go to 5G,

26   please.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    BY MR. BRICKFIELD, CONTINUED:

3         Q.    Now, Mr. Mazza, you know from this trial that

4    those are the photographs from pile number three --

5         A.    Yes.

6         Q.    -- up in Frankfort?  Do you believe that this is

7    material that came from Mazza and Sons?

8         A.    No.

9         Q.    Why not?

10        A.    Because our star screen is much smaller than

11   that product.  It made a smaller product than what you see

12   here.

13        Q.    How about Government's Exhibit 5L -- I am sorry.

14   5I?

15        A.    Again, it is much larger pieces.  Are you

16   talking about pile four?

17        Q.    Pile four.

18        A.    Yes.  Definitely didn't come from my star

19   screen.

20        Q.    Does this look like fines to you?

21        A.    It is fines in some people's eyes.

22        Q.    But is this a product that you would put out

23   from Mazza and Sons?

24        A.    Not at that time, no.

25        Q.    And how about 5L, pile number five?

26        A.    It looks like the same thing.  I notice pieces

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2    of wood on the very bottom of the ground.  You see big

3    pieces.  The star screen would never allow that to go

4    through.  It was a brand new unit making a very nice,

5    beautiful product.

6         Q.    How about Government's Exhibit 5V.

7         A.    Same answer basically.

8         Q.    Not your stuff?

9         A.    Not my stuff.

10        Q.    How about 5U?

11        A.    Not my stuff again.

12        Q.    Mr. Mazza, did you ever conspire with Mr. Deck

13   to do anything unlawful in Frankfort?

14        A.    Absolutely not.

15        Q.    Did you ever conspire with DeSimone, Luther,

16   Marangi, Torriero or any one of those?

17        A.    I have never heard of those gentlemen.  I heard

18   of Marangi because he happens to have a business from North

19   Jersey, but I never met him.  I surely didn't meet Luther.

20   I never met DeSimone, and I forgot who the other gentleman

21   was.  Why would I jeopardize my business for -- with these

22   guys?  I mean if I knew this was illegal, I never would

23   have went there.

24             MR. BRICKFIELD:  Thank you.  I have no

25   further questions subject to cross-examination.

26             THE COURT:   Mr. Zeller, any questions.

1    DOMINICK MAZZA - Direct By Mr. Brickfield

2                    MR. ZELLER:  None, Your Honor.

3                    MR. MUSITANO:  No, Your Honor.  Thank you.

4                    THE COURT:  Mr. Gleason, you may examine.

5                    MR. GLEASON:  Thank you, Your Honor.

6

7    CROSS-EXAMINATION BY MR. GLEASON:

8         Q.    Good afternoon.

9         A.    Good afternoon.

10        Q.    You don't remember me at that meeting?

11        A.    If I did, I would have said it.

12        Q.    Well, hopefully you will remember me after

13   today.  I may have missed this.  You said you have been in

14   the solid waste business how many years?  You said you

15   started when you were a kid, right?

16        A.    Well, I was eight years old.  My father

17   worked -- my father incorporated the business, Mazza and

18   Sons, in 1964.  I was twelve years old.  I was put in the

19   business at twelve years old.

20        Q.    I don't mean to call you old, but is it fair to

21   say you have been around the business for a few decades?

22        A.    Absolutely.

23        Q.    You said you were president of Mazza and Sons;

24   is that correct?

25        A.    Yes.

26        Q.    You agree with me that's a position of

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    responsibility, correct?

3          A.    Absolutely.

4          Q.    You are ultimately responsible for, among other

5    things, the well-being of that company; isn't that right?

6          A.    Yes.

7          Q.    You have got shareholders, for instance, to whom

8    you are responsible?

9          A.    Just me and my brother.

10         Q.    Nonetheless shareholders, right?

11         A.    Me and my brother run the business together.

12         Q.    Do you have any other shareholders from Mazza

13   and Sons, Inc.?

14         A.    No.

15         Q.    Nonetheless, your family works in the company,

16   right?

17         A.    Well, we just recently -- my oldest son just

18   came out of college.  He joined us in 2006.  After that, my

19   son joined us, my other son.  And my brother's son joined

20   us too.  I don't know exact dates when they started, but we

21   have three sons in our business right now.

22         Q.    Okay.  So it is fair to say that you have

23   several family members that depend on the company for a

24   job; is that correct?

25         A.    Yes.

26         Q.    Okay.  Now, you mentioned that you have several

1   DOMINICK MAZZA - Cross by Mr. Gleason

2   different types of business that you do, correct, for

3   instance, you have got actual demolition work that your

4   company does in the field; is that right?

5        A.   Yes.

6        Q.   And that demolition operation generated a

7   significant amount of construction and demolition debris,

8   correct?

9        A.   What time frame are we talking about?

10       Q.   Well, we are talking about the 2005, 2006

11   timeframe.

12       A.   Not as much as the transfer station.  And

13   without records to indicate how much I actually took from

14   different jobs, I really couldn't say how much it would be

15   in comparison.

16       Q.   Well, if I may, I would like to show you

17   Government Exhibit 51, which is not yet in evidence, but

18   nonetheless.

19            MR. GLEASON:  May I approach?

20            THE COURT:  You may.

21   BY MR. GLEASON, CONTINUED:

22       Q.   I am handing you what has been marked for

23   identification as Government Exhibit 51.  Do you recognize

24   that to be a photograph of construction and demolition

25   operations, correct?

26       A.   Absolutely.

1  DOMINICK MAZZA - Cross by Mr. Gleason

2       Q.    And that's your vehicle that is being used to

3  effect those operations; is that right?

4       A.    If that's my name up there, I can confirm.

5       Q.    And that would be Mazza that appears on the arm?

6       A.    I can't tell you.  It doesn't -- I can't make it

7  out.

8       Q.    Okay.

9            MR. GLEASON:  May I show the witness the

10  electronic copy?  Unfortunately I can't do so without

11  publishing it to the jury.

12            MR. BRICKFIELD:  Judge, we have no

13  objection.

14            MR. GLEASON:  Okay.  May I publish it to the

15  jury, Your Honor?

16            THE COURT:  Are you moving it into evidence?

17            MR. GLEASON:  Yes, Your Honor.

18            THE COURT:  All right.  Received.

19            (Exhibit No. 51, received.)

20            MR. GLEASON:  If we could maybe zoom out

21  that might help with the resolution.

22  BY MR. GLEASON, CONTINUED:

23       Q.    Does that help at all, is that easier to see?

24       A.    I still can't make the name out on top.

25       Q.    Okay.  Well, nonetheless, does your construction

26  company -- pardon me.  Does your demolition company have

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    heavy equipment like that that they use in the field?

3         A.    Yes.

4         Q.    Okay, and so using that type of equipment to

5    knock down buildings effectively, correct?

6         A.    I didn't get the first part of your question.

7         Q.    I am sorry.  I will wait until the screen goes

8    down.  Your company uses heavy equipment of that sort to

9    knock down buildings, is that fair to say?

10        A.    Yes.

11        Q.    As a consequence of that operation, there is

12   waste that's generated, correct?

13        A.    Yes.

14        Q.    Okay, and that goes to a solid waste management

15   facility; is that right?

16        A.    It goes to a landfill, yes.

17        Q.    Speaking of landfills, that brings me to your

18   Tinton Falls facility.  You have two different types of

19   operations going on at that facility if I understand you

20   correctly.  You have a recycling center and a transfer

21   station, correct?

22        A.    Yes.

23        Q.    And those both are solid waste management

24   facilities, is that right?

25        A.    Well, recycling is not solid waste.  Transfer

26   station is a solid waste.  Recycling is recycling.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2        Q.    Okay.  But nonetheless, you are familiar with a

3    statute known as the Resource Conservation and Recovery

4    Act?

5        A.    I can't believe I am.

6        Q.    Okay.  Well, you are aware that nonetheless

7    there are certain federal, state, and local statutes that

8    govern -- that regulate that industry; is that right?

9        A.    I am not familiar with that statute, itself.

10       Q.    So you have been running -- you are the

11   president of the recycling center and a transfer station

12   and you are unaware of regulations?

13       A.    No, I have an operating permit from the

14   Department of Environmental Protection.  The terminologies

15   that you have stated to me, I am not aware of.

16       Q.    But nonetheless, you know that there are

17   regulations in your industry, correct?

18       A.    Absolutely, yes.

19       Q.    Okay, and there is federal regulations, correct?

20       A.    Yes, but I am still not...

21       Q.    State regulations?

22       A.    Yes.

23       Q.    County regulations?

24       A.    Yes.

25       Q.    And you understand that you are obligated -- you

26   and your company are obligated to follow those regulations,

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    correct?

3         A.    Yes.

4         Q.    And you understand that you need to follow those

5    regulations all of the time, correct?

6         A.    To the best that we can.

7         Q.    Okay.  So some of the time, in your view, you

8    are supposed to follow those regulations?

9         A.    Not some of the time.  To the best of our

10   ability.  It is a big difference.

11        Q.    You mentioned on direct exam to Mr. Brickfield

12   how many trucks are coming in and out of your facility on a

13   given day during the 2005, 2006 timeframe?

14        A.    I believe it was three hundred and fifty to four

15   hundred trucks a day.

16        Q.    Yet you are still -- and you have to have your

17   workers -- I think you commented to Mr. Brickfield on

18   direct that your workers have a short amount of time to

19   pick through those materials, correct?

20        A.    Yes.

21        Q.    But nonetheless, you understand that even with

22   the number -- well, let me back up for a moment.  You

23   generate revenue as more trucks come in, is that fair to

24   say?

25        A.    Yes.

26        Q.    And the more revenue you generate -- pardon me.

1   DOMINICK MAZZA - Cross by Mr. Gleason

2   The more trucks that come in, the more revenue you

3   generate; is that right?

4          A.    Isn't that a goal of a business, is to make

5   money?

6          Q.    Indeed it is, but you would agree with me that

7   nonetheless, you are still obligated to follow the

8   regulations, correct?

9          A.    To the best of our ability, yes.

10         Q.    You mentioned just a moment ago that you have a

11  New Jersey solid waste facility permit that goes with your

12  Tinton Falls facility; is that correct?

13         A.    Yes.

14         Q.    You had one in 2006 timeframe; is that correct?

15         A.    Yes.

16         Q.    And that permit provides for certain conditions;

17  isn't that right?

18         A.    Yes.

19         Q.    And again, those conditions are, in your view,

20  voluntary or mandatory?

21         A.    They are not voluntary.  Obviously it is

22  mandatory.

23         Q.    Okay.  So among other conditions, there are

24  permit conditions that provide for a maximum capacity at

25  your facility; is that right?

26         A.    Yes.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2        Q.    In fact, the maximum capacity in 2006 was six

3    hundred tons of material on any given day; is that right?

4        A.    I would like to see a document.  I know we had

5    some increases in those timeframes.  I don't know exactly,

6    when exactly that happened.

7        Q.    Okay.

8              MR. GLEASON:  Well, may I approach the

9    witness, Your Honor?

10             THE COURT:  Yes.

11   BY MR. GLEASON, CONTINUED:

12       Q.    Showing you what has been marked as Government's

13   Exhibit 84, you recognize that to be a permit; is that

14   correct?

15       A.    It appears to be my name on it, yes.

16       Q.    Now, you also recognize that this document is

17   something prepared in the normal course, you recognize this

18   to be a public document, correct, prepared by the State of

19   New Jersey?

20       A.    Yes.

21       Q.    Based on input from you, correct?

22       A.    Yes.

23             MR. GLEASON:  United States offers

24   Government Exhibit 84.

25             THE COURT:  Any objection?

26             MR. BRICKFIELD:  What was the date on it?  I

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    am sorry.

3                   MR. GLEASON:  It is the document you

4    provided me yesterday.

5                   MR. BRICKFIELD:  No objection, Your Honor.

6                   THE COURT:  Received.

7                   (Exhibit No. 84, received.)

8                   MR. MUSITANO:  No objection.

9    BY MR. GLEASON, CONTINUED:

10       Q.    You produce this to the United States in

11   connection with a trial subpoena; is that correct?

12       A.    I believe my office staff supplied that.

13       Q.    In connection with a trial subpoena, correct?

14       A.    I believe so.

15       Q.    All right.  Now, did that refresh your

16   recollection as to whether those permit conditions provide

17   for a maximum capacity?

18       A.    Yes.

19       Q.    At it also specifies that your company stores

20   and processes materials using manual and mechanical

21   methods; is that correct?

22       A.    Yes.

23       Q.    Your company had to prepare an application to

24   get that permit, correct.  They didn't just hand it to you,

25   the State of New Jersey, they didn't just give it to you,

26   correct?

1  DOMINICK MAZZA - Cross by Mr. Gleason

2      A.    That's correct.

3      Q.    And in connection with that permit as part of

4  your application, you had to submit an engineering report;

5  is that correct?

6      A.    Yes.

7      Q.    Operations and maintenance manual, correct?

8      A.    Yes.

9      Q.    And environmental and health impact statement?

10     A.    Yes.

11     Q.    An updated traffic impact assessment?

12     A.    Yes.

13     Q.    Architectural drawings?

14     A.    Yes.

15     Q.    Ventilation plans?

16     A.    Yes.

17     Q.    And all of those application materials you just

18  listed are incorporated into and referenced in the permit I

19  just showed you; is that correct?

20     A.    Yes.

21     Q.    Fair to say your company invested a fair amount

22  of resources in preparing the materials for that

23  application?

24     A.    Yes.

25     Q.    A significant amount of money?

26     A.    Yes.

1   DOMINICK MAZZA - Cross by Mr. Gleason

2       Q.    And without that permit, your company can't

3   operate that facility; is that right?

4       A.    Yes.

5       Q.    And if it can't operate that facility, you can't

6   make money, can you?

7       A.    Well, you make money, just not necessarily with

8   the transfer station.

9       Q.    Okay.  So the facility wouldn't generate revenue

10  if it doesn't have a permit, is that right?

11      A.    That's correct.

12      Q.    Again, you have several family members that work

13  for that company, isn't that right?

14              MR. BRICKFIELD:  Objection.  It was asked

15  and answered.

16              THE COURT:  Sustained.

17  BY MR. GLEASON, CONTINUED:

18      Q.    Well, if your company can't generate revenue,

19  your family's income will be reduced; isn't that right?

20              MR. BRICKFIELD:  Same objection.

21              THE COURT:  Sustained.

22  BY MR. GLEASON, CONTINUED:

23      Q.    If your company was convicted here, that will

24  have an impact on your permit status in New Jersey, won't

25  it?

26      A.    I would think so.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2        Q.    Now, I would like to go to defense exhibit --

3              MR. GLEASON:  If you would just put up the

4    aerial photograph of your facility, your Tinton Falls

5    facility.  What exhibit is that, Mr. Brickfield?

6              MR. BRICKFIELD:  That's Exhibit 7.

7              MR. GLEASON:  Could I have defense

8    Exhibit 7, please?

9    BY MR. GLEASON, CONTINUED:

10       Q.    I would like to talk to you a little bit about

11   this, if that's okay.

12       A.    Could you put this up?

13       Q.    I am sorry.  That's fair.  Now, you mentioned at

14   your facility there is a scale house, correct?

15       A.    Three scales houses.  Actually three scales, two

16   houses.

17       Q.    Okay.  So there is multiple scales at the he

18   facility, correct?

19       A.    Yes.

20       Q.    And there is a fairly large sorting facility

21   which you pointed out?

22       A.    Yes.

23       Q.    Are you familiar with site controls, with the

24   concept known as site controls?

25       A.    Yes.

26       Q.    Does your facility have site controls?

1   DOMINICK MAZZA - Cross by Mr. Gleason

2       A.    Absolutely.

3       Q.    What sort of site controls does your facility

4   have?

5       A.    Our facility is paved.  It has two retention

6   ponds.  It has drainage systems.  We monitor the water

7   every six months, I believe.

8       Q.    Okay, and is the drainage pond appearing in the

9   bottom of Defense Exhibit 7, is that what you are referring

10  to there?

11      A.    Well, that's for the mulch.

12      Q.    So there is more than one retention pond?

13      A.    Yes, there is one right there.  That handles the

14  transfers station area.

15      Q.    Okay.

16            MR. GLEASON:  I would like to put up

17  Government Exhibit 1C if I could.

18  BY MR. GLEASON, CONTINUED:

19      Q.    Could you be kind enough to point out the scale

20  at this site?

21      A.    I can't.

22      Q.    How about a fence?

23      A.    I can't.

24      Q.    Is there anything that resembles site controls

25  in your view?

26      A.    I never visited the site, so...

1   DOMINICK MAZZA - Cross by Mr. Gleason

2        Q.    From this photograph?

3        A.    From this picture, I would not know what was

4   required of their New York permit.

5        Q.    I wasn't asking you what was required of the New

6   York permit.  What I was asking you is did you see anything

7   in this photograph that constitutes a site control as you

8   understand it?

9        A.    No.

10        Q.    I would like to show you Defense Exhibit 3A, if

11   I may.  Now, you testified that you thought this was a

12   valid permit on direct exam, correct, when it was given to

13   you; is that right?

14        A.    Yes.

15        Q.    You claim to have relied on this when you

16   arranged to have twenty-one loads sent to the Frankfort

17   site, isn't that right?

18        A.    I really relied on what Mr. Deck furnished me

19   about this permit and also when the testing guy came in to

20   verify that our material was good, that's what I relied on.

21        Q.    Okay.  So you did not even look at this permit?

22        A.    I looked at the permit.  I said I read the

23   permit.  I am a speed reader, and I looked at it.  And I

24   thought it was verified by his testing that had came in.

25              MR. GLEASON:  May I approach the witness,

26   Your Honor?

1360

1    DOMINICK MAZZA - Cross by Mr. Gleason

2                    THE COURT:  You may.

3    BY MR. GLEASON, CONTINUED:

4         Q.    I am going to hand you a complete copy of

5    Defense Exhibit 3A, the same copy that's on the screen.

6    Could you point out in that purported permit where there is

7    a reference to any engineering reports?

8         A.    Can you clarify the question?

9         Q.    Please point out to the members of the jury

10   where that permit references or incorporates that

11   engineering reports have been prepared for this site.

12        A.    I don't believe it says it, but...

13        Q.    Okay.  You have answered my question.  Likewise,

14   it doesn't say anything about an environmental health

15   impact statement, does it?

16        A.    Would an exemption require that type of permit?

17        Q.    Sir, let me be -- if you don't understand my

18   question, that is fine.  I will rephrase it.  I need you to

19   answer the question that I am actually putting to you.

20              Can you tell me in that permit that's in your

21   hand whether there is no reference to an environmental and

22   health impact statement being prepared for this site,

23   correct?

24        A.    That's correct.  However, however, however,

25   sir --

26              THE COURT:  No, wait a minute.  This is

1   DOMINICK MAZZA - Cross by Mr. Gleason

2   cross-examination.  You just answer the questions.  Do you

3   understand?

4                   THE DEFENDANT:  Okay.

5                   THE COURT:  Your attorney will have an

6   opportunity for redirect.

7   BY MR. GLEASON, CONTINUED:

8        Q.   Likewise, there is no mention of an updated

9   traffic impact assessment being done for the site, is

10  there?

11       A.   No.

12       Q.   No architectural drawings, correct?

13       A.   No.

14       Q.   No ventilation plans, correct?

15       A.   No.

16       Q.   Let's go to what the permit does say.  I would

17  like to go to second page, if we could.  Third page,

18  please.  Under the section you just mentioned, exemptions,

19  I would like to zoom in on the section that says B,

20  Exemptions, one and also small Roman Numeral iii underneath

21  it, correct?

22       A.   Yes.

23       Q.   Okay.  You let me know if I read this correctly.

24            The follow facilities are exempt from the permit

25  requirement of this part provided the facilities operate

26  only between the hours of sunrise and sunset, and, if the

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    allowable waste comes from an off site source, no fee or

3    other form of consideration is required for the privilege

4    of using the facility for disposal purposes.

5              Did I read that correctly, sir?

6         A.    Yes.

7         Q.    And you did pay fifty-two dollars a ton to send

8    material to the Frankfort site, correct?

9         A.    I don't know whether it was for a fee for the

10   landfill or a fee for the trucking.

11        Q.    Did you pay money to send the materials out of

12   your Tinton Falls facility up to this site, yes or no?

13        A.    Yes.

14        Q.    Okay.  Going on to the next section, B1, small

15   Roman Numeral i:

16              A site at which only the following C and DC and

17   D debris is placed:  Recognizable, uncontaminated concrete

18   and concrete products, including steel or fiberglass,

19   reinforcing rods that are embedded in concrete, asphalt,

20   pavement, brick, glass, soil, and rock.

21              Did I read that correctly?

22        A.    Yes.

23        Q.    You mentioned on direct exam that you are a

24   speed reader you said, correct?

25        A.    Correct.

26        Q.    And you mentioned that -- well, as I have said

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    before, this is a family company, right?

3         A.    Yes.

4         Q.    You said on direct exam why would you risk your

5    livelihood, correct?

6              MR. MUSITANO:  Objection.

7         A.    Yes.

8    BY MR. GLEASON, CONTINUED:

9         Q.    But nonetheless, you had a permit to send

10   materials which purported to allow you to send materials to

11   Upstate New York and you just skimmed through the permit,

12   is that your testimony here today, yes or no?

13        A.    Yes.

14        Q.    Isn't it true that during the meeting that you

15   had with federal agents in Syracuse, New York you admitted

16   that you knew it was not a valid permit?

17        A.    Absolutely not.

18        Q.    You mentioned at the beginning of this

19   examination that a smart businessman seeks to minimize

20   overall cost, correct?

21        A.    Yes.

22        Q.    As president of your company, you were

23   responsible to minimize its costs; isn't that right?

24        A.    Yes.

25        Q.    Some of your costs include costs associated with

26   shipping materials to landfills; isn't that right?

1    DOMINICK MAZZA - Cross by Mr. Gleason

2         A.    Yes.  However, I really didn't handle that at

3    that time in 2006.

4         Q.    Well, companies certainly -- companies that

5    transport your materials, for instance, you said certainly

6    bill your company, don't they?

7         A.    That's correct.

8         Q.    And landfills bill Mazza and Sons, Inc., for

9    things that are disposed of off site; isn't that right?

10        A.    Yes.

11        Q.    And you confirm those billings, correct?

12        A.    I don't.  Office staff does.

13        Q.    Your company nonetheless does; is that right?

14        A.    Yes.

15        Q.    For instance, you confirm the tonnage for which

16   you are being billed; is that right?

17        A.    My company does, yes.

18        Q.    You do that with scale receipts; isn't that

19   right?

20        A.    Again, my company employees would do that.

21        Q.    Your company also -- I think you mentioned on

22   your direct exam a type of paperwork that is generated

23   called the waste origin manifest; is that right?

24        A.    Yes.

25        Q.    That's one of the documents that your company

26   uses to ensure that the rate and tonnage for which you are

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    being billed are correct; isn't that right?

3        A.    You said O and D.

4        Q.    I said waste origin manifest?

5        A.    It accompanies the weight slip when the load

6    goes out.

7        Q.    So that's a yes, it is used for billing

8    purposes, among other things, correct?

9        A.    It is not used for billing purposes.  I think it

10   is used to verify the trucking bills that come to us.

11       Q.    But you have seen a waste origin manifest

12   before, correct?

13       A.    Yes.

14       Q.    You are aware, for instance, that it has got

15   carbon copies behind them, correct?

16       A.    Yes.

17       Q.    So it has got the top copy, correct?

18       A.    Yes.

19       Q.    And then it has got three carbon copies behind

20   it; is that right?

21       A.    Yes.

22       Q.    So the white copy, correct?

23       A.    I am not sure whether it has two or three copies

24   or four copies.  I am not sure.

25       Q.    Is there a pink one associated?

26       A.    If you have one, I can look at it and I could

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    tell you exactly.  I don't handle paperwork that is

3    generated by my company.

4        Q.    Okay.  But nonetheless, you said on direct exam

5    that when a load comes in, the first thing that you ask for

6    is one of these waste origin manifests, correct?

7        A.    No, it was an O and D form.

8        Q.    Okay.  But nonetheless, you maintain an O and D

9    form, correct, in your office and collect those?

10       A.    Yes.

11       Q.    Likewise, you collect and maintain the waste

12   origin manifest as well, correct?

13       A.    I am not sure of that.

14       Q.    You don't collect waste origin manifests?

15       A.    I am not sure of that.

16       Q.    Nonetheless, the O and D forms are routinely

17   prepared at your facility, correct?

18             MR. BRICKFIELD:  Objection.

19       A.    Say that again.

20   BY MR. GLEASON, CONTINUED:

21       Q.    You are making a distinction here between waste

22   origin manifest and, I think you said, origin and

23   destination forms, correct?

24       A.    Yes.

25       Q.    Okay.  The latter, the origin and destination

26   forms, those are prepared and maintained at Mazza and Sons

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    facility at part of the normal business, right?

3         A.    You have to remember, at this time we were

4    seeking to find an outlet for the fines.

5         Q.    Again, that wasn't my question.  My question

6    was --

7         A.    It kind of pertains to what I have to --

8         Q.    Well, I would appreciate a yes or no here. Your

9    company --

10              THE COURT:  If you can answer it yes or no,

11   say so.  If you can't answer it yes or no.

12        A.    I can't answer that question.

13              THE COURT:  Next question.

14   BY MR. GLEASON, CONTINUED:

15        Q.    So among other things, when a truck comes into

16   your facility carrying waste, you document, among other

17   things, the generator's name; is that correct?

18        A.    Yes.

19        Q.    You document the address of the generator; is

20   that right?

21        A.    Now, this is for the O and D?

22        Q.    Either one.  I am asking you if you document or

23   record descriptions of waste that is coming into your

24   facility?

25        A.    The O and D forms are filled out by the drivers.

26        Q.    But you collect them, right?

1    DOMINICK MAZZA - Cross by Mr. Gleason

2         A.    We collect them.

3         Q.    And you maintain them, correct?

4         A.    Yes.

5         Q.    Some the documents you collect and maintain also

6    document the quantity of waste; isn't that right?

7         A.    Yes.

8         Q.    And the dates of transport; isn't that right?

9         A.    Yes.

10        Q.    And there is a shipment number associated with a

11   lot of these forms; isn't that right?

12        A.    Yes.

13        Q.    And you have heard, for instance, in this trial

14   a lot of discussion about 1106, 1109, and 1104?

15        A.    Yes.

16        Q.    And as part of the Grand Jury response that your

17   company provided, you produced -- how many waste origin

18   manifests would you say you produced?

19        A.    Without seeing them, I can't tell you.

20        Q.    Can you give me an estimate?

21        A.    No, because I never handled it.

22        Q.    Who did?

23        A.    People in my office.

24        Q.    Could you be specific about which people in your

25   office?

26        A.    It could have been Fran Donner (phonetically).

1   DOMINICK MAZZA - Cross by Mr. Gleason

2   It could have been Peter Dellera.  It could have been my

3   son.  It could have been a number of people.

4        Q.    Does your company -- you have seen waste origin

5   manifests in the past though, correct?

6        A.    Yes.

7        Q.    And you have seen them in your office, isn't

8   that right?

9        A.    I have seen them at the scale house.

10       Q.    There was quite a few questions on direct

11   examination regarding asbestos.  Do you remember those

12   questions?

13       A.    Not really, but if you want to reiterate the

14   questions I will be free to answer.

15       Q.    Okay.  With respect to asbestos you said that

16   you have -- on occasion workers would find amounts of

17   asbestos, and they will set it aside, correct?

18       A.    Suspected asbestos.

19       Q.    Suspected asbestos?

20       A.    Like I explained before.

21       Q.    It is suspected asbestos, correct?

22       A.    Yes.

23       Q.    Those workers, do they have TSCA or OSHA

24   training?

25       A.    I am not necessarily sure that they do need

26   that.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2         Q.    Regardless, you don't -- certainly you don't

3    have paperwork here today saying they are certified to

4    handle that material, do you?

5         A.    No.

6         Q.    I would like to show you Defendants'

7    Exhibit 147, please.  Now, on direct examination you

8    mentioned that this was a document that your company

9    generated which summarized the payments during the --

10   pardon me.  Summarized the shipments for the 2005

11   timeframe, correct?

12        A.    Yes.

13        Q.    Drawing your attention to the upper left-hand

14   corner of that document, could we zoom in on that?  Am I

15   reading this right, September 25, 2012?

16        A.    That's the day it was printed.

17        Q.    Okay.  Moving on then.  Can we pull back out of

18   there?  Why don't we move on to 148.  Again, upper

19   left-hand corner, same date, September 25, 2012?

20        A.    Yes.

21        Q.    So this was not printed out in 2006, correct, it

22   was printed out in September 25, 2012, correct?

23        A.    Yes.

24        Q.    And pulling back out of there, Tannery Road

25   doesn't appear anywhere on that summary, does it?

26        A.    Could you make it larger, please?  I don't see

1   DOMINICK MAZZA - Cross by Mr. Gleason

2   it on there.

3        Q.    Okay, and this purports to be a summary report

4   for the period of January 1st 2006 to December 31, 2006; is

5   that right?

6        A.    Yes.

7        Q.    You mentioned that -- going to the Delaware

8   rejections, you mentioned -- I think you said on direct,

9   and you can correct me if I am wrong, but I think you

10  mentioned that one demolition job prompted all the

11  rejections, correct?

12       A.    No.

13       Q.    Okay.  Is that what started the rejections; is

14  that correct?

15       A.    Not that I am aware of.

16       Q.    Okay.  You didn't say that on direct

17  examination?

18       A.    I don't believe I said that.

19       Q.    I would like to show you Government Exhibit 24D.

20            MR. GLEASON:  If we could zoom in on that.

21  And if we could zoom in so it is just the first four

22  columns, if we cut off the right notes, I think that will

23  help.

24  BY MR. GLEASON, CONTINUED:

25       Q.    Do you see this documents the rejected loads

26  from Mazza in 2008, correct?

1    DOMINICK MAZZA - Cross by Mr. Gleason

2         A.    Yes.

3         Q.    2006, pardon me.

4         A.    Is that an eight or a six on top?  I can't see

5    it.

6         Q.    Does that say 2006 in the left hand column

7    there?

8         A.    It looks likes an eight.  I don't know.  This

9    could be a six.

10        Q.    Well, your Delaware rejections were in the 2006

11   timeframe, you said that on direct exam, correct?

12        A.    Yes.

13        Q.    And you said you were unaware of all of these

14   rejections; is that right?

15             MR. BRICKFIELD:  Objection, Your Honor.

16             THE COURT:  Overruled.  Cross.

17   BY MR. GLEASON, CONTINUED:

18        Q.    It is your testimony that you were unaware of

19   all of these rejections in 2006?

20        A.    I didn't say that.

21        Q.    So you were aware of those rejections in 2006?

22        A.    I was told on the phone that two loads got

23   rejected and everything behind it was rejected

24   automatically.  Now, if it turns out to be more than the

25   twelve loads that went that day, then so be it.  I am not

26   familiar with this document.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2         Q.    You mentioned -- we talked a little bit about a

3    meeting at the U.S. Attorney's office in 2008, correct?

4         A.    Yes.

5         Q.    You went there at least -- on your direct

6    testimony, you said to help with the investigation, is that

7    what you said?

8         A.    That's what I was led to believe.

9         Q.    Okay.  So you did receive a target letter from

10   the Department of Justice advising you you were a criminal

11   target before you went to that meeting?

12        A.    I am not sure about that.

13        Q.    You mentioned that you were unaware of Delaware

14   doing any testing with respect to asbestos.  You said that

15   on direct exam.  Do you remember that?

16        A.    I believe -- wasn't that the November test or

17   something?

18        Q.    Correct.  Where you said you were unaware of

19   that?

20        A.    I was unaware of that.

21        Q.    Do you deny having a conversation with

22   Fulton Williams of Delaware Recyclable Products where he

23   advised you of these problems?

24        A.    I believe during his testimony that he said that

25   he didn't have test results at that time.  I don't think he

26   mentioned anything about test results.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2         Q.    Well, nonetheless, you guys did have a

3    conversation related to asbestos rejections, correct?

4         A.    Yes.

5         Q.    So you were aware that there was an asbestos

6    problem in the late 2006 timeframe, correct?

7         A.    Yes.

8         Q.    Now, you mentioned -- going back now to the 2008

9    meeting at the U.S. Attorney's office, and I do apologize

10   for jumping around a bit.  You mentioned that Mr. Benedict

11   got aggressive, correct?

12        A.    Yes.

13        Q.    And that you lost your composure, is that fair

14   to say?

15        A.    Yes.

16        Q.    And I think you said after you got your

17   composure, you remembered, and you said you remembered

18   about the Delaware rejections, correct?

19        A.    That's correct.

20        Q.    Isn't it true you were actually handed paperwork

21   documenting those rejections before you admitted to it?

22        A.    I believe he gave it to me afterwards.

23        Q.    That is your testimony here today?

24        A.    That's what I thought I did.

25        Q.    And you were represented at that meeting; is

26   that right?

1    DOMINICK MAZZA - Cross by Mr. Gleason

2        A.    Yes.

3        Q.    By a gentleman by the name of

4    Mr. Robert Honecker, correct?

5        A.    That's correct.

6        Q.    At the beginning of that meeting, Mr. Honecker

7    went on at great length about his superb legal

8    qualifications, do you remember that?

9        A.    He was an existing prosecutor for Monmouth

10   County.

11       Q.    And as a matter of fact, he prepped you before

12   you went into that meeting, correct?

13             MR. BRICKFIELD:  Objection, Your Honor.

14             THE COURT:  Overruled.  Yes or no.

15       A.    I mean, we talked about going up there and

16   visiting you.  I don't call that prep.

17   BY MR. GLEASON, CONTINUED:

18       Q.    Okay.  Nonetheless, he actually did provide you

19   counsel during that meeting, correct?  Not going into what

20   he told you, but he did provide you counsel during that

21   meeting?

22       A.    The way it was explained to was I was going up

23   there to help you guys.

24       Q.    That wasn't my question.  My question was

25   whether he provided you counsel during that meeting?

26       A.    Yes, he was my counsel.

1    DOMINICK MAZZA - Cross by Mr. Gleason

2        Q.    And he actually pulled you out of the room on

3    multiple occasions to talk to you; isn't that right?

4        A.    Yes.

5        Q.    And he was present, for instance, when you were

6    given all the warnings at the beginning of that meeting;

7    isn't that right?

8        A.    I don't remember that.

9        Q.    So what I would like to do now is I would like

10   to hand you another exhibit that has been marked for

11   identification as Government's 87.  You recognize this to

12   be a scale house ticket from your facility, correct, at the

13   top of the page?

14       A.    Yes.

15       Q.    It is generated at your facility in the normal

16   course of its business, correct?

17       A.    Yes.

18       Q.    Maintained in the normal course of business?

19       A.    Yes.

20       Q.    It is in the same or substantially the same

21   condition as when it was generated, correct?

22       A.    Yes.

23       Q.    Turn to the second page.  Do you recognize that

24   to be -- what is the title on that document?

25       A.    This is an O and D form.

26       Q.    Okay, and that's another document you have

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    already testified that your company prepares in the normal

3    course of its business; isn't that right?

4         A.   Yes.

5         Q.   You maintain it in the normal course of your

6    business?

7         A.   Yes.

8         Q.   And that's in the same or substantially the same

9    condition as when it was created, correct?

10        A.   Yes.

11             MR. GLEASON:   United States offers

12   Government's Exhibit 87.

13             MR. BRICKFIELD:   May we see it briefly?   No

14   objection.

15             THE COURT:   Government's 87 received.

16             (Exhibit No. 87, received.)

17             MR. GLEASON:   May I leave a hard copy with

18   the defendant, Your Honor?

19             THE COURT:   You may.

20             MR. GLEASON:   May I publish it to the jury?

21             THE COURT:   You may.

22   BY MR. GLEASON, CONTINUED:

23        Q.   What I would like to do is compare these two

24   documents.  First, I would like to do a side by side of the

25   two facility names, if I could, and facility ID number.  We

26   will do the name first.  Both of them say Mazza Tinton

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    Falls; is that correct?  I know the one on the right is a

3    little difficult to read.

4         A.    Yes.

5         Q.    Okay.  The ID number is next.

6         A.    Yes.

7         Q.    There is a gross weight listed on both forms,

8    correct?

9         A.    Yes.

10        Q.    That is exactly the same, correct?

11        A.    Yes.

12        Q.    There is a net weight, correct?

13        A.    Yes.

14        Q.    Precisely the same, correct?

15        A.    Yes.

16        Q.    And finally, I would like to compare both the

17   origin versus the final disposal facility name and state if

18   we could.  You see Tannery Road on the left and multiple

19   places in Pennsylvania and Virginia listed on the right; is

20   that correct?

21        A.    Yes.

22              MR. GLEASON:  You can take that down.

23   BY MR. GLEASON, CONTINUED:

24        Q.    And the second page of that document is

25   something that's reported, it is -- the top of that

26   document reads New Jersey Department of Environmental

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    Protection, correct?

3         A.    Yes.

4         Q.    And the bottom -- or the front page is something

5    that you use internally, isn't that right, it is a scale

6    receipt?

7         A.    Are you talking about the first page?

8         Q.    Yes.  The first page.

9         A.    Yes.

10        Q.    You testified that you occasionally have workers

11   remove suspected asbestos containing materials, correct?

12        A.    Yes.

13        Q.    Are your workers provided respirators?

14        A.    Yes.

15        Q.    Fit test for those respirators?

16        A.    They have been fitted.  They have been shown how

17   to use it, yes.

18        Q.    What year?

19        A.    I can't tell you.

20        Q.    Okay.  Did you bring the fit test records with

21   you today?

22        A.    No.

23        Q.    Is there a negative pressure or containment when

24   they are conducting this removal of asbestos?

25        A.    No.

26        Q.    Are they using water hoses to remove the

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    asbestos?

3         A.    They use water to keep the dust down, yes.

4         Q.    And the disposal bins into which you place this

5    material are rubber trash cans, correct?

6         A.    Yes.

7         Q.    So they are not leak tight, double sealed

8    containers, are they?

9         A.    No.

10        Q.    Just regular trash cans, correct?

11        A.    No.

12              MR. GLEASON:   If I may have just a moment,

13   Your Honor.

14   BY MR. GLEASON, CONTINUED:

15        Q.    You mentioned on direct examination that you

16   were relying, among other things, and you said this again

17   and cross-examination, you relied on Mr. Deck, correct?

18        A.    Yes.

19        Q.    But you had never done business with him before

20   this; is that right?

21        A.    Not to my knowledge.

22        Q.    And you also said you relied on testing results

23   that were provided by an individual; is that right?

24        A.    That is correct.

25        Q.    But you didn't receive the testing results from

26   Mr. Deck until November after you had already been shipping

1    DOMINICK MAZZA - Cross by Mr. Gleason

2    materials; isn't that right?

3         A.    Yes.

4         Q.    Okay.

5               MR. GLEASON:  I have nothing further at this

6    time, Your Honor.

7               THE COURT:  Redirect, if any,

8    Mr. Brickfield.

9               MR. BRICKFIELD:  Yes.

10

11   REDIRECT EXAMINATION BY MR. BRICKFIELD:

12        Q.    Mr. Mazza, the government showed you your permit

13   on December 2005, Government Exhibit 84?

14        A.    Was that our permit?

15        Q.    Yes.  He showed you what is marked as Government

16   Exhibit G84.  Do you recall that?

17        A.    Yes.

18        Q.    And he asked you if your limit was six hundred?

19        A.    Yes.

20        Q.    And if you turn towards page three, is there an

21   indication that the limit was actually increased?

22        A.    Well, that's what I indicated before.  I said we

23   did apply for annual increases, but I didn't know exactly

24   when they happened.

25        Q.    Well, does it indicate that there was an

26   increase from six hundred tons to more?

1    DOMINICK MAZZA - Redirect by Mr. Brickfield

2        A.    What page was that?

3              Yes.  In March 28, 2005, we were allowed to go

4    to nine hundred tons.

5        Q.    And that permit also reflected that you had

6    gotten approval in 2005 to build the recycling station,

7    correct?  Going back to the front page.  I am sorry.

8        A.    The front page.  Yes, it says the modification

9    includes construction of a building addition to accommodate

10   a new picking line for the recovery of recyclable materials

11   from the waste stream.

12              MR. BRICKFIELD:  Now, could we have D3 put

13   up again, please, the exemption letter -- I am sorry, 3A.

14   I am sorry.

15   BY MR. BRICKFIELD, CONTINUED:

16       Q.    Now, Mr. Gleason asked you all these questions

17   about permits.  Do you recall him asking you about

18   environmental studies and architectural plans and the like,

19   correct?

20       A.    Yes.

21       Q.    Now, on D3, it says -- on the second paragraph,

22   it says exemptions, does it not?

23       A.    Yes.

24       Q.    So did you think this was a permit or an

25   exemption letter?

26       A.    I thought it was exemption letter.

1383

1    DOMINICK MAZZA - Redirect by Mr. Brickfield

2        Q.    And the exemption letter that you received

3    yourself back about a year earlier, how many pages was

4    that?

5        A.    One page.

6        Q.    Now, Mr. Gleason also asked you about on

7    Exhibit 148 there was no indication of Tannery Road.  Do

8    you recall that?

9        A.    Yes.

10            MR. BRICKFIELD:  Now, if you could put up

11    Exhibit 148.  Let's take a look at that.

12    BY MR. BRICKFIELD, CONTINUED:

13        Q.    Now that was for C and D materials, was it not?

14        A.    Yes.

15        Q.    Were you shipping any C and D materials to

16    Tannery Road in 2006?

17        A.    That's what I tried to explain to him.  Our

18    permit because we are extracting fines, and we used them as

19    recyclable not as a solid waste.

20        Q.    So when you made an agreement with Deck, you

21    were going to send fines, correct?

22        A.    Yes.

23            MR. BRICKFIELD:  Now, may we look at 149,

24    please, Defense Exhibit 149.

25    BY MR. BRICKFIELD, CONTINUED:

26        Q.    Now, that has the listing of fines in 2006, does

1    DOMINICK MAZZA - Redirect by Mr. Brickfield

2    it not?

3         A.    Yes.

4         Q.    Could you point to the jury where it lists the

5    Tannery Road shipments of fines?

6         A.    Right there.

7         Q.    Mr. Gleason also asked you about scale tickets

8    and O and D forms?

9         A.    Yes.

10        Q.    Now, is there a different procedure between

11   trucks coming in to Mazza and Sons facility to drop off

12   items and trucks going out containing C and Ds and fines?

13        A.    Yes.

14        Q.    When trucks come in, incoming trucks, whose

15   responsibility is that to have the form, to keep it?

16        A.    It's the actual owner of the truck of the waste

17   of a company that is coming in.

18        Q.    And when it comes in, are you required to keep

19   it?

20        A.    Yes.

21        Q.    When a truck is going out, what is generated at

22   your scale exit or scale station?

23        A.    Well, that's what I was trying to explain.  When

24   we started doing fines, we were relatively new in the

25   removal of that product, didn't know what an exemption

26   letter was until we got them and kind of cut out, found out

1    DOMINICK MAZZA - Redirect by Mr. Brickfield

2    what they were, and how they were treated, and our office

3    staff really didn't have a handle on the manifest.

4           You know, sometimes they would keep them and

5    said they wouldn't keep them.  They were a little confused

6    of what they were doing.  So I guess after a while we

7    started keeping them.

8        Q.    But at all times, you kept scale tickets though,

9    correct?

10       A.    Yes.

11          MR. BRICKFIELD:  Now, let's go to exhibit,

12   Government Exhibit 87, if we could post that again, please.

13   I am sorry.  It is the one with the G87.  I am sorry.

14   BY MR. BRICKFIELD, CONTINUED:

15       Q.    Now, this is the scale ticket that is generated

16   at the scale by the Mazza and Sons scale facility, correct?

17       A.    Yes.

18       Q.    And that indicates that the shipment on

19   October 4th was going to Tannery Road, correct?

20       A.    Can you make it a little bigger, if you can.

21          Yes, it shows Tannery Road.

22       Q.    Now, do you recall October 4th was around the

23   first shipment?  Do you know?

24       A.    This ticket shows October 4th.

25       Q.    But from the trial, you learned that shipments

26   went from the 4th to around the 11th, correct?

1    DOMINICK MAZZA - Redirect by Mr. Brickfield

2         A.    Yes.

3         Q.    So this had to be one of their earliest things?

4         A.    Yes.

5         Q.    And then the second page, if we can go to second

6    page, please.  Now, this is the form that covers -- that's

7    used for all outgoing shipments, is it not?

8               Well, explain it.  I am sorry.

9         A.    It is a solid waste origin/disposal form.

10   Usually these were for coming-in material, but our company

11   may have used it for an outgoing load because I noticed

12   there is a cab unit, license plate number on it, and a

13   trailer license plate number on it, showing the weight, and

14   it looks like it went to Bell Vernon, Pennsylvania.

15        Q.    And that lists a number of the different

16   locations where the company maybe shipped?

17        A.    Yes.

18        Q.    These are different locations, Delaware and

19   Gros, you spoke about that?

20              MR. GLEASON:  Objection to the leading, Your

21   Honor.

22              THE COURT:  Move on.

23              MR. BRICKFIELD:  I am sorry.  I will

24   restate.

25   BY MR. BRICKFIELD, CONTINUED:

26        Q.    These are locations that your company in 2006

1    DOMINICK MAZZA - Redirect by Mr. Brickfield

2    would ship materials to, correct?

3         A.    Yes.

4         Q.    And do you know whether or not after the first

5    few days with Deck that another form was created that had

6    the Tannery Road address printed on it?

7         A.    I believe so, yes.

8              MR. BRICKFIELD:  Thank you, Your Honor.  I

9    have no further questions.

10             THE COURT:  Mr. Zeller, any questions?

11             MR. ZELLER:  None, Your Honor.

12             MR. MUSITANO:  No, Your Honor.  Thank you.

13             THE COURT:  Mr. Gleason, recross, if any.

14             MR. GLEASON:  Just briefly, Your Honor.

15

16   RECROSS-EXAMINATION BY MR. GLEASON:

17        Q.    I would like to show you Government Exhibit 8D

18   if we could.  It is not fines, is it, sir?

19        A.    Absolutely not.

20             MR. GLEASON:  Nothing further.

21             THE COURT:  Okay.  All right.  You may step

22   down.

23             (Whereupon, the Witness is excused.)

24             THE COURT:  And, Mr. Brickfield, next

25   witness.

26             MR. BRICKFIELD:  Your Honor, we rest at this

1
2    time.
3                         (Defendant Mazza rests.)
4                         MR. BRICKFIELD:  We do have a stipulation to
5    read to the jury.  I don't know if this is the appropriate
6    time.
7                         THE COURT:  You may go to the podium and
8    read that stipulation to the jury.
9                         MR. BRICKFIELD:  Your Honor, this is the
10   third stipulation.  It reads:
11                        The United States of America and the
12   defendants in the above-captioned action hereby stipulate
13   that Marceles D. Sales was deported from the United States
14   to Brazil in June 2011.
15                        That's the stipulation.  With that, we rest,
16   Your Honor.
17                        THE COURT:  Okay.  Defendant Dominick Mazza
18   rests.
19                        Mr. Zeller, any witnesses on behalf of Mazza
20   and Sons, Inc.?
21                        MR. ZELLER:  None, Your Honor.  Mazza and
22   Sons, Inc., rests.
23                        (Defendant Mazza & Sons, Inc., rests.)
24                        THE COURT:  Any requests for any rebuttal
25   testimony, Mr. Gleason?
26                        MR. GLEASON:  May we have a five minute

1

2   recess to confer with my co-counsel?

3           THE COURT:  You may.  Let's take a short

4   break, members of the jury.  And we will see where we go

5   for tomorrow.  We will give you some more directions.

6   Don't discuss the case.  We will be back in five or ten

7   minutes.

8           Mr. Minor.

9           COURT CLERK:  Court stands for a brief

10  recess.

11          (Whereupon, a brief recess was taken.)

12          (Whereupon, the proceedings were held in

13          open court out of the presence of the Jury.)

14          THE COURT:  Mr. Gleason.

15          MR. GLEASON:  Nothing further, Your Honor.

16          THE COURT:  So for the record, all sides

17  rest, correct?

18          MR. MUSITANO:  Yes, Your Honor.

19          MR. BRICKFIELD:  Yes, Your Honor.

20          MR. ZELLER:  Yes, Your Honor.

21          THE COURT:  The evidence is closed.  We will

22  sort out the exhibits and see where we stand on those.

23          Okay.  I am going to summon the jury.  And

24  then we will have motions after I excuse the jury for the

25  day.

26          COURT CLERK:  Well, we have got to have a

1

2  defendant.  He is not here.

3                MR. BRICKFIELD:  Oh, here he comes.

4                THE COURT:  All right.  Sam, summon the

5  jury.

6                (Whereupon, the proceedings were held in

7                open court in the presence of the Jury.)

8                THE COURT:  Okay.  Members of the jury, we

9  have concluded all of the evidence.  Everybody has rested.

10  There is no more evidence to come in.  We will have to do a

11  little sorting out with the exhibits.

12                So here is what, at the moment, is what is

13  on schedule for you tomorrow.  We have -- tomorrow will be

14  closing arguments, summation day for you.  Come in at 9:30,

15  and we will move into the afternoon because we have gone on

16  the case a little faster than anybody thought even though

17  we took some days off.

18                But there will be five closing arguments

19  tomorrow.  The government will go first with its closing

20  argument, and then Mr. Musitano will go next, and then

21  Mr. Brickfield, and then Mr. Zeller.  And then the

22  government will have an opportunity to have a rebuttal.  So

23  in effect you are going to have five.  There are going to

24  be some breaks, some lunch.

25                We will see where we are timewise at the end

26  of this day as far as summations are concerned.  And then

1
2    we will decide whether I will submit the case to you
3    tomorrow late in the afternoon or whether we submit the
4    case to you and charge you.
5                The next thing after all the summations, I
6    have got to charge you on the law.  I gave you a
7    preliminary charge at the start of the trial.  This will be
8    my final charge in more detail now that you have heard all
9    of the evidence.  And that will take somewhere between
10   forty-five minutes to an hour I anticipate at this moment.
11               So we will see how late in the day it is.
12   Maybe as a practical matter, it would be more appropriate
13   to give you the charge first thing on Monday morning, and
14   then you would retire to deliberate, and we will get the
15   exhibits in to you.  I will go over the charge.  I will go
16   over the verdict forms that you are going to have to
17   consider.  And you will all have copy a of my charge,
18   etcetera.  And then you can take as long as you will.
19               In any event, starting on Monday, we will
20   bring lunch in for you, Monday when you retire to
21   deliberate.  So we will see what time it is, whether I will
22   give you the case to start, say, like four o'clock in the
23   afternoon or three o'clock, maybe as a practical matter
24   because you are going to listen to five closing arguments
25   tomorrow.  So maybe it would be better for you to wait
26   until Monday.  We will see.

1

2          But you are going to have to be here Monday

3   for sure because even if I give the case to you, it will be

4   late, and we will just adjourn.  And then you can start

5   deliberating first thing Monday morning.  We will have to

6   see how long the closing arguments take.  I can't predict

7   that.  I have no idea how long they are going to be.

8          But they are very important, of course, and

9   you have got to pay attention to all of the arguments.

10  Very important case to everybody concerned here as you can

11  tell.  So you are excused until 9:30 tomorrow when we will

12  start with closing arguments.

13          Again, don't discuss the case among

14  yourselves or anyone else.  Don't go on the Internet now

15  that you have gotten some familiarity with some of the

16  issues that are in this case or any newspaper articles or

17  TV or anything that may have appeared.  Again, you have my

18  extreme thanks.  You have been terrific.  See you tomorrow.

19          Court remains in session.

20          (Whereupon, the proceedings were held in

21          open court out of the presence of the Jury.)

22          THE COURT:  Now that the evidence is closed,

23  Mr. Musitano, do you have any motions on behalf of

24  Defendant Nicastro?

25          MR. MUSITANO:  I do, Judge.  Thank you.

26          Pursuant to Rule 29, Judge, of the Federal

1  Motions

2  Rules of Criminal Procedure, I would renew my previous

3  motion in light of the fact that the government, we would

4  respectfully submit, has failed to satisfy its burden to

5  present sufficient evidence on each and every element of

6  the offense charged in Count 1.

7                Mr. Nicastro is only facing the conspiracy

8  count, Judge.  And again, relying on Your Honor's

9  preliminary instructions, it is our position that

10 government has failed to present any evidence to indicate

11 that Mr. Nicastro intentionally joined any type of

12 conspiracy.  We heard Mr. Mazza this afternoon indicate

13 that he did not join any conspiracy, which also would have

14 involved Mr. Nicastro.

15                And then secondly, Judge, there is no

16 evidence that he willfully and knowingly joined any type of

17 conspiracy to violate any of the statutes alleged in

18 Count 1.  For those reasons, Judge, we would respectfully

19 ask that the count be dismissed.

20                THE COURT:  Mr. Gleason.

21                MR. GLEASON:  Yes, Your Honor.  We obviously

22 incorporate by reference the arguments we made yesterday.

23 Today's defense case put on by the Mazza defendants doesn't

24 change our position.

25                Obviously the standard is that Your Honor

26 must view the evidence in the light most favorable to the

1  Motions

2  United States.  That is a heavy burden that Mr. Nicastro

3  cannot make here, for all the same reasons, Your Honor,

4  between his Grand Jury transcript, the agreement to

5  exchange money for dumping, the admissions by Mr. Nicastro,

6  the testimony of Chris Nicastro.  There is more than enough

7  proof to tie Mr. Nicastro in to the conspiracy, and it

8  should be submitted to the jury.

9           THE COURT:  Defendant Nicastro's renewed

10  motion under Rule 29 is denied.  You may have an exception.

11           Mr. Brickfield, motions on behalf of

12  Defendant Dominick Mazza with regards to Counts 1, 2, and

13  7?

14           MR. BRICKFIELD:  Yes, Your Honor.  We renew

15  our motions to dismiss Counts 1, 2, and 7 as to Mr. Mazza.

16  I incorporate our comments yesterday at the close of the

17  government's case.  I also incorporate Mr. Zeller's

18  comments, and we move on all possible grounds available.

19           In particular, we renew our application with

20  regard to Count 1.  There is simply no evidence in our view

21  that a rational trier of fact could find that Mr. Mazza

22  entered a conspiracy.

23           Again, this is a conspiracy case.  It

24  requires proof beyond a reasonable doubt that Mr. Mazza

25  knowingly and voluntarily entered an unlawful conspiracy to

26  do something unlawful.  And the evidence that we presented

1   Motions

2   today on his behalf, including his testimony, indicates

3   that he had no such intent.  There was no intent to join

4   anything.

5              As a matter of fact, the evidence was

6   overwhelming that anything that may have occurred was

7   inadvertent.  There was no evidence established that

8   Mr. Mazza was told or knew of the illegality of Frankfort.

9   He testified that he relied in good faith on the letter

10  that he had received almost a year prior to this date.

11  Based on all of the evidence in that regard, I would move

12  to dismiss at this time Count 1.

13             With regard to Count 2, I would incorporate

14  the argument I made prior with the additional fact that's

15  now been brought before Your Honor, is that it turns out

16  that South Plainfield deposited almost sixty thousand tons

17  of material on the Frankfort site on the morning of

18  October 11, 2006 -- sixty thousand pounds, I am sorry, Your

19  Honor, twenty-nine tons.

20             And this raised very substantial issues as

21  to whether any rational trier of fact could possibly find

22  sufficient evidence to conclude that the material sent --

23  that the material tested that day by the government --

24  tested thirty days later, I am sorry, by the government

25  would rationally belong to Dominick Mazza and Mazza and

26  Sons.

1    Motions

2                And finally, with regard to the false

3    statement, I renew my application in that regard.

4    Mr. Mazza testified that he was not aware, either in 2006

5    or 2008, of the existence of that particular lab report and

6    that rejection.  And there was no evidence submitted during

7    our case, and there was no rebuttal challenging that.  So

8    for those reasons I would move to dismiss those three

9    counts.

10                THE COURT:  Thank you.

11                Mr. Gleason.

12                MR. GLEASON:  With respect to Count 1, Your

13   Honor, again, the United States needs to prove that

14   Mr. Mazza entered into an agreement as set forth in the

15   United States versus Hopkins and the United States versus

16   Laughlin case.  The standard is different.  Need only be in

17   agreement to carry out the acts that led to the crime.  We

18   submitted a proposed jury instruction to that effect.

19                Here, the evidence is substantial insofar as

20   Mr. Mazza's own copy of the permit, Defense Exhibit 3A,

21   specifically names all the -- many of the conspirators to

22   the crime.  He is now relying on exemption that he received

23   in the State of New Jersey.

24                However, Defense Exhibit 3A is substantially

25   different insofar as it even advises Mr. Mazza the acts

26   that he carried out were, in fact, illegal in their own way

1   Motions

2   insofar as he dumped contaminated materials for money.

3   Something that the very regulations that were in his

4   possession on which he relied, specified.

5                    Likewise, there is evidence of payments,

6   shipments, etcetera.  It is more than enough evidence to go

7   to the jury.  It should go to the jury with respect to

8   Count 1.

9                    With respect to the Superfund Count,

10  Mr. Brickfield is now raising claims that there was --

11  South Plainfield deposited material at the Frankfort site

12  the same day.  That nonetheless does nothing to refute the

13  evidence of eyewitnesses who saw Mazza loads shortly after

14  they were dumped, the fact that truckers driving trucks

15  attributable to the Mazza loads provided manifests, O and D

16  forms, that I guess are more accurately waste origin

17  manifests, specifying that the materials they had

18  deposited, came from Mazza and Sons, Inc..

19                   And likewise, the defendants' own witness,

20  Jack Gall, testified that material that was dumped, the

21  transite, could be rendered friable as a consequence of

22  being pulverized as it was here.  Therefore, again, it is

23  an issue the jury needs to sort out.

24                   And then last, the false statement.  Nothing

25  Mr. Mazza said today refutes the fact there had been

26  testimony from no less than two law enforcement officers

1   Motions

2   that he gave a false statement to that was material to

3   their investigation.  Accordingly, the United States

4   submits that the Rule 29 motion on behalf of Dominick Mazza

5   should be denied.

6             THE COURT:  Issues of fact remain for the

7   jury, and the Defendant Dominick Mazza's motion for

8   dismissal pursuant to Rule 29 with regards to Counts 1, 2,

9   and 7 is denied.  And you may have an exception.

10             Mr. Zeller, for the record, any motions on

11  behalf of the defendant, Mazza and Sons, Inc.?

12             MR. ZELLER:  Yes, Your Honor.  I incorporate

13  the arguments that were made yesterday at the end of the

14  government's case by Mr. Brickfield and myself.  I renew

15  those today, and based on all possible grounds, including

16  what was said yesterday, which I am going to say now, we

17  would move to dismiss all the counts against Mazza and

18  Sons, Inc..

19             With respect to the conspiracy count, we are

20  much farther along today than we were yesterday in that we

21  have unrebutted testimony by Mr. Mazza that there was no

22  agreement entered into with Mr. Deck or any other persons,

23  Your Honor.  There is a showing that the agreement has to

24  be entered into knowingly, willfully, and voluntarily.  And

25  there is no -- not a scintilla of evidence that that was

26  done.

1    Motions

2              With respect to the CERCLA count, the only

3    testimony we have in this trial concerning shredded,

4    grinded, and pulverized debris and materials comes from

5    Mr. Mazza and from the testimony of the South Plainfield

6    site manager during cross-examination by the government.

7              Mr. Derx, during his testimony, testified

8    that the materials which he alleges contained friable

9    asbestos were all shredded, grinded, and pulverized.

10   Dominick Mazza set forth and was not cross-examined on it,

11   that his process that was used for the materials that came

12   up here did not have any grinders, did not have any

13   shredders, did not have any pulverizers.

14             However, upon cross-examination by

15   Mr. Donner, the witness from South Plainfield said that

16   everything they brought in was ground up, was pulverized.

17   It was shredded, and they sent sixty thousand pounds of

18   that up to Frankfort, New York.

19             Your Honor, even giving the government every

20   benefit of the doubt and every inference in its favor, the

21   criteria is still can a rationale jury find Mazza and Sons,

22   Inc., guilty beyond a reasonable doubt for the CERCLA

23   violation?

24             Next, with respect to the obstruction of

25   justice, Your Honor, we are just where we are yesterday

26   afternoon.  There is still no proof.  The government has

1    Motions

2    had the opportunity of rebuttal witnesses.  They haven't

3    put them on.  There is no evidence at all that manifests

4    Number 1106 and 1109 ever made their way back to Mazza and

5    Sons after they were taken by one of the two DEC officers

6    from the drivers or by Mr. DeSimone from the drivers to

7    Mr. Carr.

8                    We know where they are, Your Honor.  They

9    are in the possession of either the New York State

10   Department of Environmental Conservation or they are in the

11   possession of the United States Attorney's office.  They

12   were never in the possession of Mazza and Sons, and they

13   did not have them to turn over.  If they did not have them

14   to turn over, there could have been no intentional act or

15   knowing act on their part to keep them from the government

16   in response to a Grand Jury subpoena.  And there could be

17   no intent to do any act in connection with 1106 or 1109 to

18   impede any investigation or any other governmental act.

19                    Your Honor, with respect to the false

20   statement that we are charged with, there is a two-fold

21   requirement that the person who uttered those statements,

22   and that would be Dominick Mazza, purposely and

23   voluntarily, as opposed to mistakenly or accidentally, made

24   a statement to the government which was untrue.  That has

25   not been met, Your Honor.

26                    And he is not charged with any -- the only

1    Motions

2    false statement he is charged with has to do with whether

3    there were shipments rejected by Delaware after September

4    of 2006.  And with respect to that statement that he is

5    charged with, there is no proof that he knowingly,

6    voluntarily, purposely, willfully made a statement to the

7    government that he knew was untrue at the time that he

8    uttered it.

9              And for that reason and, again, for all

10   possible grounds, I would ask on behalf of Mazza and Sons,

11   Inc., that the count charging the company with conspiracy,

12   charging the company with a violation of CERCLA, charging

13   the company with obstruction of justice, and charging the

14   company with false statement be dismissed.

15             THE COURT:  Thank you, Mr. Zeller.

16             Mr. Gleason.

17             MR. GLEASON:  Thank you, Your Honor.  I will

18   not address the conspiracy or false statements again.  I

19   have done so adequately both yesterday and with respect to

20   Mr. Brickfield's motion today.  I will address the new

21   arguments that are being put forth by Mr. Zeller with

22   respect to Count 2, the Superfund count.

23             I believe I heard him say there was no

24   evidence of any pulverizing or any shredding.  That

25   conveniently forgets the testimony of Brandi McPeak of the

26   New York Environmental Protection that says that she

1    Motions

2    routinely saw materials being shredded in nothing else but

3    the horizontal shredder.

4              Likewise, with respect to the Superfund

5    count, that in the presence of Mr. White from South

6    Plainfield, there were five piles on site.  One was

7    attributed to Eagle.  Three were attributed to Mazza.  That

8    leaves another pile.  That's something for the jury to work

9    out.  It is simply a triable issue of fact.  It is

10   something the jury needs to sort itself out with.

11             And then lastly, Your Honor, the obstruction

12   of justice count.  Today we learned, among other things,

13   that Mazza and Sons, Inc., uses origin and destination

14   forms and waste origin manifests for billing purposes, for

15   tracking purposes.  We further learned that Mr. Mazza was

16   familiar with those forms, that he had the forms on

17   occasion -- not on occasion, but that he routinely saw the

18   forms in the office or the scale house, I believe is what

19   he said.

20             Likewise, Your Honor, certainly the other

21   acts of concealment.  We saw today through his testimony

22   that depending on which agency to which he was reporting,

23   he would report different things whenever it was

24   convenient.  So, for instance, Monmouth County got one

25   document.  The State of New Jersey got another purporting

26   to be the same thing.  There is a scale ticket and an

1   Motions

2   origin and destination form, both listing Frankfort and

3   Tannery Road.  One is for internal billing purposes.  The

4   other is for a governmental agency and doesn't list the

5   same load going to Tannery Road.  And that is an act of

6   obstruction.

7                Moreover, if you look at the original

8   evidence in the binders, those waste origin manifests,

9   there is four copies.  There is a white cover with three

10  carbon copies behind it, white, pink, yellow, and green.

11  We accounted for two that were seized by law enforcement.

12  Dave Clarke had one, who is not the room.  And then

13  likewise, Officer Schoonover had another one.  That's two

14  that passed through the Mazza facility.  That's enough

15  evidence for a rational trier of fact to render a verdict,

16  Your Honor.

17                THE COURT:  Thank you, Mr. Gleason.

18                MR. GLEASON:  Thank you, Your Honor.

19                THE COURT:  The motion on behalf of the

20  defendant, Mazza and Sons, Inc., is denied, issues of fact

21  for the jury.  However, counts -- it is denied with regard

22  to Counts 1, 2, and 7.

23                I will continue to reserve with regards to

24  Count 5 as Mazza and Sons, Inc., is the only defendant in

25  that count.

26                Anything further, counsel?  If not, we will

1404

1    Motions
2    meet in about ten minutes for a charge conference.
3                    Mr. Minor.
4                    COURT CLERK:  Court stands for a brief
5    recess.
6                    (Whereupon, a brief recess was taken.)
7
8                    (Whereupon, the proceedings held on
9                    October 11, 2012, were ended at 5:10 p.m..)
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

1                     C E R T I F I C A T E

2

3          I, NANCY L. FREDDOSO, RPR, Official Court Reporter

4    in and for the United States District Court, Northern

5    District of New York, do hereby certify that I recorded

6    stenographically the foregoing at the time and place

7    mentioned; that I caused the same to be transcribed; and

8    that the foregoing is a true and correct transcript thereof

9    to the best of my knowledge, ability, and belief.

10

11         I further certify that I am not an attorney or

12   counsel of any parties, not a relative or employee of any

13   attorney or counsel connected with the action, nor

14   financially interested in the action.

15

16

17                     S/NANCY L. FREDDOSO, RPR

18              Official United States Court Reporter

19

20

21   My Commission expires March 30, 2015

22

23

24

25

26